DANIEL B. ASIMOW (SBN 165661)
daniel.asimow@arnoldporter.com
MATTHEW H. FINE (SBN 300808)
matthew.fine@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, California  94111
Telephone:      415.471.3100
Facsimile:      415.471.3400

JOHN A. FREEDMAN*
john.freedman@arnoldporter.com
GAELA K. GEHRING FLORES*
gaela.gehringflores@arnoldporter.com
DAVID J. WEINER (CA SBN 219753)
david.weiner@arnoldporter.com
DANA O. CAMPOS*
dana.campos@arnoldporter.com
MATEO MORRIS*
mateo.morris@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743
Telephone:      202.942.5000
Facsimile:      202.942.5999

LINDA EVARTS*
levarts@refugeerights.org
KATHRYN C. MEYER*
kmeyer@refugeerights.org
MARIKO HIROSE*
mhirose@refugeerights.org
INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
40 Rector Street, 9th Floor
New York, NY  10006
Telephone:      646.459.3057
Facsimile:      212.533.4598

PHILLIP A. GERACI*
phillip.geraci@arnoldporter.com
SUSAN S. HU*
susan.hu@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY  10019-9710
Telephone:      212.836.8000
Facsimile:      212.836.8689

*Attorneys for Plaintiffs*

**Pro Hac Vice* motion forthcoming

## UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.A.; J.A.; A.B.; R.C., on behalf of himself and as Guardian Ad Litem for J.C., a minor child; M.C.; D.D.; G.E., on behalf of himself and as Guardian Ad Litem for B.E., a minor child; J.F., on behalf of himself and as Guardian Ad Litem for H.F. and A.F., minor children, on behalf of themselves and on behalf of a class of all similarly situated individuals, and CASA,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION | Case No.<br><br>**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

SERVICES; U.S. DEPARTMENT OF STATE; KIRSTJEN NIELSEN, in her official capacity as Secretary of Homeland Security; MICHAEL R. POMPEO, in his official capacity as Secretary of State; L. FRANCIS CISSNA, in his official capacity as Director of U.S. Citizenship and Immigration Services; UNITED STATES OF AMERICA,

Defendants.

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.       This lawsuit challenges the Trump Administration's termination of the parole portion of the Central American Minors ("CAM") program—a program established in 2014 in response to the humanitarian crisis presented by thousands of unaccompanied minors fleeing danger in El Salvador, Guatemala, and Honduras and arriving at the Southern Border.  Over the years, the CAM Program enabled thousands of Central American parents lawfully residing in the United States to safely and legally bring their children to the United States as refugees or parolees through an orderly process in which eligibility determinations were made in the minors' home countries.

2.       This Administration's highly erratic and unexplained termination of the CAM Parole program, which began with secretly shutting down its operations immediately after inauguration and culminated with the mass rescission of conditional approval for parole status for nearly 3,000 children in August 2017, can only be understood as another one of this Administration's cruel and xenophobic policies against people it has publicly labeled "animals."

3.       The termination of the CAM Parole program pulled the rug out from under Plaintiffs and proposed class members—thousands of families who had spent years and thousands of dollars in reliance on the availability of this safe pathway to family reunification, and thousands of whom had attained conditional approval for parole status and believed they would imminently travel. Plaintiffs include U.S.-based parents and their children in Central America who completed every step of the application process, including paying for plane tickets to come to the United States. They include a teenage girl who was forced to drop out of high school a few months shy of her graduation because an MS-13 gang member was trying to forcibly "date" her and she feared being raped or killed.  They include a teenage boy who was beaten so badly by the MS-13 after he refused to join the gang that he needed emergency surgery and still has trouble walking and bathing himself. They include a teenage boy whose uncle was shot and killed by the MS-13 right outside the boy's home, and now the gang has repeatedly threatened to do the same to him.  They include Central American parents who have lived lawfully in the United States for decades, including in Northern California, are raising U.S. citizen children, have earned state professional licenses, and have spent years and sometimes decades at jobs in the U.S. as teacher's assistants, butchers, and mechanics.

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

4.      Meanwhile, the life-threatening conditions in the Central American countries that led to the creation of the CAM Program have not abated.  Honduras, El Salvador, and Guatemala— sometimes called "the Northern Triangle"—are among the countries with the highest child homicide rates in the world.  Just in the past month, a refugee "caravan," including children from these countries fleeing violence and seeking asylum, arrived at the Southern border of the United States.  The caravan was organized to raise awareness of the conditions in the Northern Triangle countries and to protect the migrants from the dangers they would otherwise face on the journey to the U.S. border—a journey that the CAM Program had made unnecessary for thousands of children.

5.      Having shut down the CAM Program's pathway to safety for Central Americans, the Trump Administration is now turning away Central Americans seeking to apply for asylum at ports of entry and prosecuting those who desperately attempt to enter the border illegally.  In short, President Trump has acted on his promise to get Central Americans out of the United States by trying to shut down every possible avenue for relief for people, often children, fleeing the humanitarian crisis in their home countries.

6.      When the CAM Parole program was terminated, the Trump Administration told many of the named Plaintiffs and the proposed class members that they could request review of the denial of their refugee applications under the CAM Program.  But with only a few months left to this fiscal year, many who have requested review of their denials have not yet received a response— raising the prospect and the fear that this final opportunity to safely reach the United States will also be foreclosed.

7.      The termination of the CAM Parole program violated, among other things, the Administrative Procedure Act and the Fifth Amendment guarantees of Due Process and Equal Protection.  Individual Plaintiffs, along with CASA, request that the Court set aside the termination of the CAM Parole program and the mass rescission of conditional approval for parole, and thereby restore the important, historic American tradition of protecting and aiding the most vulnerable people fleeing perilous circumstances abroad.

//

//

**PARTIES**

8.      Plaintiffs S.A. and J.A. are a family.  Plaintiff S.A. is a national of El Salvador and a lawful resident of Concord, California, where she has worked for the same small business for 12 years.  S.A. was eligible to apply for the CAM Program and in August 2015 submitted an application on behalf of her biological daughter, J.A., who was then 20 years old, and her daughter's baby son, who was then a year old.  J.A. and her son are both nationals and residents of El Salvador.  They were conditionally approved for parole and progressed through every stage of the CAM application process, including paying thousands of dollars for plane tickets.  They never traveled, however, because their conditional approval for parole was rescinded when the CAM Parole program was publicly terminated in August 2017.  Soon after learning that her family would not be able to reunite with her, S.A. was diagnosed with breast cancer and has gone through surgery and multiple rounds of radiation without the support and assistance of her daughter.

9.      Plaintiff A.B. is a national of El Salvador and a lawful resident of San Jose, California, where he is raising a U.S. citizen child and has been working as a cashier at a local Safeway for 15 years.  A.B. was eligible to apply for the CAM Program and in November 2015 submitted an application on behalf of his biological son who is a national and resident of El Salvador and who was 20 years old at the time of application.  After President Trump's inauguration, A.B.'s son's application process ground to a halt, and a year later, he was denied refugee status and not considered for parole status because the CAM Parole program had been terminated.  A.B.'s son has been repeatedly threatened and robbed by members of the MS-13, which is very active in his community.

10.      Plaintiffs R.C., M.C., and J.C. are a family.  Plaintiff R.C. is a national of El Salvador and a lawful resident of Oxnard, California, where he is raising three U.S. citizen children and has been working for the same company as a celery packer for ten years.  R.C. was eligible to apply for the CAM Program and in May 2016 submitted applications on behalf of his three biological children who are nationals and residents of El Salvador, including M.C., who at the time was 17 years old, and J.C., who at the time was 14 years old.  The three children were conditionally approved for parole and had progressed through every stage of the CAM application process,

-3-

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

including receiving a travel date of February 20 after R.C. paid thousands of dollars for their plane tickets.  They never traveled, however, because their conditional approval for parole was rescinded when the CAM Parole program was publicly terminated.  Around the time that the family learned about the rescission of their conditional approval, J.C. was brutally attacked by MS-13 gang members and required emergency surgery.  M.C. has been aggressively pursued by an MS-13 gang member demanding that she "date" him, and she has been forced to drop out of school.

11.     Plaintiff D.D. is a national of El Salvador and a lawful resident of Hyattsville, Maryland, where she is raising a U.S. citizen son and has been working as a licensed teacher's assistant at a day care.  She was eligible to apply for the CAM Program and in May 2015 submitted an application on behalf of her biological daughter who is a national and resident of El Salvador and who at the time was 15 years old.  D.D.'s daughter was conditionally approved for parole and progressed through every stage of the CAM application process, including receiving a travel date of February 13, 2017 after D.D. paid more than a thousand dollars for her plane ticket.  D.D.'s daughter never traveled, however, because her conditional approval for parole was revoked when the CAM Parole program was publicly terminated.  D.D.'s daughter remains in El Salvador and remains at risk.

12.     Plaintiffs G.E. and B.E. are a family.  G.E. is a national of El Salvador and a lawful resident of Montgomery Village, Maryland, where he is raising two U.S. citizen children and has been working as a mechanic at the same car shop for more than six years.  He was eligible to apply for the CAM Program and in December 2015 submitted an application on behalf of his biological son who is a national and resident of El Salvador and who at the time was 15 years old.  B.E. was conditionally approved for parole and was waiting for his medical exam—which G.E. paid for—to be scheduled when President Trump was inaugurated and processing on his application stopped.  B.E.'s conditional approval for parole was revoked when the CAM Parole program was publicly terminated.  B.E. has been repeatedly threatened by MS-13 gang members and leaves his home as little as possible.

13.     Plaintiffs J.F., H.F., and A.F. are a family.  J.F. is a national of Honduras and a lawful resident of Jamaica, New York where he has been working at the same restaurant for two

decades.  He was eligible to apply for the CAM Program and in June 2016 submitted an application on behalf of his biological daughters, H.F. and A.F., and his wife—their biological mother—who are nationals and residents of Honduras.  At the time of application, H.F. was 4 years old, and A.F. was an infant.  After President Trump was inaugurated, J.F.'s family waited almost a year for a decision on their applications, and then they were deemed ineligible for refugee resettlement and not considered for parole.  While waiting for the decision on their applications, MS-13 gang members threatened J.F.'s wife at her job.

14.     Plaintiff CASA is a nonprofit advocacy and assistance organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, and Pennsylvania.  Founded in 1985, CASA is the largest membership-based immigrant rights organization in the mid-Atlantic region, with more than 90,000 members.  Its mission is to create a more just society by building power and improving the quality of life in low-income immigrant communities.  Seeing in the CAM Program the opportunity to advance its mission by lawfully uniting its members with their children living in the Northern Triangle, CASA helped 235 of its members to apply for CAM.  Through its investment of significant staff and volunteer time and resources to assist its members, CASA developed substantial expertise in the CAM Program.  CASA continued to expend staff and volunteer time assisting members with the CAM Program following the unannounced shutdown of the CAM Program.  Following the announcement of the termination of the program and mass rescission of conditional approval for parole, CASA had to expend further staff and volunteer time and resources counseling CAM applicants on their options, and had to redirect staff and resources elsewhere.  At least two of CASA's members submitted CAM applications for their family members, the family members were conditionally approved for parole, and their parole was rescinded by Defendants.  Moreover, CASA suffered reputational harm due to the CAM termination and mass rescission; CAM applicants frustrated that their time and money was wasted directed their anger at CASA.  As a result of the termination of the CAM Program and the mass rescission of conditional approval for parole status, CASA suffered in a way sufficient to establish organizational standing and associational standing on behalf of its members.

15.     Defendant Donald J. Trump is the President of the United States.  He is sued in his

1   official capacity.

2        16.    Defendant United States Department of Homeland Security ("DHS") is a

3   Department of the Executive Branch of the United States Government and is an agency within the

4   meaning of 5 U.S.C. § 552(f)(l).  Along with Defendant United States Department of State

5   ("DOS"), it is jointly responsible for administering the CAM Program.

6        17.    Defendant United States Citizenship and Immigration Services ("USCIS") is an

7   Operational and Support Component agency within DHS.  USCIS is the DHS sub-agency

8   responsible for making determinations on CAM applications and for processing cases in the CAM

9   Program generally and in the CAM Parole program.

10       18.    Defendant DOS is a Department of the Executive Branch of the United States

11  Government and is an agency within the meaning of 5 U.S.C. § 552(f)(l).  Along with Defendant

12  DHS, it is jointly responsible for administering the CAM Program.  DOS has contracted the

13  International Organization for Migration ("IOM") to run the United States Government's

14  Resettlement Support Center in Latin America, which is responsible for processing CAM

15  applications.

16       19.    Defendant Kirstjen Nielsen is the Secretary of Homeland Security.  She oversees

17  DHS.  She is sued in her official capacity.

18       20.    Defendant Michael R. Pompeo is the Secretary of State.  He oversees DOS.  He is

19  sued in his official capacity.

20       21.    Defendant L. Francis Cissna is the Acting Director of U.S. Citizenship and

21  Immigration Services.  He oversees USCIS.  He is sued in his official capacity.

22       22.    Defendant United States of America includes all government agencies and

23  departments responsible for the termination of the CAM Parole program and mass rescission of

24  conditional approval for parole.

25               **JURISDICTION AND VENUE**

26       23.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises

27  under the Constitution and laws of the United States.  This Court has additional remedial authority

28  under the Declaratory Judgment Act, *see* 28 U.S.C. § 2201 *et seq.*, and the Administrative

Procedure Act, 5 U.S.C. §§ 701-706.

24.     The federal government has waived its sovereign immunity and permitted judicial review of agency action pursuant to 5 U.S.C. § 702. *See Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989).  Sovereign immunity does not bar claims against federal officials which seek only to prevent future violations of federal law, rather than monetary relief. *See, e.g.*, *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 697-99 & nn. 18-19 (1949); *Shields v. Utah Idaho Cent. R. Co.*, 305 U.S. 177, 183-84 (1938).

25.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(e)(1) because at least one plaintiff resides in this judicial district and each defendant is an agency of the United States or an officer of the United States sued in his or her official capacity.

**INTRADISTRICT ASSIGNMENT**

26.     A substantial part of the events or omissions which give rise to the claim occurred in each of Santa Clara County and Contra Costa County, given that at least one of the plaintiffs resides in each such county.  Accordingly, for purposes of Civil Local Rule 3-2(c) and 3-5(b), this case may be assigned to the San Francisco, Oakland, or San Jose Division.

**FACTUAL ALLEGATIONS**

**THE CAM PROGRAM WAS CREATED**
**TO RESPOND TO A HUMANITARIAN CRISIS FOR CHILDREN**

27.     DOS and DHS proposed and implemented the CAM Program in 2014 as part of a multi-prong effort to respond to a humanitarian crisis for children in the Americas and an unprecedented rise in the number of unaccompanied Central American children crossing the border between Mexico and the United States.

28.     Beginning in 2012, the number of unaccompanied children from the Northern Triangle countries attempting to cross the southern U.S. border rose exponentially.  In the years preceding 2012, approximately 4,000 unaccompanied children from Northern Triangle countries were apprehended at the southern border each year.  In 2012, that number more than doubled, and by 2014, more than 50,000 unaccompanied children from the Northern Triangle countries were stopped at the border.  Many of these children were younger than 12.  A significant portion of these

children were seeking to reunify with parents or other family members present in the United States.

29.     The overland journey from Central America through Mexico and into the United States is extremely dangerous.  While some immigrant smugglers, or "coyotes," deliver migrants to their destinations, others rob, exploit, enslave, or abandon them.  Among the reported stories:

a)  Many migrants of all ages have been raped or sexually assaulted, extorted, or abducted by drug cartels and other criminal groups.  Indeed, the likelihood of rape is so high that girls and women obtain prophylactic shots of the contraceptive Depo-Provera before setting out to avoid pregnancy.

b)  Children are regularly crushed to death or lose limbs under the tracks of "La Bestia," the freight train that runs south to north through Mexico, where many migrants hitch a ride.

c)  In 2017, at least 85 migrants died on the journey through Mexico—many of them hit or run over while attempting to hitch a ride on trains and trucks, and another 415 migrants drowned or died of exposure while attempting to cross the Southern Border.

30.     As then-DHS Secretary Jeh Johnson acknowledged on July 10, 2014—two months before DHS, DOS, and the Department of Justice ("DOJ") proposed the CAM Program—"the long journey for a child, in the custody of a criminal smuggling organization, from Central America to the United States is dangerous. Many of the children are exploited, abused and hurt."

31.     Despite the dangers of the journey, unaccompanied children from the Northern Triangle countries risked their lives on this passage in record numbers because of increased violence in their home countries, particularly targeting young people.  In these countries, gangs like the MS-13 and Barrio 18—gangs originally formed in the United States that extended to Central America after their members were deported—have created a confederation of semi-autonomous mini-states within each country that coordinate more closely than the national governments.  Attacks on buses, abductions and gang rapes, and shootings in broad daylight occur daily in many neighborhoods in the Northern Triangle, along with omnipresent efforts to recruit even small children as gang members or sex slaves.  Children are executed by gang members for refusing to join a gang or to have sex or to pay extortion money, or simply because they are in the wrong place at the wrong time.  In one city in Honduras, morgue technicians have regularly received corpses of children under 10, and sometimes as young as two.  In 2014, the collapse of a "truce" agreement between the MS-13 and the government of El Salvador led to an explosion in violence in that

country.  The Northern Triangle countries have some of the highest homicide rates in the world for children under 18 years old, with a 2014 United Nations ("UN") report identifying El Salvador and Guatemala as the two countries with the highest child homicide rates.

32.     Nearly 60 percent of Central American children interviewed in U.S. custody by the U.N. High Commissioner for Refugees in 2013 said they had suffered, been threatened, or feared serious harm—of the sort that would make them likely eligible for international protection as refugees.  By comparison, only 13 percent of children identified such concerns in similar interviews in 2006.

33.     Then-DHS Secretary Jeh C. Johnson determined that the situation at the border was a "humanitarian crisis."  In the face of this crisis, the United States struggled to meet its legal obligations to the children streaming across its border.  Federal law—passed with overwhelming bipartisan support in the last months of the George W. Bush Administration—requires the government to provide unaccompanied Central American children with an opportunity for an immigration hearing prior to removal.  8 U.S.C. § 1232(a)(5)(D).  It also requires the Department of Health and Human Services to place the child "in the least restrictive setting that is in the best interest of the child" and to attempt to reunite children with their family members in the United States.  *See* 8 U.S.C. § 1232(c)(2)(A).  The U.S. government opened emergency shelters on an Air Force base in order to house the young arrivals, and later enlisted the Federal Emergency Management Agency to manage the relief effort.

34.     To address the refugee crisis, the U.S. government proceeded along multiple tracks to attempt to reduce the number of dangerous border crossings by unaccompanied Central American children.  Among other things, it:

    a)   Worked with Mexico to secure its borders.

    b)   Put in place a public messaging campaign in Central America emphasizing the dangers of the journey through Mexico to the United States.

    c)   Delivered $750 million in aid to the Northern Triangle countries.

35.     And the U.S. government implemented the Central American Minors program to allow children from the Northern Triangle countries to apply for refugee resettlement or parole

status while still in their home countries, in order to be reunified with their parents lawfully residing in the United States.

### THE CAM PROGRAM SUCCEEDED IN PROVIDING CHILDREN A LEGAL PATHWAY TO SAFETY AND FAMILY REUNIFICATION

36.     The Obama Administration first proposed the CAM Program on September 18, 2014 as part of the President's annual recommendations to Congress on the proposed refugee admissions for the following fiscal year, pursuant to 8 U.S.C. §§ 1157(d) & (e).  The annual Presidential Determination on Refugee Admissions incorporated these recommendations, identifying people in El Salvador, Honduras, and Guatemala as being of special humanitarian concern.  From the start, the Administration trumpeted the CAM Program as a "safe, legal, and orderly alternative to the dangerous journey that some children are taking to reach the United States."[1]

37.     Like many prior programs created by the U.S. government to address humanitarian crises in particular countries, CAM was structured as a dual refugee/parole program.  Under the CAM Refugee program, Central American parents lawfully living in the United States could apply for their minor children and qualifying family members in the Northern Triangle countries to be considered for refugee resettlement while still in their home countries.  This type of in-country refugee processing takes place only after DOS, in consultation with DHS/USCIS, NGOs, UNHCR, and other experts, identifies a specific group as being in need of resettlement.  The children and qualifying family members were accepted as refugees if they could establish that they qualified for resettlement under U.S. law—by demonstrating a well-founded fear of persecution based on religion, race, nationality, political opinion, or membership in a particular group.

38.     But significantly for CAM participants, even if the children and qualifying family members did not meet the specific eligibility criteria for refugee admission, they were automatically

---

[1]U.S. Dep't of State, *Central American Minors (CAM) Program*, http://web.archive.org/web/20170806132845/https://www.state.gov/j/prm/ra/cam/index.htm (version from Aug. 6, 2017 accessed via Wayback); U.S. Dep't of State, *Expansion of the Central American Minors (CAM) Program*, Fact Sheet (Jan. 20, 2017), *available at* https://www.state.gov/j/prm/releases/factsheets/2017/266363.htm (last accessed on Apr. 17, 2018); USCIS, *In-Country Refugee/Parole Processing for Minors in Honduras, El Salvador and Guatemala (Central American Minors – CAM)*, http://web.archive.org/web/20170806014805/https://www.uscis.gov/CAM (version from August 6, 2017 accessed via Wayback).

considered on a case-by-case basis for parole pursuant to 8 U.S.C. § 1182(d)(5) under the CAM

Parole program.  USCIS promised participants that if they were eligible for the CAM Program but

deemed ineligible for refugee status, they "*will* then be considered on a case-by-case basis for

parole into the United States" and that "[a] separate application for this parole process is *not*

*required* if the individual already has access to the CAM program" (emphasis added).[2]  Children

and qualifying family members were eligible for parole to join their family members in the United

States if USCIS determined that: (1) they were "at risk of harm"; (2) they "clear[ed] all background

vetting"; (3) USCIS had received "no serious derogatory information"; and (4) a third party had

committed to financially support them in the United States.[3]

39.    The CAM Program continued a long tradition by the United States of adopting

mixed refugee/parole programs to address specific regional crises.[4]  For example, for more than

two decades beginning in 1988, the United States considered applicants fleeing religious

persecution in the former Soviet Union for refugee resettlement, and if they did not qualify, for

extended parole status in the United States.[5]  Similarly, for a decade beginning in 1989, Vietnamese

nationals who were denied refugee status were considered for admission to the United States as

parolees under a program established to provide a safe and legal alternative to leaving Vietnam by

boat.[6]

40.    To qualify as a CAM applicant, a U.S.-based parent had to be at least 18 years old

and be lawfully present in the United States as a Legal Permanent Resident, Temporary Protected

Status recipient, Parolee, or Deferred Action Recipient.  In order to be eligible, Parolees and

Deferred Action Recipients had to have held that status for at least one year at the time of

---

[2] USCIS, *Central American Minors (CAM) Refugee/Parole Program: Information for Conditionally Approved Applicants* (from June 2, 2017—accessed using Wayback).
[3] U.S. Dep't of State, *In-Country Refugee/Parole Program for Minors in El Salvador, Guatemala, and Honduras with Parents Lawfully Present in the United States*, 2009-2017 Archive for the U.S. Dep't of State (Nov. 14, 2014), https://2009-2017.state.gov/j/prm/releases/factsheets/2014/234067.htm, *supra* n.1.
[4] USCIS Ombudsman, *Recommendation on the Central American Minors (CAM) Refugee/Parole Program* (Dec. 21, 2016) at 13-14, *available at* https://www.dhs.gov/sites/default/files/publications/Citizenship%20and%20Immigration%20Service%20Ombudsman.pdf.
[5] *Id.* at 14.
[6] GAO, *Report to the Chairman, Subcommittee on Immigration, Refugees, and International Law, Committee on the Judiciary, House of Representatives: Refugee Program – The Orderly Departure Program From Vietnam* (Apr. 1990), *available at* http://archive.gao.gov/t2pbat10/141353.pdf.

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

application.

41.     To qualify as a CAM beneficiary, a child had to be under 21 years old; unmarried; a national of El Salvador, Guatemala, or Honduras, and the genetic, step- or legally adopted- child of a qualifying parent.  The CAM Program also allowed close family members of qualifying children to participate as beneficiaries under certain conditions.  In mid-2016, the Obama Administration expanded the program to allow additional immediate family members of the children to apply as "derivative" beneficiaries.

42.     The lengthy CAM application process had many components, which included the extensive screening and vetting process accompanying the U.S. Refugee Admissions Program.  The CAM application process included the following steps:

(a)     **First**, a qualifying parent filed an application with assistance of a "resettlement agency" in the United States—a non-profit organization that is partially funded by the government to welcome refugees into the country. The parent had to provide proof of identity, proof of legal status in the United States, and a passport size photo of the child.  Defendant DOS reviewed applications and forwarded eligible applications to the International Organization for Migration ("IOM")—the inter-governmental organization DOS contracts to run its Resettlement Support Center[7] in Latin America.

(b)     **Second**, IOM contacted the child in the Northern Triangle country and invited them to a pre-screening interview in the capital city of their country. There, IOM interviewed the child, took their biometric data and background information, prepared their case file, and initiated security checks—following the standards for processing applicants to the U.S. Refugee Admissions Program.

(c)     **Third**, USCIS verified the relationship between the parent and child and

---

[7] DOS funds and manages nine Resettlement Support Centers around the world to process refugee applications for U.S. resettlement consideration.  DOS contracts international and nongovernmental organizations, such as IOM, to operate these centers.

1    performed security checks.  Part of the verification required the parent and

2    child to take DNA tests at the parent's expense.   After the parent paid for

3    testing, the child had to travel to the capital city of their country to provide

4    the test sample.  Where the testing confirmed the relationship, parents were

5    subsequently reimbursed for the DNA tests.  USCIS's Refugee Access

6    Verification Unit also verified the relationship using documentary evidence.

7    If the relationship was not confirmed, USCIS rejected the application.

8    (d)    **Fourth**, after confirming the relationship, USCIS scheduled and conducted

9    an interview with the child in the capital city.  The U.S. Embassy in

10    Honduras told CAM applicants that after they submitted an application,

11    "DHS officials will interview eligible family members to determine who will

12    be admitted as a refugee or offered parole to the U.S."[8]

13    (e)    **Fifth**, after confirming security check results and DNA test results, USCIS

14    made a determination on the refugee application.  CAM beneficiaries either

15    received a decision letter or a phone call informing them of the

16    determination.  For those who received letters, if refugee status was denied,

17    the letter checked one of several boxes to explain the reason for the denial

18    and outlined the process to request a review of the refugee determination.

19    The letter then indicated whether the child was eligible for the CAM Parole

20    program.  Where USCIS had approved the child for the CAM Parole

21    program, the letter said:

22    You have been conditionally approved for parole into
       the United States.  Final approval is conditioned upon
23    successful completion of any remaining clearances that
       are required in the screening process.  These clearances
24    include medical examination by a U.S. approved panel
       physician,   completion   of   security   clearance
25    procedures,  and  verification  of  family  relationships.
       Please  see  attached  information  sheet  for  next  steps
26

27    ---
       [8] U.S. Embassy in Honduras, *In-Country Refugee/Parole Processing for Minors in Honduras, El Salvador, and*
28    *Guatemala (Central American Minors – CAM): Frequently Asked Questions*, *available at* https://hn.usembassy.gov/wp-
       content/uploads/sites/109/2016/07/visas_campprogram-faqs.pdf (last viewed on April 18, 2018).

that must be completed for you to be paroled into the United States.

(f)  **Sixth**, after a child was conditionally approved for parole, they had to undergo a medical examination at the parent's expense.  USCIS told applicants that if they were conditionally approved, "IOM will contact your relative in the United States to collect payment for the medical exam," and "[a]fter receiving payment, IOM will contact you to arrange your exam."[9] The child was required to travel to the capital city for the exam.[10]  If the child cleared the exam, they would receive a medical clearance valid for six months.[11]

(g)  **Seventh**, USCIS told applicants that "[i]f the medical exam results clear, IOM will contact your relatives in the United States to arrange for your flight," and "[a]fter IOM receives payment for your travel, they will submit the travel itinerary to USCIS."[12]

(h)  **Eighth**, USCIS told applicants that after receiving the travel itinerary from IOM, USCIS "will . . . [p]erform final security checks, [e]nsure the medical exam results remain valid until date of travel, and [v]erify that your relative still has a qualifying legal presence in the United States."[13]  USCIS further represented to applicants that "[i]f we decide that you have met all requirements for parole under this program, we *will* issue Form I-512L, Authorization for Parole of an Alien Into the United States," and "IOM *will* give you this document and your plane ticket the day you fly to the United States."[14]  Under DHS regulations, "when parole is authorized," "the alien

---

[9] USCIS, *Central American Minors (CAM) Refugee/Parole Program: Information for Conditionally Approved Applicants* (from June 2, 2017—accessed using Wayback), *supra* n.2.
[10] *Id.*
[11] *Id.*  If the child suffered from Class "A" TB, Class "B" 1 TB, or HIV, the medical exam was valid for only three months.  *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*shall* be issued an appropriate document authorizing travel" to the United States by DHS.  8 C.F.R. § 212.5(f) (emphasis added).

(i) **Finally**, the child traveled to a U.S. port of entry, where DHS Customs and Border Protection could authorize parole for a period of up to two years and would issue Form I-94, Arrival/Departure Record.  USCIS told applicants that "[w]e will consider CAM parole extension requests for the duration of the program."[15]

43.    The CAM application process was designed to proceed quickly, particularly after an applicant was conditionally approved for parole.  The required medical examination results were valid for only six months (and only three months for beneficiaries with certain medical diagnoses),[16] and needed to be repeated—and paid for again—if they expired.  Similarly, security checks were valid for only a limited period of time.  Accordingly, USCIS advised applicants "to book the travel [to the United States] within the time period suggested by IOM to avoid additional processing delays and costs if the medical exam or security checks expire."[17]  Anticipating that conditionally approved parolee cases would be quickly processed, USCIS also advised applicants that if they needed additional time to pay for medical exams or flights to the United States to notify IOM or USCIS so their cases could be administratively closed and reopened when they had collected the necessary funds.[18]

44.    The CAM Program began accepting applications on December 1, 2014, and during the approximately two and a half years it was in operation, more than 13,000 people applied.  Because of the program, at least 1,627 individuals were able to resettle in the United States as refugees and 1,465 people were able to reunite with their families in the United States as parolees.

//

//

//

---

[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## THE TRUMP ADMINISTRATION, MOTIVATED BY RACIAL ANIMUS TOWARD LATINOS, SHUT DOWN THE CAM PAROLE PROGRAM

### *The Trump Administration Campaigned on Anti-Latino Animus.*

45.     President Trump launched his 2016 presidential campaign with the xenophobic claim that Latin America was "not sending their best" people to the United States: "They're sending people that have lots of problems, and they're bringing those problems with us.  They're bringing drugs.  They're bringing crime.  They're rapists. . . . It's coming from all over . . . Latin America."

46.     Candidate Trump continued to categorize all Latinos as gang members, killers, and rapists in promising to deport and exclude Latinos from the country, at one point even suggesting that violence against Latinos was justified for people who "love this country and want this country to be great again."  For example:

    a) On August 21, 2015, when asked to respond to a report that two of his supporters had urinated on a sleeping Latino man and then beat him with a metal pole, Trump responded, "people who are following me are passionate.  They love this country and want this country to be great again.  They are passionate."

    b) In May 2016, then-candidate Trump referred to anti-Trump protestors who carried the Mexican flag on Twitter as "criminals" and "thugs."

    c) In June 2016, then-candidate Trump stated that Judge Gonzalo Curiel could not be fair in presiding over a lawsuit because he was "Hispanic."

    d) In October 2016, during a presidential debate, then-candidate Trump responded to a question about immigration by referring to Latino immigrants as "bad hombres" and promising that "we're going to get them out."

    e) In December 2016, Trump referred to an article about a recent crime wave on Long Island and said "They come from Central America. They're tougher than any people you've ever met.... They're killing and raping everybody out there. They're illegal. And they are finished."

### *The Trump Administration Shut Down the CAM Parole Program Immediately After Inauguration, Without Notifying the Public.*

47.     Within days of President Trump's inauguration, the Administration set to work to keep Central Americans from entering the United States, in part by shutting down the CAM Parole program.  But, the Trump Administration did so secretly, without informing the public or the CAM participants of what it was doing.

48.     For example, without any public announcement, the Administration stopped USCIS

-16-

interviews of CAM beneficiaries, thereby blocking all CAM applications at that stage from being processed.  Emails recently released in response to a Freedom of Information Act request show that within the first seven days of the Trump Presidency, USCIS cancelled more than 2,000 CAM interviews already scheduled to take place in January, February, and March 2017.   The interviews were cancelled in anticipation of an Executive Order suspending the U.S. Refugee Admissions Program—what would later become Executive Order 13,769, Protecting the Nation from Foreign Terrorist Entry into the United States ("EO-1").  Although EO-1 was immediately enjoined nationwide on February 3, 2017 by *Washington v. Trump*, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017), *aff'd*, 847 F.3d 1151 (9th Cir. 2017), USCIS did not reinstate the interviews; rather, USCIS confirmed on February 3, 2017 that all USCIS interviews in the Northern Triangle countries through the end of March 2017 were cancelled.

49.     The Trump Administration, without notifying the public, stopped issuing decisions post-interview to applicants who were likely candidates for parole.  For example, Plaintiff J.F.'s two young children, Plaintiffs H.F. and A.F., were interviewed in November 2016, but did not receive decisions on their applications for more than a year (when they were denied refugee resettlement and not considered for parole).

50.     With regard to children who prior to President Trump's inauguration had been conditionally approved for parole, the Trump Administration stopped scheduling the medical examinations that were required before conditionally approved parolees could travel to the United States.  Once again, the Administration did so secretly, without informing the public or the CAM participants of what it was doing.  And notwithstanding its secret shutdown of the CAM Program, the Trump Administration continued to solicit and accept funds from applicants, leading them to believe the program was still operational.

51.     For example, Plaintiff B.E. was conditionally approved for parole in November 2016, and on January 30, 2017, IOM contacted his father, Plaintiff G.E., requesting advance payment for B.E.'s medical exam by February 15, 2017.  G.E. paid for the exam before February 15, but B.E.'s medical exam was never scheduled.

52.     With respect to conditionally approved parolees who had cleared their medical

examinations, completed every step of the application process, and whose parents had paid for their plane tickets to come to the United States, the Trump Administration—again without notifying the public—blocked their travel.

53.     For example, days after President Trump's inauguration—on or about January 22, 2017—Plaintiff D.D., who had already paid for her daughter's plane ticket on or about December 8, 2016, sought information about when her daughter would fly to the United States.  An IOM employee told D.D. that IOM had received new orders and all the CAM cases were frozen for 120 days—the same length of suspension called for in EO-1 for refugee admissions—although her daughter's case was in the Parole program.  The IOM employee told D.D. that her daughter had been scheduled to fly to the United States on February 13, 2017, but that she could not travel at that time and had to wait.  Finally, the IOM employee said that none of the CAM cases could be processed because the new government had changed its position, and IOM had to wait for orders from the new Administration.  The employee told D.D. that IOM would call her in 120 days.  D.D. was never called by IOM again.

54.     Similarly, Plaintiff R.C. paid approximately $3,875 for his three children's plane tickets to the United States in January 2017.  R.C., who packs produce for a living, took a loan from friends and managed to send the money to IOM within three days as instructed.  IOM told his family that the children would travel on February 20, 2018 and would receive a follow up call with more information.  The children, including Plaintiffs M.C. and J.C., never received a call.

55.     Notwithstanding the secret shutdown of the program, the Trump Administration continued to solicit and accept payments for plane tickets from applicants, thus leading applicants to believe that the program was still operational.  For example, on February 1, 2017, Plaintiff S.A. received an email from IOM saying that it had received "the payment information for the Flight Reservation" for her daughter, Plaintiff J.A., and baby grandson, and she needed to send IOM over $2,500 "no later than FEB 25, 2017."  S.A. sent the funds within days, and IOM confirmed receipt on February 9, 2017.  IOM told S.A. that her daughter and grandson would be able to travel to the United States approximately two weeks after her payment was received, but they never received flight information and never traveled.  When J.A. called IOM for an update in approximately April

-18-

2017, she was told that all the CAM parole cases were frozen.

56.    Despite shutting down the CAM Parole program and stopping USCIS interviews of all CAM applicants in January 2017, Defendants failed to notify the public of what they were doing or to provide any explanation, much less a reasoned one, for why they were **shutting down** the program.  Instead, Defendants continued to publicly misrepresent—**for 7 months**—that the CAM Parole program was functioning normally and continued to solicit and accept payments from applicants for various steps of the program, including DNA testing and medical tests.

57.    Notably, even after the Administration secretly shut down the CAM Parole program, the USCIS program webpage for CAM applicants conditionally approved for parole, which discussed USCIS's and IOM's obligations vis-à-vis those applicants, remained active.  This website and another USCIS website specifically disclaimed any plan to terminate the CAM Parole program, saying "[c]urrently **there is no planned end date** for the CAM parole program,"[19] and "[t]here is **currently no filing deadline for this program**."[20]

58.    Similarly, following the secret shutdown of the CAM Parole program, the USCIS program webpage for conditionally approved CAM applicants continued to recommend that applicants not delay in paying for plane tickets—the single largest CAM-related expense—to avoid delayed processing:  "We encourage your relative to book the travel within the time period suggested by IOM to avoid additional processing delays and costs if the medical exam or security checks expire."[21]  USCIS estimated that the cost of a single plane ticket for a child or adult ranged from $1,110 to $1,401.[22]

59.    And following the secret shutdown of the CAM Parole program, a DOS webpage discussing the CAM Program expansion continued to represent that applications for newly-eligible derivative beneficiaries would be processed if they were filed before **September 30, 2017**:

> For a temporary period of time, the expansion of the CAM program will apply
> retroactively in certain cases.  A qualifying, lawfully present parent who filed a

---

[19] *Id.* (emphasis added).
[20] USCIS, *In-Country Refugee/Parole Processing for Minors in Honduras, El Salvador and Guatemala (Central American Minors – CAM)*, http://web.archive.org/web/20170806014805/https://www.uscis.gov/CAM (version from Aug. 6, 2017 accessed via Wayback).
[21] *Id.*
[22] *Id.*

CAM AOR from December 1, 2014, through November 30, 2016, and wishes to request access for expanded category relatives will need to file an amended DS-7699 prior to *September 30, 2017.* . . . An amended AOR form filed on or before this date *will be processed* regardless of where the qualifying child is in the process as long as the relationships of the expanded category relatives can be verified through DNA testing.[23]

60.     Moreover, for months following the secret shutdown of the CAM Parole program, in no fewer than five webpages controlled by USCIS, DOS, and the U.S. Embassies in El Salvador and Honduras, Defendants represented well into the summer of 2017 that the CAM Program continued to offer:

   a)  "a legal means of family reunification for qualified individuals,"[24]

   b)  "a safe, legal, and orderly alternative to the dangerous journey that some children are currently undertaking to the United States,"[25] and

   c)  "protect[ion for] Central Americans at risk by allowing lawfully present parents in the United States to request refugee status for their children in El Salvador, Honduras, and Guatemala via the U.S. Refugee Admissions Program."[26]

### The Trump Administration Waited Until August 2017 to Publicly Announce the Termination of CAM.

61.     President Trump and his Administration officials had ample opportunity to publicly acknowledge that they had shut down the CAM Parole program—and indeed they issued repeated announcements about the use of parole authority—but they specifically failed to mention any changes to the CAM Parole program.

---

[23] U.S. Dep't of State, *Expansion of the Central American Minors (CAM) Program*, Fact Sheet (Jan. 20, 2017), https://www.state.gov/j/prm/releases/factsheets/2017/266363.htm (emphasis added).  The U.S. Embassy in El Salvador has an identical and still-active webpage about the expansion of the CAM program.  U.S. Embassy in El Salvador, *Expansion of the Central American Minors (CAM) Program, available at* https://sv.usembassy.gov/expansion-central-american-minors-cam-program/ (last viewed on April 18, 2018).

[24] U.S. Embassy in Honduras, *In-Country Refugee/Parole Processing for Minors in Honduras, El Salvador, and Guatemala (Central American Minors – CAM): Frequently Asked Questions, available at* https://hn.usembassy.gov/wp-content/uploads/sites/109/2016/07/visas_camprogram-faqs.pdf (last viewed on April 18, 2018).

[25] USCIS, *In-Country Refugee/Parole Processing for Minors in Honduras, El Salvador and Guatemala (Central American Minors – CAM)*, http://web.archive.org/web/20170806014805/https://www.uscis.gov/CAM (version from August 6, 2017 accessed via Wayback); U.S. Embassy in El Salvador, *Expansion of the Central American Minors (CAM) Program, available at* https://sv.usembassy.gov/expansion-central-american-minors-cam-program/ (last viewed on April 18, 2018); U.S. Dep't of State, *Expansion of the Central American Minors (CAM) Program*, Fact Sheet (Jan. 20, 2017), *available at* https://www.state.gov/j/prm/releases/factsheets/2017/266363.htm.

[26] U.S. Dep't of State, *Expansion of the Central American Minors (CAM) Program*, Fact Sheet (Jan. 20, 2017), *available at* https://www.state.gov/j/prm/releases/factsheets/2017/266363.htm; U.S. Embassy in El Salvador, *Expansion of the Central American Minors (CAM) Program, available at* https://sv.usembassy.gov/expansion-central-american-minors-cam-program/ (last viewed on April 18, 2018).

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

62.     For example, President Trump issued Executive Order 13,767 ("the Parole EO"), 82 Fed. Reg. 8,793, on January 25, 2017, in which he ordered the Homeland Security Secretary to take "appropriate action" to ensure that his statutory parole authority was exercised "only on a case-by-case basis" and "only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole." The Parole EO made no mention of the CAM Program.

63.     Similarly, on February 20, 2017, then-Homeland Security Secretary John Kelly issued a memorandum purporting to implement the Parole EO, and said that in his judgment, statutory parole authority "should be exercised sparingly." Without any explanation, he asserted that "[t]he practice of granting parole to certain aliens in pre-designated categories in order to create immigration programs not established by Congress, has contributed to a border security crisis, undermined the integrity of the immigration laws and the parole process, and created an incentive for additional illegal immigration." He ordered the Director of USCIS to "ensure that . . . appropriate written policy guidance and training is provided to employees . . . so that such employees are familiar with the proper exercise of parole . . . and exercise such parole authority only on a case-by-case basis," pending the issuance of final regulations on the use of parole. Secretary Kelly omitted any mention of the CAM Program.

64.     Not until August 16, 2017 did Defendants finally publicly announce the termination of the CAM Parole program by publishing a notice in the Federal Register.  82 Fed. Reg. 38,926 (Aug. 16, 2017).

65.     In the August Federal Register notice, then-Acting Secretary of Homeland Security Elaine Duke announced that, effective immediately, USCIS was no longer considering or authorizing parole under the CAM Parole program.  In the same notice, DHS rescinded conditional approval for parole *en masse* for all CAM beneficiaries whom USCIS had granted this status but had not yet traveled to the United States.

66.     Notably, DHS's Federal Register notice did not provide any explanation for the termination of the CAM Parole program or for the mass rescission of conditional approval for parole.  Furthermore, the notice failed to acknowledge that in fact the program had been shut down without any explanation since January 2017.

67.     Nor did DHS's Federal Register notice claim that conditions in the Northern Triangle counties had improved from the conditions in 2014 that led to the establishment of the CAM Program.  Indeed, they have not, even according to the U.S. government.  For example:

a)  In March 2017, DOS issued a report on El Salvador's human rights practices.  This report described rampant human rights abuses throughout El Salvador that "stem[] from . . . widespread extortion and other crime," "widespread corruption," "weak rule of law, which contributed to high levels of impunity and government abuse, including unlawful killings by security forces," "widespread" violence against women and girls, and the commercial sexual exploitation of women and children.

b)  On January 10, 2018, DOS issued a Level Three travel advisory for El Salvador that warns travelers to "[r]econsider travel" to the country "due to crime."  The advisory states that "[v]iolent crime, such as murder, assault, rape, and armed robbery, is common," and that "[g]ang activity, such as extortion, violent street crime, and narcotics and arms trafficking, is widespread."

c)  According to DOS, nearly one out of every five persons in El Salvador has been a victim of violent crime.  Approximately ten women per day experience violence or sexual assault in El Salvador, and 7 of every 10 victims of sexual violence are under the age of 20.

d)  In a report published in August 2017, the U.N. World Food Program identified the violence in El Salvador as "a humanitarian emergency" that "has significantly impeded development" in the country.

e)  DOS's 2017 Human Rights Report for El Salvador stated that over 48,000 students dropped out of school in 2015 due to gang threats, crime, or forced displacement due to gang activity.  In 2017, the Internal Displacement Monitoring Centre estimated that nearly 220,000 people were forced to flee violence in El Salvador in 2016 alone.  The U.S. Conference of Catholic Bishops Delegation noted that the estimated number of displaced persons in El Salvador could be as high as 400,000.

f)  El Salvador has one of the world's highest homicide rates.  In 2017, the homicide rate was nearly twelve people per day.

g)  In January 2018, Human Rights Watch reported that Honduras continues to have the highest murder rate in the world.

h)  On January 10, 2018, DOS issued a Level 3 Travel Advisory for Honduras, noting that homicide and armed robbery are "common" and that "[v]iolent gang activity," including rape, violent street crime, and human trafficking, is "widespread."  The advisory further notes that "[l]ocal police and emergency services lack the resources to respond effectively to serious crime."

i)  DOS's 2017 Human Rights Report for Honduras identified widespread human rights violations including arbitrary killings and arrests, killings of journalists, and widespread corruption, as well as "murder, extortion, kidnapping, torture, human trafficking," and other forms of violence by "local and transnational gangs and narcotics traffickers."  It stated "that the judiciary was "subject to intimidation, corruption, politicization, and patronage," and that "organized criminal groups . . . exercised influence on the outcomes of some court proceedings."

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

j) Honduras has a femicide rate of 14.6 per 100,0000, and in 2016, 463 women were murdered in Honduras. Authorities only investigated 15 of those cases.

k) On January 10, 2018, DOS issued a Level 3 Travel Advisory for Guatemala, asking that U.S. citizens "[r]econsider travel" to the country. The Advisory noted that "sexual assault, carjacking, armed robbery, and murder" are "common" and that "gang activity," including "extortion, violent street crime, and narcotics trafficking, is widespread."

l) DOS's 2017 Human Rights Report for Guatemala says that government officials "frequently engaged in corrupt practices with impunity." The report cited major crimes committed with stunning flagrancy, including an MS-13 attack on a large public hospital that killed five civilians and freed a fellow gang member.

m) Violence against women remained at epidemic levels. DOS's 2017 report mentions that "[p]olice had minimal training or capacity to investigate sexual crimes or assist survivors of such crimes, and the government did not enforce the law effectively."

n) DOS's 2017 report mentions rampant abuse of children, including "children engaged in the worst forms of child labor." It reported that 683 minors had been violently killed in the country between January 2017 and August 2017. It also noted that in 2016, 41 girls at a government-run shelter for adolescents died after a fire started in the room where the shelter had locked them.

68. The Federal Register notice was silent about the grave risks to the life and safety of unaccompanied minors that motivated the original creation of the CAM Program. It did not suggest that those risks had abated or would be addressed by other approaches.

69. The August 16, 2017 Federal Register notice stated that the CAM Refugee program would be left in place, but the reprieve for the CAM Refugee program was short-lived. On November 8, 2017, DOS announced that it would stop accepting CAM applications the following day, and soon thereafter it announced that it would stop interviews in January 2018. Since January 31, 2018, children with pending CAM applications who had not been interviewed have been receiving communications denying their applications and advising them to seek assistance at child welfare agencies in their countries of origin. On information and belief, the Administration plans to deny the nearly 4,000 CAM applicants who were not interviewed by January 31, 2018.

70. After the Administration formally terminated the CAM Parole program, IOM told applicants whose conditional approval for parole was rescinded—all of whom had previously been deemed ineligible for refugee resettlement under the CAM Refugee program—that they could file a Request for Review ("RFR") of the denial of refugee status within 90 days of notice of the rescission.

-23-

71.     Many of the CAM applicants affected by the mass rescission relied upon Defendants' representations and filed RFRs, including Plaintiffs H.F., A.F., and B.E.

72.     Nonetheless, upon information and belief, while RFRs are often adjudicated within two to four months of filing, many CAM applicants who filed RFRs have not yet received decisions for RFRs filed in 2017 or early 2018.  Fiscal Year 2018 is drawing to a close, and the Fiscal Year 2019 Presidential Determination on refugee admissions may further limit refugee admissions from Central America or end in-country processing, and thereby prevent even people deemed eligible for refugee resettlement from entering the United States.

73.     The termination of the CAM Parole program—its secret termination, the mass rescission of conditional approval of parole status for nearly 3,000 people, and failure to consider parole eligibility for people already in the pipeline in August 2017—was unprecedented.  The United States has created or maintained many refugee/parole programs in the past, but it has never before secretly and abruptly terminated one in this fashion.  For example:

a)  When the Lautenberg parole program[27] was publicly terminated in 2011, USCIS gave applicants conditionally approved for parole who had not yet traveled 90 days to complete their processing and enter the United States.  The vast majority of parole applicants travelled to the United States before the deadline, and USCIS later extended the deadline to give another chance to those who missed the window.

b)  When the Vietnamese Public Interest Parole program was ended in 1999, applicants who were already conditionally approved for parole were allowed to travel to the United States after the termination.

c)  When a program considering Cuban medical professionals for parole ended in the early days of 2017, USCIS announced that it would process all pending applications and parolees would be given six months to submit applications on behalf of derivative family members.

74.     The termination of the CAM Program—specifically, shutting it down first before officially announcing its permanent termination—does, however, follow the Trump Administration's *modus operandi* in its various attempts to ban immigrants and refugees from this country.  For example, in the context of immigrant and non-immigrant visas, President Trump issued successive Executive Orders purporting to temporarily suspend Muslim travelers from six

---

[27] The Lautenberg Amendment, first enacted in 1990 and subsequently expanded, lowered the standard for proving refugee status for persecuted religious minorities in the former Soviet Union and later in other countries.

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   countries from entering the United States—allegedly, to enable a security review—before issuing an

2   order that permanently subjected nearly the same group of Muslim travelers to nearly an identical

3   ban.  *See* Exec. Order No. 13,769, 82 Fed. Reg. 8,977 (Feb. 1, 2017); Exec. Order No. 13,780, 82

4   Fed. Reg. 13,209; Presidential Proclamation 9,645 (Sept. 24, 2017).

5        75.     Similarly, in the refugee context, President Trump issued successive Executive

6   Orders purporting to temporarily suspend the U.S. Refugee Admissions Program—again, allegedly,

7   to enable successive security reviews.  *See* Exec. Order No. 13,769, 82 Fed. Reg. 8,977 (Feb. 1,

8   2017); Exec. Order No. 13,780, 82 Fed. Reg. 13,209.  On the day the second "temporary"

9   suspension was slated to end, the Trump Administration publicly purported to resume refugee

10  admissions, but the Secretary of Homeland Security, the Secretary of State, and the Director of

11  National Intelligence released a memorandum which further suspended admissions of all refugees

12  from nine Muslim-majority countries.  *See* Exec. Order No., 13,815, 82 Fed. Reg. 50,055, 50,057,

13  and its accompanying memorandum.  To this day, only a handful of refugees from those nine

14  Muslim-majority countries have been admitted to the United States this fiscal year.

### *The CAM Termination Is Part and Parcel of Trump Administration Policies Motivated by Racial Animus Against Latinos.*

17       76.     This unprecedented, unexplained, and unsupported termination of the CAM Parole

18  program can only be understood as one of this Administration's many policies fueled by anti-Latino

19  animus.  For example, since coming to office, the Administration has announced the termination of

20  Temporary Protected Status ("TPS") for Salvadorans, Nicaraguans, and Hondurans, many of whom

21  had lived in the United States for decades.  The Administration forged ahead with these TPS

22  terminations in deliberate disregard of the advice of senior career diplomats with regional expertise

23  to the contrary.

24       77.     Moreover, recently disclosed USCIS emails further call into question whether the

25  Administration's decision to end these and other TPS programs were made in good faith and

26  whether the stated reasons for TPS terminations were pretextual.  The emails demonstrate that

27  Administration officials sought negative details about Haitian TPS holders before terminating TPS

28  for Haiti—despite the fact that such details were irrelevant to the Administration's purported reason

for termination: that there was no longer any humanitarian need for the program.

78.     Nearly 200,000 Salvadorans, 60,000 Hondurans, and 5,000 Nicaraguans will lose legal status in the United States as a result.  The TPS terminations have been challenged as discriminatory and based on unconstitutional animus.  *See Ramos v. Nielsen*, 3:18-cv-01554, Class Action Compl. (N.D. Cal. filed Mar. 12, 2018); *Centro Presente v. Trump*, 1:18-cv-10340, First Amended Compl. (D. Mass. filed May, 9, 2018); *CASA de Maryland v. Trump*, 8:18-cv-00845, Compl. (D. Md. filed Mar. 23, 2018).

79.     Similarly, the Trump Administration has ended other programs and reversed policies affecting unaccompanied minors, primarily from El Salvador, Guatemala, and Honduras, in an effort to facilitate their deportation.  Within days of his inauguration, President Trump ordered federal officials to take policy actions relating to the treatment of unaccompanied minors from Central America, and in response, the DOJ issued memoranda making it easier to strip unaccompanied minors of their legal rights and protections.  DOJ has also removed guidelines—in place since the George W. Bush Administration—on child-sensitive questioning techniques, and declined to renew funding for a program providing legal services to 7,000 unaccompanied minors.

80.     The Trump Administration has also embraced a widely criticized policy of separating migrant parents from their children by prosecuting any adult who illegally crosses the border.  Administration officials say the goal is to discourage Central American families from traveling to the border and applying for asylum—indeed, the very goal that the CAM Program was designed to, and did, address.  The separation policy has been challenged as unconstitutional and unlawful, and a federal judge recently denied the government's motion to dismiss a case involving such a challenge, finding that the alleged behavior shocks the conscience and violates the migrant parents' and children's constitutional right to family integrity.  *Ms. L. v. U.S. Immig.t and Customs Enforcement*, 3:18-cv-00428, Order on Motion to Dismiss (S.D. Cal. June 6, 2018).

81.     And most notoriously, the Trump Administration illegally terminated the Deferred Action for Childhood Arrivals ("DACA") program through which approximately one million immigrants who had illegally come to the United States as children applied for and received deferred action allowing them to legally work, study, and drive in this country.  The majority of the

people affected by the termination are Latino, and in response to legal challenges, three courts have issued nationwide injunctions of the termination. *NAACP v. Trump*, 1:17-cv-02325-JDB (D.C. Cir. Apr. 24, 2018); *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1026 (N.D. Cal. 2018); *Batalla Vidal v. Nielsen*, 279 F. Supp. 401, 437–38 (E.D.N.Y. 2018).  One court held that plaintiffs were likely to succeed on their constitutional claim that the DACA termination was the result of animus toward Latinos. *Batalla Vidal*, 279 F. Supp. at 437–38.

82.     Even as the Trump Administration has been accused of promoting and implementing these and other anti-Latino policies motivated by racial animus, President Trump has persisted in labeling all Latinos as gang members and drug traffickers and calling Central Americans as a group "true animals" and "bad people."  For example:

a)  On January 25, 2017, shortly after signing executive orders calling for immediate construction of a wall along the southern U.S. border and withholding federal funds from "sanctuary" cities, President Trump condemned the "unprecedented surge" of migrants from Central America for eroding safety in the United States, claiming that these two orders "will save thousands of lives."

b)  On January 27, 2017, newly-inaugurated President Trump and Mexico's President Peña Nieto discussed President Trump's proposal for a border wall over the phone. During that transcribed conversation, President Trump once again referred to Mexicans as "tough hombres."

c)  On February 3, 2017, during a visit to the Customs and Border Protection training center, President Trump said "You know they're bad. They're pouring in from El Salvador, Guatemala, Honduras, Mexico, all over. They're just pouring into our country!"

d)  In February 2017, President Trump said "What has been allowed to come into our country, when you see gang violence that you've read about like never before, and all of the things—much of that is people that are here illegally . . . They're rough and they're tough . . . So we're getting them out."

e)  On June 21, 2017, President Trump implied that thousands of immigrants are members of the Central American gang MS-13.  He said "These are true animals. We are moving them out of the country by the thousands, by the thousands."

f)  Similarly, on June 28, 2017, President Trump suggested that the MS-13 gang had taken over swaths of U.S. territory, and said: "They are bad people. And we've gotten many of them out already. . .  We're actually liberating towns, if you can believe that we have to do that in the United States of America.  But we're doing it, and we're doing it fast."

g)  On August 25, 2017, President Trump pardoned former Maricopa County Sheriff Joe Arpaio, who was to be sentenced for criminal contempt for failing to comply with a federal judge's order to stop racially profiling Latinos.  Before issuing the pardon, President Trump asked rhetorically, "Was Sheriff Joe convicted for doing his job?"

After issuing the pardon, President Trump sent a tweet calling Mr. Arpaio "an American patriot."

h)  On September 5, 2017, in conjunction with the Administration's announcement of the termination of the DACA program, President Trump issued a statement decrying "the massive surge of unaccompanied minors from Central America including, in some cases, young people who would become members of violent gangs throughout our country, such as MS-13."

i)  On January 11, 2018, President Trump infamously referred to El Salvador as a "shithole country" during a meeting with lawmakers about immigration, asking "Why are we having all these people from shithole countries come here?" He then suggested that the United States should bring more people from countries such as Norway, which has an overwhelmingly white population.

j)  In February 2018, President Trump claimed that immigrants from El Salvador, Guatemala, Honduras, and Mexico are "just pouring into our country . . . . These countries are not our friends, you know. We think they're our friends, and we send them massive aid . . . and they're pouring drugs into our country and they're laughing at us"—returning to his common refrain that Central Americans are somehow gaming the U.S. immigration system.

k)  In May 2018, President Trump said of people crossing the Mexican border into the United States: "You wouldn't believe how bad these people are. These aren't people. These are animals."

**THE CAM PAROLE PROGRAM TERMINATION AND MASS RESCISSION HAVE BEEN DEVASTATING AND ARE CONTINUING TO HARM PARENTS AND THEIR CHILDREN SEEKING TO REUNITE IN THE UNITED STATES AWAY FROM DANGER**

83.     The CAM Parole program termination and mass rescission devastated thousands of families in the United States and the Northern Triangle countries. The termination meant that thousands of children and family members who had applied for CAM in reliance on the possibility of parole under that program—including nearly 3,000 children and family members who had been conditionally approved for parole and who relied on Defendants' representation that if they met all the requirements for parole under the CAM Program, they would travel to the United States—were deprived of the opportunity to reunite with their loved ones in the safety of the United States.

84.     Moreover, the families who had applied for CAM prior to its termination had reasonably relied on Defendants' representations about the availability of the CAM Parole program in applying for CAM in the first place and in proceeding with their applications during the first seven months of President Trump's Administration, even though the Administration had secretly shut down the program. During that time, Defendants continued to publicly promise parents that

their children, including children who had been denied refugee status but had been conditionally approved for parole, had a legal pathway to the United States, and Defendants continued to solicit and accept parents' money to process the applications.  Defendants' misrepresentations led families to continue to expend significant financial resources and to put their lives in danger in order to pursue the false promise of parole.

85.    The CAM application process required applicant parents to pay a significant amount of money, particularly for individuals who often must support themselves, their families in the United States, *and* their families living in danger in Central America.  Parents had to pay approximately $400 per parent-child pair for DNA tests, which was required to be reimbursed if the tests confirmed a biological relationship.

86.    After a child was conditionally approved for parole, parents had to pay approximately $100 for their required medical exam, and sometimes additional money for a follow-up exam.  Then, parents had to pay approximately $1,400 for each child's plane ticket to the United States.  The Trump Administration continued to solicit and accept these fees from January to August 15, 2017, even after they secretly shut down the CAM Parole program.

87.    Parents whose children had already completed their medical exam, such as Plaintiffs D.D., R.C., S.A., and G.E., were not reimbursed when their children's conditional approval for parole was revoked *en masse*.

88.    Moreover, even when parents were eventually reimbursed the thousands of dollars they paid for their children's plane tickets, they incurred additional expenses that were not reimbursed and suffered hardships that could not be remedied.  For example, Plaintiff R.C. had to take out loans from friends in order to pay about $4,000 for his three children's plane tickets within the three-day deadline IOM gave him, and he was not reimbursed the $200 interest he paid.  Plaintiff S.A. was not able to travel to El Salvador to visit her family because she used her limited income to pay approximately $2,500 for her daughter and grandson's plane tickets to the United States and didn't receive a refund until nine months later.

89.    In addition to these costs specifically required by the CAM Program, parents and children by necessity incurred other application-related costs.  Each step of the application

process—prescreening, DNA testing, USCIS interviews, medical examinations, and dropping off and receiving required documentation—took place in San Salvador, Tegucigalpa, or Guatemala City.  Many of the children, including Plaintiffs A.F., H.F., M.C., J.C., B.E., and J.A., lived hours outside of their respective capital cities and repeatedly had to travel long distances for each step of the process.  Because road travel in the Northern Triangle countries is extremely unsafe and public transportation is especially dangerous—gangs routinely attack buses, rob or abduct passengers, and murder bus drivers (driving a bus in Guatemala has been characterized as the most dangerous job on the planet)—Plaintiff children regularly drove in private cars to and from their CAM appointments.  Plaintiff parents thus had to pay for gasoline, tolls, and food for the trip, and frequently had to reimburse the family member or friend who drove the child for a day's lost wages.  Plaintiffs R.C., S.A., D.D., J.F., G.E., and A.B. sent their children one hundred dollars or more for each of their long trips to and from capital cities for their CAM appointments.

90. And, even private transportation did not fully mitigate the risk of being stopped on the highway by gangs, particularly when driving in the dark.  Plaintiff J.C., for example, worried about being stopped or harassed on the road every time he and his siblings traveled to San Salvador for their CAM appointments.  Nevertheless, the CAM families continued to take these risks and incur these costs because they reasonably relied on Defendants' representations that the program was still operating in the first seven months of the Trump Administration.

91. Moreover, Plaintiff parents—particularly those whose children had been conditionally approved for parole and expected their children to travel to the United States imminently—incurred significant expenses in preparing their homes and buying clothes, furniture, and luggage in anticipation of the promised arrival of their children.  For example, Plaintiff R.C. spent more than $2,000 to buy new furniture and clothes for his three children after he paid for their plane tickets and believed they would arrive at his California home within weeks.

92. The U.S. Government was well aware of the financial burden and safety risks CAM families faced in proceeding with their CAM applications.  The USCIS Ombudsman stated in a December 2016 report that the CAM Program imposed "significant financial hardships" on the families of applicants.  She noted that some families "require[d] extended time to gather the funds

necessary to pay DNA testing costs or, in the case of parolees, to cover the costs of travel to the United States," and that the upfront cost for DNA testing in particular was "prohibitive for some families." Defendants, specifically DOS, have recognized the danger associated with travel to capital cities in El Salvador, Honduras, and Guatemala, identifying each as a "critical-threat location."

**Plaintiff family S.A. and J.A.**

93. Twenty-three year old Plaintiff J.A. remains in El Salvador with her four-year-old son. She is harassed daily by gang members who congregate outside her house. They threaten to kidnap her, demand that she "date" them, and extort her. J.A. remains at risk, and at one point in 2017, she became so fearful when a gang member aggressively demanded to "date" her that she temporarily fled with her son to San Salvador for their safety.

94. J.A. and her son were conditionally approved for parole, and had progressed through every step of the process. S.A. had purchased plane tickets for her daughter and grandson, and they expected to travel to the United States two weeks later. To reach this stage of the process, J.A. had to make approximately eight trips to San Salvador, a four-hour drive each way from where she lives, often with her baby son in tow. Then, inexplicably, processing of her and her son's applications ground to a halt. After about eight months of waiting desperately for news, the family learned that J.A. and her son's conditional approval for parole had been rescinded and they would not travel to the United States.

95. S.A. and J.A. lost the opportunity to reunite in the United States—and S.A. to protect her daughter from the dangers she faces in El Salvador. S.A. has not lived with her daughter since she was just a baby—when S.A. fled the violence of El Salvador's civil war and an abusive ex-husband. S.A. is deeply aware of all the events, big and small, in her daughter's life that she has missed and had been filled with hope at the possibility of sharing their lives together.

96. Soon after her family members' conditional approval for parole was rescinded, S.A. was diagnosed with breast cancer. S.A. missed the opportunity to have her daughter care for her during her recovery from surgery and her chemotherapy.

97. S.A. lost the money she spent on her daughter's and grandson's applications and

associated expenses, including $196 and $137 she spent on two medical exams, $250 she spent on suitcases and clothing, and approximately $800 total for her daughter's trips to San Salvador for CAM appointments.

**Plaintiff A.B.**

98.     Plaintiff A.B. worries every day about the safety of his 23-year-old son who lives in a neighborhood in El Salvador where the MS-13 is very active.  The MS-13 killed A.B.'s nephew in the community several years ago.  MS-13 members have robbed A.B.'s son multiple times and violently attacked a bus he was traveling in, injuring some of the passengers.  Recently, the MS-13 murdered a young man and his family in the son's community.

99.     A.B.'s son, a university graduate with a degree in computer systems, has struggled to find work in El Salvador, and recently felt compelled to take the only job he could find—collecting interest on loans—which requires him to travel to dangerous neighborhoods in his community. A.B. tried to convince not to take the job, but recognizes that his son has little choice, given that coming to the United States is no longer a possibility.

100.     A.B. filed a CAM application for his son in 2015, and his son had completed the initial steps of the CAM process.  He was waiting for USCIS to schedule an interview with him when processing of his application inexplicably ground to a halt.  About a year later in January 2018, he was finally interviewed.  Weeks later, he was denied refugee status and not considered for parole—even though he had applied to the CAM Program more than a year and a half before the parole program was publicly terminated, and his life is in grave danger.  A.B.'s son submitted an RFR in approximately March 2018, but has not received a decision to date.

101.     The CAM Parole program termination deprived A.B. of the opportunity to reunite with his son, his first child.  A.B. has not been able to live with his son since he left El Salvador when his son was a baby, but he has stayed in close touch with him, and was deeply looking forward to having a life together in the United States.

102.     In addition to the program fees, A.B. spent approximately $100 for each of four trips his son had to make to San Salvador for CAM-related appointments.

//

**Plaintiff family R.C., M.C., and J.C.**

103.     Plaintiffs M.C. and J.C. remain in El Salvador and are at grave risk.  In Fall 2017, while playing soccer outside, J.C. was beaten by MS-13 members to the point where he lost consciousness and required emergency surgery.  He now requires a cane to walk and he struggles to bathe himself.  He is terrified to leave his house, and he dropped out of school to minimize the time he must spend outside.

104.     M.C.  has been stalked by a known gang member and rapist in her community and became so afraid that she dropped out of school just a few months short of graduation.  She would have been the first person in her family to graduate from high school.  She, too, has become a prisoner in her own home.

105.     R.C. fears for the safety of M.C., J.C., and his younger son.  He submitted CAM applications on behalf of all three children, and they were conditionally approved for parole and completed every step of processing, including payment for plane tickets.  The siblings were so far along in the CAM parole process that they had packed all of their belongings, M.C.'s friends threw her a goodbye party, and the children were waiting for IOM to contact them with confirmation details for their flight to the United States.  The rescission of the children's conditional approval for parole and the lost opportunity to live together in the United States was very upsetting for R.C., M.C., and J.C., as well as the rest of their family.

106.     R.C. spent thousands of dollars on his children's CAM applications and associated expenses, relying on Defendants' representations about the program. R.C. is an agricultural worker who works long days packing celery, and it was no small feat for him to pay these expenses, while also supporting his three children in the United States and his family in El Salvador.   Each time R.C.'s children traveled to San Salvador in connection with their CAM application—a total of six trips—R.C. sent them approximately $300 in order to hire a private driver and reimburse their aunt for chaperoning them, as well as pay for gas and food.  He also spent $450 on their medical examinations, and sent them $280 to help them buy suitcases for their trip.  Finally, R.C. spent $1,200 to prepare his home for their arrival by purchasing beds and blankets, and spent a further $1,000 to purchase clothing and shoes for his children to use on arrival.

107.    After IOM gave R.C. a three-day deadline to pay $3,875 for his children's flights to the United States, he had to take out a loan from friends, with interest, to pay the fee on time.  Even though R.C.'s children never traveled to the United States, IOM did not reimburse him for almost a year.

**Plaintiff D.D.**

108.    Plaintiff D.D. and her eight-year-old U.S. citizen son were heartbroken when D.D.'s daughter's conditional approval for parole was rescinded after the family had completed every step of the application process.  D.D. has not lived with her daughter since her daughter was a baby.  The family had hoped to celebrate Christmas together for the first time, and D.D. had prepared a room for her daughter and bought winter clothes for her.  D.D. also planned to buy a puppy for her daughter and son to take care of together.  After learning that his older sister would not be coming to United States through CAM, D.D.'s young son cried for days.

109.    D.D. had struggled to pay for all the costs associated with the CAM Program on her teacher's aide salary, but did so happily—in reliance on the opportunity to reunite with her daughter.  Each of her daughter's approximately six CAM appointments were in San Salvador— about a three-hour drive from D.D.'s daughter's home—and each time, D.D. sent her daughter $100 to cover the cost of gas, food, and to repay her sister for taking the whole day off work to drive her daughter back and forth.

110.    D.D. paid additional fees in connection with the CAM Program: $1,551 for her daughter's flight to the United States; $100 for the required medical examination; and $800 for DNA testing (which was later reimbursed).  D.D. had to take out a loan in order to pay for her daughter's flight by IOM's quick deadline, and while she was ultimately reimbursed for the flight about a year after paying for it, she had to pay interest on the loan.

**Plaintiff family G.E. and B.E.**

111.    Seventeen-year-old Plaintiff B.E. continues to live in the house in El Salvador where he heard the gun shots that killed his uncle.  MS-13 gang members murdered B.E.'s uncle in 2014, and his grandfather testified against them at the trial for their crime.  Ever since, the gang has sought to make the family, and particularly B.E., pay.  MS-13 members have repeatedly pursued

-34-

B.E., harassed him, and threatened to kill him.  Terrified to leave the house, B.E. has become essentially a prisoner in his own home, and avoids leaving without an adult by his side.

112.    Plaintiff G.E. lives in fear that his son will be attacked or killed by the MS-13.  He is particularly fearful because his brother's killers will be released from prison in a year.

113.    G.E. struggled to pay the fees and expenses associated with his son's CAM application.  G.E. sent his son approximately $100 each time he had to travel to San Salvador for a CAM appointment—a journey B.E. made approximately six times.  This money paid for the cost of a private driver, gasoline, and food.  It was also intended to reimburse the lost wages of B.E.'s grandfather who accompanied him on his trips.  G.E. paid approximately $223 for his son's medical exam, which was never scheduled.  IOM finally refunded this fee more than a year after G.E. paid it.  G.E. also spent approximately $500 to purchase a new bed for his son, among other costs to prepare his home for his son's expected arrival.

114.    After B.E.'s conditional approval for parole was rescinded, B.E. filed an RFR.  To date, he has not received a decision.

**Plaintiff family J.F., H.F. and A.F.**

115.    Plaintiff J.F. felt desperate after processing of the CAM applications for his young daughters, H.F. and A.F., and his wife inexplicably stopped for the first eight months of 2017.  Then, soon after his family was interviewed in Fall 2017, they were denied refugee status and not considered for parole.  After being filled with hope at the prospect of being reunited with his family, J.F. now feels afraid and uncertain about his future because he believes that President Trump is trying to harm Central Americans like them.   He has lived and worked in the United States for two decades and has never had an opportunity to share a home with his wife and daughters.

116.    J.F.'s eight-year-old daughter, H.F., does not understand why her family cannot join her father in the United States.  She became very angry after their CAM applications were denied and blames her father for their situation.

117.    H.F., A.F., and their mother remain in Honduras, where J.F.'s wife has been threatened by MS-13 gang members at the school where she works as a kindergarten teacher.  J.F.'s wife knows of other female heads of household in her area who have been raped and killed, and she

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

fears for her safety and the safety of her daughters

118.    J.F. lost money in connection with his family's CAM applications.  Each time H.F., A.F., and their mother traveled to Tegucigalpa in connection with CAM—a nearly four-hour trip that required them to leave their house around 3:00 AM—J.F. sent them $200 to cover the costs of the trip, including tolls, gas, and food.

**CLASS ACTION ALLEGATIONS**

119.    Plaintiffs D.D., J.F., H.F., A.F., R.C., M.C., J.C., G.E., B.E., S.A., J.A., and A.B. bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) and (b)(2), on behalf of themselves and all other similarly situated persons who applied for the CAM Program as applicants or as beneficiaries prior to August 16, 2017, who were denied refugee status under the CAM Refugee program, and who were denied parole under the CAM Parole program as a result of its termination.  This class includes but is not limited to all CAM applicants and beneficiaries who were conditionally approved for parole prior to August 16, 2017, and whose conditional approval was rescinded *en masse* by the August 16, 2017 Federal Register notice.

120.    The Plaintiff Class is so numerous that joinder is impracticable.  On information and belief, the Plaintiff Class consists of over 5,000 putative class members.  Conditional approval for parole was mass rescinded for approximately 2,714 in-country family members.  An estimated several hundred in-country family members were beneficiaries of CAM applications filed before August 16, 2017 and were interviewed by USCIS, but were never considered for the CAM Parole program.  Each of these beneficiaries has a family member lawfully present in the United States who applied for CAM on his or her behalf.

121.    The claims of the Plaintiff Class members share common issues of law, including but not limited to:

a)    Whether the termination of the CAM Parole program violated the Administrative Procedure Act ("APA") and the Fifth Amendment to the U.S. Constitution;

b)    Whether the mass rescission of conditional approval for parole violated the APA and the Fifth Amendment to the U.S. Constitution;

c)    Whether the decision in January 2017 to secretly terminate the CAM Program violated the APA and the Fifth Amendment to the U.S. Constitution;

d) Whether the Defendants' failure to issue travel documentation to individuals who had received parole violated the APA and the Fifth Amendment to the U.S. Constitution; and

e) Whether the Defendants' ongoing acceptance of payments from CAM applicants following the secret shutdown of the CAM Parole program requires that they be equitably estopped from benefitting from their affirmative misconduct.

122. The claims of the Plaintiff Class members share common issues of fact, including but not limited to:

a) Whether the Defendants secretly shut down the CAM Parole program in January 2017;

b) Whether, following the secret shutdown of the CAM Parole program, the Defendants continued to accept payments from CAM applicants;

c) Whether, following the secret shutdown of the CAM Parole program, the Defendants continued to represent to the public that the CAM Parole program was still operational;

d) Whether, following the secret shutdown of the CAM Parole program, the Defendants failed to issue travel documentation to individuals who had received parole;

e) Whether, at the time the CAM Parole program was formally terminated, the Defendants rescinded *en masse* all conditional approval for parole without providing individualized process;

f) Whether the Defendants provided a legally sufficient justification for terminating the CAM Parole program; and

g) Whether the Defendants' termination of the CAM Parole program was motivated by animus against persons of a certain race or national origin.

123. The claims or defenses of the named Plaintiffs are typical of the claims or defenses of the members of the Plaintiff Class.

124. The named Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class. The named Plaintiffs have no interest that is now or may be potentially antagonistic to the interests of the Plaintiff Class.

125. The attorneys representing the named Plaintiffs include experienced attorneys who are considered able practitioners in federal civil litigation, including civil rights litigation. These attorneys should be appointed as class counsel.

126. Defendants have acted, have threatened to act, and will act on grounds generally

-37-

applicable to the Plaintiff Class, thereby making final injunctive and declaratory relief appropriate to the class as a whole.  The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(2).

127.    Prosecution of separate actions by individual members of the Plaintiff Class would create the risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for individual members of the Plaintiff Class.  The Plaintiff Class may therefore be properly certified under Federal Rule of Civil Procedure 23(b)(1).

## CAUSES OF ACTION

### COUNT ONE
### ADMINISTRATIVE PROCEDURE ACT — ARBITRARY & CAPRICIOUS

**On Behalf of All Plaintiffs, Including the Class,
Against All Defendants Except President Trump**

128.    The shutdown of the CAM Parole program in January 2017 with no notice to applicants and while holding out the program as operational constitutes a final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

129.    In addition, Defendants' failure to provide notice of the termination violated 5 U.S.C. § 552(a)(1)(E).

130.    The official termination of the CAM Parole program in August 2017 without any explanation and without identifying any change in circumstances to justify the termination of a policy upon which thousands of people had relied to their detriment constitutes a final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

131.    The mass rescission of conditional approval for parole without any explanation, without any individualized process, and without identifying any change in circumstances to justify the rescission of a status upon which thousands of people relied to their detriment constitutes a final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

132.    The final agency actions should therefore be set aside pursuant to 5 U.S.C. § 702 and

5 U.S.C. § 706(2).

**COUNT TWO**
**ADMINISTRATIVE PROCEDURE ACT — *ACCARDI***

**On Behalf of All Plaintiffs, Including the Class,**
**Against All Defendants Except President Trump**

133.  The termination of the CAM Parole program and mass rescission of conditional approval for parole are final agency actions that violate agency procedures, including those identified on USCIS and DOS public webpages directed at CAM applicants and beneficiaries. These agency procedures include:

a)  "Once a DS-7699 form has been filed, . . . IOM *will* contact the applicants in their country of origin, and *will* conduct pre-screening interviews for the qualifying child and family members and support processing as the case proceeds through DNA testing, Department of Homeland Security interview, and all medical and security checks."

b)  "After form DS-7699 is submitted, . . . DHS officials *will* interview eligible family members to determine who *will* be admitted as a refugee or offered parole to the U.S."

c)  "A separate application for this parole process is *not required* if the individual already has access to the CAM program."

d)  "If refugee status is denied, your decision letter *will* state whether you have been conditionally approved for parole into the United States."

e)  "If you are a conditionally approved CAM applicant, IOM *will* contact your relative in the United States to collect payment for the medical examination."

f)  "After receiving payment [for the medical examination], IOM *will* contact you to arrange your exam."

g)  "If the medical exam results clear, IOM *will* contact your relative in the United States to arrange for your flight."

h)  "After IOM receives payment for your travel, they *will* submit the travel itinerary to USCIS."

i)  After receiving the travel itinerary from IOM, USCIS "*will*:
 1) [p]erform final security checks,
 2) [e]nsure the medical exam results remain valid until date of travel, and
 3) [v]erify that your relative still has a qualifying legal presence in the United States."

j)  "If [USCIS] decide[s] that you have met all requirements for parole under this program, [USCIS] *will* issue Form I-512L, Authorization for Parole of an Alien Into the United States."

k) "IOM *will* give you [Form I-512L] and your plane ticket the day you fly to the United States."

l) With respect to certain CAM derivative beneficiaries eligible only after the 2016 program expansion, a DS-7699 form "filed on or before [September 30, 2017] *will* be processed regardless of where the qualifying child is in the process as long as the relationships of the expanded category relatives can be verified through DNA testing."

134.    The mass rescission of conditional approval for parole for individuals for whom parole was authorized violated 8 U.S.C. § 212.5(f).

135.    The termination of the CAM Parole program and the mass rescission of conditional approval for parole should therefore be set aside under the principle articulated in *United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

136.    In addition, Defendants' failure to comply with their own procedures and regulations render the termination of the CAM Parole program and the mass rescission of conditional approval for parole "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  The termination of the CAM Parole program and the mass rescission should therefore be set aside pursuant to 5 U.S.C. §§ 702 and 706(2).

**COUNT THREE**
**FIFTH AMENDMENT — DUE PROCESS**

**On Behalf of All Plaintiffs in the U.S., Including the Class Members in the U.S., Against All Defendants**

137.    Plaintiff parents, who are lawfully present in the United States, have constitutionally protected liberty interests in the companionship and society of their family members who are stranded in Central America.

138.    The Due Process Clause protects Plaintiffs against arbitrary or irrational deprivations of their constitutionally protected interests, as well as from deprivations that are outside the normal manner prescribed by law.  The government's burden is greater where, as here, the liberty interests at stake derive from well-established and significant reliance interests.

139.    Defendants' unprecedented, unexplained, and unsupported secret shutdown of the CAM Parole program, their August 16, 2017 termination of the CAM Parole program, and their mass rescission of conditional approval for parole violated U.S.-based Plaintiffs' right to due

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

process because Defendants' actions were arbitrary, irrational, and outside the manner prescribed by law.

140.    Defendants' failure to provide notice of the secret shutdown violated 5 U.S.C. § 552(a)(1)(E).

141.    Moreover, Defendants' deprivation of U.S.-based Plaintiffs' liberty interests served no rational purpose other than to "disrespect and subordinate" Latinos.  Denying a fundamental right based on such discriminatory intent is "so directly subversive of the principle of equality at the heart of the [Due Process Clause]" that it "deprive[s these persons] of liberty without due process of law." *Loving v. Virginia*, 388 U.S. 1, 12 (1967); *see Obergefell v. Hodges*, —— U.S. ——, 135 S. Ct. 2584, 2603-05 (2015).

142.    Defendants' conduct violates the substantive and procedural due process rights protected by the Fifth Amendment of the Constitution.

### COUNT FOUR
### FIFTH AMENDMENT — EQUAL PROTECTION

**On Behalf of Plaintiffs in the U.S., Including Class Members in the U.S., Against All Defendants**

143.    The Due Process Clause of the Fifth Amendment contains a guarantee of equal protection.

144.    Defendants' decisions to terminate the CAM Parole program and implement mass rescission of conditional approval for parole violate the equal protection guarantee because they were substantially motivated by discriminatory intent on the basis of race, ethnicity, and national origin.  The conclusion that the secret shutdown, official termination, and mass rescission were substantially motivated by discriminatory intent is inescapable in light of the Trump Administration's unprecedented departures from normal procedure, the lack of any explanation for the termination and rescission, the continuing nature of the humanitarian crisis that the program was intended to address, President Trump's long history of racial slurs and epithets toward Latinos, and the Trump Administration's targeting of Latinos for disfavored treatment.

145.    Defendants have thus violated the equal protection guarantee of the Fifth Amendment by engaging in intentional discrimination based on race, ethnicity, and national origin.

## COUNT FIVE
## EQUITABLE ESTOPPEL

**On Behalf of All Plaintiffs, Including the Class,**
**Against All Defendants**

146.    Defendants engaged in affirmative misconduct by falsely representing that the CAM Parole program remained in effect between January and August 2017 and by actively soliciting money from CAM applicants during that time period and encouraging CAM applicants to expend resources in connection with their applications.  Defendants failed to comply with 5 U.S.C. § 552(a)(1)(E) and failed to notify the public of the secret shutdown of the CAM Parole program.

147.    In fact, Defendants knew the truth that the CAM Parole program had been secretly shut down in January 2017, and that USCIS had stopped conducting interviews for the CAM Program, IOM had stopped arranging medical exams, and IOM and USCIS had stopped making arrangements for people to travel to the United States through the CAM Parole program.  They nevertheless intended through their misconduct to induce CAM applicants and beneficiaries to continue to make payments and expend resources to advance their applications.

148.    Plaintiffs were ignorant of the truth that the CAM Parole program had been shut down, and they detrimentally relied on Defendants' misconduct.

149.    Defendants' misconduct caused a serious injustice to U.S.-based parent Plaintiffs, who reasonably relied on Defendants' misrepresentations in paying fees required by the program, paying expenses associated with repeated trips to capital cities required by the program, paying for home remodeling, furniture, clothes, and other supplies for family members they reasonably expected to join them in the United States.   Defendants' wrongful acts also caused a serious injustice to in-country children and family member Plaintiffs, who put their lives at risk to travel long distances to participate in CAM processing in capital cities.

150.    Defendants shall therefore be equitably estopped from terminating the CAM Parole program and mass rescinding conditional approval for parole.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that Defendants' termination of the CAM Parole program and mass

rescission of conditional approval for parole were unlawful under the APA, the Fifth Amendment, and principles of equitable estoppel;

B.     Set aside Defendants' unlawful termination of the CAM Parole program and unlawful mass rescission of conditional approval for parole;

C.     Enjoin and restrain all Defendants, and their officers, agents, servants, employees, attorneys, and all persons who are in active concert or participation with any of them, from implementing or enforcing the decisions to terminate the CAM Parole program and mass rescind conditional approval for parole status;

D.     Direct Defendants to reinstate conditional approval for parole status for all beneficiaries for whom they rescinded it *en masse*, and process those applications to completion in the manner in which Defendants publicly represented they would.

E.     Direct Defendants to complete processing of all cases conditionally approved for parole and to organize flights to ports of entry in the United States for individuals granted parole within a reasonable time, not to exceed six months, or to provide this Court with case-by-case explanations for delay;

F.      Certify this case as a class action lawsuit as proposed herein, appoint Individual Plaintiffs D.D., J.F., H.F., A.F., R.C., M.C., J.C., G.E., B.E., S.A., J.A., and A.B. as class representatives of the class and the undersigned counsel as class counsel;

G.     Award Plaintiffs reasonable attorney's fees and costs for this action; and

H.     Grant any other and further relief that this Court may deem just and proper.


DATED:  June 13, 2018.

                              Respectfully submitted,

DANIEL B. ASIMOW                          LINDA EVARTS*
MATTHEW H. FINE                           KATHRYN C. MEYER*
ARNOLD & PORTER KAYE SCHOLER LLP          MARIKO HIROSE*
Three Embarcadero Center, 10th Floor      INTERNATIONAL REFUGEE ASSISTANCE
San Francisco, California  94111          PROJECT
                                          40 Rector Street, 9th Floor
JOHN A. FREEDMAN*                         New York, NY  10006
DAVID J. WEINER
GAELA K. GEHRING FLORES*
DANA O. CAMPOS*

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

MATEO MORRIS*
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743

PHILLIP A. GERACI*
SUSAN S. HU*
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY  10019-9710

*Pro Hac Vice motion forthcoming

By: _____/s/ Daniel B. Asimow_____
DANIEL B. ASIMOW

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF