DANIEL B. ASIMOW (SBN 165661)
daniel.asimow@arnoldporter.com
MATTHEW H. FINE (SBN 300808)
matthew.fine@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, California 94111
Telephone:     415.471.3100
Facsimile:      415.471.3400

JOHN A. FREEDMAN (appearance *pro hac vice*)
john.freedman@arnoldporter.com
GAELA K. GEHRING FLORES*
gaela.gehringflores@arnoldporter.com
DAVID J. WEINER (CA SBN 219753)
david.weiner@arnoldporter.com
DANA O. CAMPOS*
dana.campos@arnoldporter.com
MATEO MORRIS*
mateo.morris@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Telephone:     202.942.5000
Facsimile:      202.942.5999

LINDA EVARTS (appearance *pro hac vice*)
levarts@refugeerights.org
KATHRYN C. MEYER (appearance *pro hac vice*)
kmeyer@refugeerights.org
MARIKO HIROSE (appearance *pro hac vice*)
mhirose@refugeerights.org
INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
40 Rector Street, 9th Floor
New York, NY 10006
Telephone:     646.459.3057
Facsimile:      212.533.4598

PHILLIP A. GERACI*
phillip.geraci@arnoldporter.com
SUSAN S. HU*
susan.hu@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone:     212.836.8000
Facsimile:      212.836.8689

*Attorneys for Plaintiffs*

*\*Pro Hac Vice* motion forthcoming

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.A.; *et al.*,<br><br>                    Plaintiffs,<br><br>          v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*,<br><br>                    Defendants. | Case No. 3:18-cv-03539-LB<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Date:          August 16, 2018<br>Time:          9:30a.m.<br>Place:         Courtroom C (15th Floor)<br>Judge:         Hon. Laurel Beeler |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION ............................. 1

INTRODUCTION ..................................................................................................... 2

STATEMENT OF ISSUES TO BE DECIDED ............................................................... 4

BACKGROUND ...................................................................................................... 4

    A.    The CAM Program Helped Children Escape Danger In Their Home Countries. ........................................................................................... 4

    B.    The Application Process Involved Substantial Burdens and Expenses For U.S.-Based Parents, Which They Incurred in Reliance on the U.S. Government's Representations. ...................................................... 5

    C.    Acting on the Anti-Latino Xenophobia Central to His Campaign, President Trump Terminated the CAM Parole Program in an Unprecedented and Chaotic Way................................................................................ 6

ANALYSIS ............................................................................................................. 9

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ....................................... 10

    A.    The CAM Parole Termination and Mass Rescission Likely Violated the APA. ....... 10

        1.    The Termination of CAM Parole and the Mass Rescission in August 2017 Likely Violated the APA........................................................... 10

        2.    The Secret Shutdown of CAM Parole Likely Violated the APA................. 13

    B.    The CAM Parole Termination and Mass Rescission Likely Violate the Equal Protection Guarantee of the Fifth Amendment. ....................................... 16

    C.    The CAM Parole Termination and Mass Rescission Likely Violate the Due Process Clause............................................................................... 19

    D.    Defendants Must be Equitably Estopped from Mass Rescinding Conditional Approval for Parole........................................................................ 20

II.    PLAINTIFFS HAVE STANDING AND SUFFER IRREPARABLE HARM. .................... 22

    A.    Parents and Children Have Standing and Are Irreparably Harmed. .......................... 22

    B.    CASA Has Standing and Is Irreparably Harmed. ................................................. 23

III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST TIP SHARPLY IN FAVOR OF A PRELIMINARY INJUNCTION................................................. 25

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abboud v. INS*,
    140 F.3d 843 (9th Cir. 1998)..............................................................................23

*Alcaraz v. INS*,
    384 F.3d 1150 (9th Cir. 2004)............................................................................15

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011)......................................................................10, 25

*Anderson v. Butz*,
    550 F.2d 459 (9th Cir. 1977)..............................................................................14

*Avenue 6E Invs., LLC v. City of Yuma, Ariz.*,
    818 F.3d 493 (9th Cir. 2016)..............................................................................18

*Batalla Vidal v. Nielsen*,
    279 F. Supp. 3d 401 (E.D.N.Y. 2018) ...............................................................12

*Bennett v. Spear*,
    520 U.S. 154 (1997) ...........................................................................................10

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988) .....................................................................................12, 13

*Cardenas v. United States*,
    826 F.3d 1164 (9th Cir. 2016)............................................................................19

*Casa de Maryland v. DHS*,
    284 F. Supp. 3d 758 (D. Md. 2018) ...................................................................24

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) ...........................................................................................17

*Cort v. Crabtree*,
    113 F.3d 1081 (9th Cir. 1997)............................................................................13

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
    623 F.3d 633 (9th Cir. 2010)..............................................................................11

*Disney Enters., Inc. v. VidAngel, Inc.*,
    869 F.3d 848 (9th Cir. 2017)................................................................................9

*Elim Church of God v. Harris*,
    722 F.3d 1137 (9th Cir. 2013)......................................................................12, 13

*Encino Motorcars, LLC v. Navarro*,
    — U.S. —, 136 S. Ct. 2117 (2016) ....................................................................11

*Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*,
    666 F.3d 1216 (9th Cir. 2012)............................................................................24

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ........................................................................................... 11, 14

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ................................................................................................. 24

*Hawai'i v. Trump*,
   859 F.3d 741 (9th Cir. 2018), *vacated as moot*, No. 16-1540, 2017 WL 4782860
   (Oct. 24, 2017) ........................................................................................................ 20

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017) .................................................................................. 23

*Herron v. Heckler*,
   576 F. Supp. 218 (N.D. Cal. 1983) ......................................................................... 14

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ................................................................................................. 24

*Hunter v. Underwood*,
   471 U.S. 222 (1985) ................................................................................................. 17

*Ibrahim v. DHS*,
   669 F.3d 983 (9th Cir. 2012) .................................................................................. 23

*Indus. Customers of Nw. Utils. v. Bonneville Power Admin.*,
   767 F.3d 912 (9th Cir. 2014) .................................................................................. 21

*Kankamalage v. INS*,
   335 F.3d 858 (9th Cir. 2003) .................................................................................. 13

*Leiva-Perez v. Holder*,
   640 F.3d 962 (9th Cir. 2011) ............................................................................. 22, 23

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ................................................................................................. 19

*Mendenhall v. Nat'l Transp. Safety Bd.*,
   92 F.3d 871 (9th Cir. 1996) .................................................................................... 15

*Morton v. Ruiz*,
   415 U.S. 199 (1974) ................................................................................................. 16

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................................... 11

*NAACP v. Trump*,
   298 F. Supp. 3d 209 (D.D.C. 2018) ........................................................................ 12

*Nat'l Ass'n of Home Builders v. Norton*,
   340 F.3d 835 (9th Cir. 2003) .................................................................................. 15

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
   145 F.3d 1399 (D.C. Cir. 1998) .............................................................................. 10

*Nken v. Holder*,
    556 U.S. 418 (2009) .............................................................................................. 25

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
    465 F.3d 977 (9th Cir. 2006) ................................................................................. 10

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
    795 F.3d 956 (9th Cir. 2015) (en banc) ................................................................. 10

*Perry v. Brown*,
    671 F.3d 1052 (9th Cir. 2012), *vacated for lack of standing by Hollingsworth v.*
    *Perry*, 133 S. Ct. 2652 (2013) ...................................................................... 17, 18

*Rea v. Matteucci*,
    121 F.3d 483 (9th Cir. 1997) ................................................................................. 20

*Regents of the Univ. of Cal. v. DHS*,
    279 F. Supp. 3d 1011 (N.D. Cal. 2018) ........................................................... 10, 12

*Romer v. Evans*,
    517 U.S. 620 (1996) .............................................................................................. 18

*Rosenbaum v. Washoe Cty.*,
    663 F.3d 1071 (9th Cir. 2011) ............................................................................... 19

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ................................................................................................ 22

*Salgado-Diaz v. Gonzales*,
    395 F.3d 1158 (9th Cir. 2005) ................................................................... 20, 21, 22

*Samson v. City of Bainbridge Island*,
    683 F.3d 1051 (9th Cir. 2012) ............................................................................... 20

*Schlegel v. Wells Fargo Bank, NA*,
    720 F.3d 1204 (9th Cir. 2013) ............................................................................... 13

*Socop-Gonzalez v. INS*,
    272 F.3d 1176 (9th Cir. 2001) ............................................................................... 21

*Stuhlbarg Int'l Sales Co v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) ................................................................................. 24

*Sun Il Yoo v. INS*,
    534 F.2d 1325 (9th Cir. 1976) ............................................................................... 20

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*, — U.S. —, 136
    S. Ct. 2271 (2016) ................................................................................................. 25

*Trump v. Hawai'i*,
    585 U.S. —, 138 S. Ct. 2392 (2018) ........................................................ 16, 17, 22

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973) .............................................................................................. 17

*United States ex rel. Accardi v. Shaughnessy*,
    347 U.S. 260 (1954) ................................................................................... 15

*United States ex rel. Parco v. Morris*,
    426 F. Supp. 976 (E.D. Pa. 1977) ................................................................ 14

*United States v. U.S. Coin & Currency*,
    401 U.S. 715 (1971) ................................................................................... 25

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ...................................................................... 24

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ............................................................................. 17, 18

*Villena v. INS*,
    622 F.2d 1352 (9th Cir. 1980) ...................................................................... 20

*Watkins v. U.S. Army*,
    875 F.2d 699 (9th Cir. 1989) (en banc) ........................................................ 20

*Winter v. Nat'l Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .......................................................................................... 9

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ................................................................................... 19

**Statutes and Regulations**

5 U.S.C.
    § 301 ........................................................................................................... 13
    § 552(a)(1) .................................................................................................. 14
    § 552(a)(1)(D) ............................................................................................ 14
    § 553 ........................................................................................................... 14
    § 706(2)(A) ................................................................................................. 10

6 U.S.C. § 112(e) ............................................................................................. 13

8 U.S.C.
    § 101(a)(42) ................................................................................................... 4
    § 1182(d)(5) ................................................................................................... 5
    § 1182(d)(5)(A) ........................................................................................... 13

8 C.F.R. § 212.5(f) .......................................................................................... 16

82 Fed. Reg. 38,926 (Aug. 16, 2017) .......................................................... 1, 2

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

Please take notice that on August 16, 2018, at 9:30 a.m., or as soon thereafter as the matter may be heard by the Court, at the courtroom of the Honorable Laurel Beeler, Courtroom C, 15th Floor, United States District Court, 450 Golden Gate Avenue, San Francisco, California, Plaintiffs S.A.; J.A.; A.B.; R.C., on behalf of himself and as Guardian Ad Litem for J.C., a minor child; M.C.; D.D.; G.E., on behalf of himself and as Guardian Ad Litem for B.E., a minor child; J.F., on behalf of himself and as Guardian Ad Litem for H.F. and A.F., minor children; on behalf of themselves and on behalf of a class of all similarly situated individuals; and CASA, will and hereby do move the Court to issue a preliminary injunction.

This Motion seeks a preliminary injunction enjoining Defendants from terminating the CAM Parole program as announced in the August 2017 Federal Register notice, 82 Fed. Reg. 38,926 (Aug. 16, 2017), and requiring Defendants to reinstate the conditional parole approvals that were rescinded pursuant to that notice.

This motion for a preliminary injunction (as set forth in the attached) is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities that follows, the Declaration of Daniel B. Asimow, the Declaration of Linda Evarts, the Declaration of George Escobar, the Declaration of John Feeley, the Declaration of Lawrence Yungk, the Declaration of S.A. (ECF No. 6-12), the Declaration of J.A. (ECF No. 6-13), the Declaration of A.B. (ECF No. 6-14), the Declaration of R.C. (ECF No. 6-11), the Declaration of M.C. (ECF No. 6-15), the Supplemental Declaration of M.C., the Declaration of J.C. (ECF No. 6-17), the Declaration of D.D. (ECF No. 6-10), the Declaration of A.D., the Declaration of G.E. (ECF No. 6-18), the Declaration of B.E. (ECF No. 6-16), the Declaration of J.F. (ECF No. 6-9), the Declaration of S.F., any reply papers that may be filed, and on the arguments of counsel.

**INTRODUCTION**

This motion for preliminary relief seeks to enjoin the Trump Administration from terminating the parole portion of the Central American Minors ("CAM") program.  Established in 2014 as part of the response to the humanitarian crisis of minor children fleeing danger in El Salvador, Honduras, and Guatemala and arriving at the Southern Border, the CAM program allowed parents legally present in the United States to apply for refugee status for their children and avoid the perilous overland journey.  If the children were denied refugee status, they were automatically considered for parole status, which granted them temporary permission to live in the United States for humanitarian reasons or in the public interest.  Children conditionally approved for parole could safely travel by air (at their parents' expense) to the United States.  Since its inception, the CAM Parole program provided a safe pathway for about fifteen hundred children to escape danger in their home countries and reunify with their parents.

In August 2017, in an unprecedented action, the Trump Administration terminated the CAM Parole program.  This decision was announced in a summary Federal Register notice which did not provide any reasons for the termination.  *See* 82 Fed. Reg. 38,926 (Aug. 16, 2017) (attached as Exhibit 1 to Declaration of Daniel Asimow ("Asimow Decl.")).  The termination was effective immediately and rescinded, *en masse*, the conditional grant of parole to nearly 3,000 children and related family members, including those who had already paid for their air travel.

The termination of CAM Parole followed a litany of racist and hostile comments from the President towards Latinos and particularly towards Central American children.  It was the culmination of the Administration's secret and chaotic efforts to shut down the program that began mere days after President Trump's inauguration.  Indeed, for the seven months between January and August 2017, Defendants secretly stopped processing applications of children and family members conditionally granted parole, even while Government websites stated that the Program continued in place and while the Government continued to solicit and accept funds from sponsoring parents.

Plaintiffs in this case are parents and children who had CAM applications pending in August 2017 and who have been kept apart by the termination of the program.  They include:

- S.A., a mother in Concord, California, who had already paid for flights for her daughter, J.A., and grandson to join her here when the program was canceled, and who has now

been forced to recover from breast cancer without her daughter by her side. J.A. had to temporarily flee her home last year to escape a gang member threatening to hurt her or her son if she did not "date" him, and now she lives in fear and rarely leaves her home.

- R.C., a father in Oxnard, California, who had already paid for his three children's flights and was anxiously awaiting their arrival, only to find out that the program was terminated. Last year, J.C., one of R.C.'s children, was brutally attacked by MS-13 gang members and had to be hospitalized. But even despite this violence suffered by J.C., just a few weeks ago Defendants denied J.C.'s request to reconsider his refugee application, leaving him and others like him stranded in danger without another hope for reuniting with their families in the safety of the United States.

- G.E., a father in Maryland, whose son B.E. was conditionally approved for parole. G.E. bought furniture and bedding in anticipation of his imminent arrival. B.E. has been targeted by the MS-13 ever since his grandfather testified at the trial of the MS-13 gang members who murdered G.E.'s brother.

Plaintiffs seek a preliminary injunction that restores the status quo *ex ante* by vacating the termination of the CAM Parole program for people who applied before the official termination and reinstating the mass rescinded conditional parole approvals. In moving for relief, Plaintiffs rely on the declarations of the Plaintiffs and the expert declarations from two former officials with direct expertise on issues relevant to this litigation, including former U.S. Ambassador John Feeley, who is an expert in the conditions in the relevant countries in Central America and U.S. foreign poicy in the region, and Mr. Lawrence Yungk, a former official in the Office of the UN High Commissioner for Refugees who is an expert in resettlement operations and who has worked with the U.S Government on the phase-out of similar humanitarian programs for over 30 years. As set forth below, Plaintiffs are likely to succeed on multiple claims because Defendants have violated the U.S. Constitution and the Administrative Procedure Act ("APA") by acting secretly, arbitrarily, and with the intent to discriminate against Latinos. Plaintiffs also show that the harms to Plaintiffs and others like them have been swift and irreparable, indeed devastating. Parents lawfully in the United States—including those who had purchased plane tickets for their children (in reliance on the Government's representations) and believed their children would arrive in days or weeks—remain separated from their loved ones. Children have suffered brutal attacks and death threats at the hands of vicious gangs and are consigned to a life as prisoners in their own homes, separated from their parents. The balance of hardships and the public interest tips in favor—indeed, *sharply* in favor— of Plaintiffs' requested preliminary injunction.

**STATEMENT OF ISSUES TO BE DECIDED**

1.  Did the termination of the CAM Parole program, including the mass rescission of conditional parole approval and the secret termination of the program, likely violate the APA, Equal Protection, or Due Process?  In the alternative, are Plaintiffs likely to succeed on their claim that Defendants should be equitably estopped from terminating the CAM Parole program?

2.  Have Plaintiffs been irreparably harmed by the termination of the CAM Parole program?

3.  Do the balance of equities and the public interest favor the injunction sought?

**BACKGROUND**

**A.     The CAM Program Helped Children Escape Danger In Their Home Countries.**

The United States Government created the CAM program in 2014 in response to a humanitarian crisis of epic proportions: the ten-fold surge in the number of unaccompanied Central American children crossing the U.S.-Mexico border, as a result of an explosion of gang violence in their home countries.  Asimow Decl. Exs. 2-5.  Many, if not most, of the children were fleeing direct threats to their lives and were likely to qualify for humanitarian relief, such as asylum.  *Id.* Ex. 4.  Moreover, the surge in arrivals strained government resources because the government is obligated to provide these children with certain minimum legal protections.  *See id.*

The CAM program—the latest in a long U.S. tradition of mixed refugee/parole programs addressing specific regional crises—was designed to offer a "safe, legal, and orderly alterative" to the dangerous journey to the border for certain children who qualified for refugee resettlement or who were otherwise at risk of harm and required humanitarian assistance.  *See* Asimow Decl. Exs. 8-9; *see also* Declaration of Lawrence Yungk ("Yungk Decl.") ¶¶ 43-44.  Under the program, Central American parents lawfully living in the United States could apply for their minor children and qualifying family members living in El Salvador, Honduras, and Guatemala ("the Northern Triangle countries") to be considered for refugee resettlement.  *See* Asimow Decl. Ex. 10.[1]  If the beneficiaries did not meet the specific eligibility criteria for refugee admission, they were—as a matter of policy under the CAM program—automatically considered on a case-by-case basis for

---

[1] The children and qualifying family members were accepted as refugees if they could establish a well-founded fear of persecution based on religion, race, nationality, political opinion or membership in a particular group.  Asimow Decl. Ex. 10 (citing 8 U.S.C. § 101(a)(42)).

parole pursuant to 8 U.S.C. § 1182(d)(5).  *See id.* Exs. 10, 11 at 68-69 & nn. 13-14.  Children and qualifying family members were eligible for parole if: (1) U.S. Customs and Immigration Services ("USCIS") determined that they were "at risk of harm"; (2) they "clear[ed] all background vetting"; (3) there was "no serious derogatory information"; and (4) they had a commitment of financial support in the United States.  *See id.* Ex. 12.[2]

### B.  The Application Process Involved Substantial Burdens and Expenses For U.S.-Based Parents, Which They Incurred in Reliance on the U.S. Government's Representations.

The application process was rigorous and had many components that required U.S.-based parent-applicants to spend significant time and effort, pay fees, and incur expenses.  *See, e.g.*, R.C. Decl. ¶¶ 10-11, 13-17.  After the parent filed an application in the United States, the International Organization for Migration ("IOM")—an inter-governmental organization with which the Department of State ("DOS") contracts to run its Resettlement Support Center in Latin America—pre-screened eligible children in the Northern Triangle countries.  *See* Asimow Decl. Ex. 6.  Next, USCIS verified the relationship between the parent and child, relying in part on DNA tests (paid for by the parent upfront and refunded only if relationship was confirmed), *id.* Ex. 6 at 22, 39-40, and performed security vetting that was—according to USCIS—"among the most thorough for any immigration benefit," *id.* at 40; *see also* Ex. 11 at 62 n.2.  USCIS then interviewed the child and made a determination as to whether they qualified for refugee resettlement, and if not, whether they would be conditionally approved for the parole program.  *See id.* Ex. 11 at 68-69; Ex. 12.  USCIS told applicants that people deemed ineligible for refugee resettlement "will then be considered on a case-by-case basis for parole into the United States" and that "[a] separate application for this parole process is not required if the individual already has access to the CAM program."  *Id.* Ex. 10. Children were required to travel to the capital cities of their respective countries for each CAM appointment, and because many children lived hours away, their parents had to send them money for transport and other costs associated with those trips.  *See, e.g.*, S.A. Decl. ¶¶ 7–10; A.B. Decl.

---

[2] With respect to the risk of harm, "USCIS procedures require that, to support an authorization of parole, the qualifying child must assert to the USCIS officer during the interview that he or she has a fear of being harmed, and the objective evidence must demonstrate that the child would face a reasonable possibility of harm if he or she remains in their home country."  Asimow Decl. Ex. 11 at 69.

¶¶ 13, 19; R.C. Decl. ¶¶ 10–11, 13–14; D.D. Decl. ¶¶ 6–10; D.A. Decl. ¶¶ 4-5; G.E. Decl. ¶¶ 9–10, 14; J.F. Decl. ¶ 14.  If a child was conditionally approved for parole, they could travel so long as they passed medical checks, remained eligible for the program, and completed security checks. Asimow Decl. Ex. 13.  First, the child had to complete a medical exam in the capital city (at the parent's expense), which USCIS told applicants that IOM "will contact you to arrange" after receiving the parent's payment.  *Id.*  USCIS told applicants that "[i]f the medical exam results clear, IOM will contact your relatives in the United States to arrange for your flight," and "[a]fter IOM receives payment for your travel, they will submit the travel itinerary to USCIS."  *Id.*  USCIS told applicants that after receiving the travel itinerary, it "will . . . [p]erform final security checks, [e]nsure the medical exam results remain valid until date of travel, and [v]erify that your relative still has a qualifying legal presence in the United States," and if the person "met all requirements for parole under this program, [USCIS] will issue Form I-512L, Authorization for Parole of an Alien Into the United States," which IOM "will" provide to the children along with their plane ticket on the day they fly to the United States.  *Id.*  Relying on the government's representations, Plaintiffs and other CAM applicants spent thousands of dollars to pre-pay for required DNA tests, medical examinations, and plane tickets, as well as hundreds or thousands of dollars to pay for their children's successive required trips to the capital cities where all CAM appointments took place. *See* S.A. Decl. ¶¶ 7–10; A.B. Decl. ¶¶ 13, 19; R.C. Decl. ¶¶ 10–11, 13–14; D.D. Decl. ¶¶ 6–10; G.E. Decl. ¶¶ 9–10, 14; J.F. Decl. ¶ 14.

During the approximately two and half years it was in operation, the CAM program received about 13,000 applications, and it enabled 1,627 people to resettle in the United States as refugees and 1,465 people to reunite with their families in the United States as parolees.  *See* Asimow Decl. Exs. 14-16.  Another 2,714 people were conditionally approved for parole as of August 2017.  *Id.* Ex. 16.

### C.    Acting on the Anti-Latino Xenophobia Central to His Campaign, President Trump Terminated the CAM Parole Program in an Unprecedented and Chaotic Way.

President Trump launched his 2016 presidential campaign with the assertion that Latin America was "not sending their best" people to the United States, and instead was "sending people that have lots of problems and they're bringing those problems with us.  They're bringing drugs.

1    They're bringing crime.  They're rapists. . . . It's coming from all over . . . Latin America."

2    Asimow Decl. Ex. 17.  Throughout his campaign, then-candidate Trump referred to Latinos

3    generally as "bad hombres," *id.* Ex. 18, "criminals," *id.* Ex. 19, and "thugs," *id.* Ex. 21, referred to

4    Central Americans as people who were "killing and raping everybody out there," *id.* Ex. 23,

5    promised to kick Latinos and Central Americans out of the country, *id.* Exs. 18, 26, and even

6    suggested that violence against Latino people was justified, *id.* Ex. 24.  Consistent with those and

7    similar statements, candidate Trump promised to take various actions on immigration that would

8    disproportionately harm Latinos.  *See id.* Ex. 25.

9         Within days of President Trump's inauguration, his Administration put his campaign

10   statements into action and shut down the CAM Parole program.  But, in the rush to do so, it shut

11   down the program in secret, without informing the public or CAM applicants of its actions.  USCIS

12   cancelled all previously scheduled CAM interviews, and it stopped issuing decisions finding

13   applicants eligible for the CAM Parole program.  *See* Declaration of Linda Evarts ("Evarts Decl.")

14   Exs. 1-5 (USCIS emails canceling CAM interviews and spreadsheet showing number of interviews

15   affected); *see, e.g.*, J.F. Decl ¶¶ 16–17 (U.S.-based parent's two daughters were interviewed in

16   November 2016 but not issued a decision until Fall 2017).  USCIS and DOS also shut down

17   processing for children who had already been conditionally approved for parole by halting the

18   scheduling of required medical examinations or flights to the United States, including for families

19   who had already paid for them.  *See, e.g.*, D.D. Decl. ¶¶ 9–10, 13–19, 22–23; R.C. Decl. ¶¶ 14–16,

20   18, 23; S.A. Decl. ¶¶ 9, 11–12; G.E. Decl. ¶¶ 14–17.  When applicants called IOM desperately

21   seeking information, some IOM employees told them the truth: that the new administration had

22   "frozen" the CAM Parole program.  *See, e.g.*, D.D. Decl. ¶ 16 (told on January 22, 2017 that CAM

23   Parole program "frozen" and daughter could not travel on scheduled date but had to "wait"); J.A.

24   Decl. ¶ 16 (told in April 2017 that all CAM Parole cases were "frozen"); *see also* Asimow Decl. Ex.

25   26 (in August 2017, USCIS spokesman admitted that CAM Parole program had been "suspended"

26   since February 2017).

27        Nonetheless, the Trump Administration continued to publicly represent that the CAM Parole

28   program had "no planned end date," Asimow Decl. Ex. 13, and there was "currently no filing

deadline for this program," *id.* Ex. 10.  The Government continued to represent on public websites directed at CAM applicants, and conditionally approved parolee applicants in particular, that the Government was processing applications.  *See id.* Exs. 10, 13.  And, the Government continued to solicit fees, including thousands of dollars for payment of plane tickets, from applicants.  *See, e.g.*, S.A. Decl. ¶ 9 (in February 2017, IOM requested $2,500 for plane ticket to be paid "no later than FEB 25"); G.E. Decl. ¶ 14 (on January 30, 2017, IOM requested $223 for medical exam to "be received no later than February 15"); Declaration of George Escobar ¶ 21 (in February 2017, IOM requested advance payment of plane tickets for CASA member C.B.'s two children).

In light of the Government's representations, Plaintiffs never doubted that the program would process their applications or—in the case of conditionally approved applicants—that they would eventually travel to the U.S. if they met the program requirements.  *See, e.g.*, J.F. Decl. ¶ 15 ("I never thought the program would be cancelled."); D.D. Decl. ¶ 20 ("I never thought [my daughter] would be affected by the [CAM Parole] termination after going through the whole process, after we did everything that was asked of us.").

On August 16, 2017, seven months after secretly shutting down the CAM Parole program, the Trump Administration officially terminated the program and rescinded *en masse* conditional parole approvals for the 2,714 children and qualified family members who had already received approvals for that status as of that date.  *See* Asimow Decl. Ex. 16.  The Administration's Federal Register notice announcing these actions, *id.* Ex. 1, provided no explanation for the termination or the mass rescission of already-granted status.  The Trump Administration's program termination and mass rescission of conditional parole status, both effective immediately, are unprecedented in the history of this country's humanitarian programs, which have been gradually phased out with a program termination date announced in advance and all applications in the pipeline processed, with only limited exceptions (which do not apply here).  *See* Yungk Decl. ¶¶ 10, 22, 37-42, 45-56.

At the time of the official CAM Parole termination, Defendants claimed that CAM applicants, including those whose conditional parole was rescinded, still had a limited avenue of relief—they could file requests for review ("RFRs") of the decisions denying them refugee status under the CAM Refugee program.  *See, e.g.*, D.D. Decl. ¶ 25.  Several Plaintiffs filed RFRs within

1  the 90-day deadline, but most have still not received a response to date.  *See, e.g.*, G.E. ¶ 18; S.F. ¶

2  17.  And the only Plaintiffs to receive decisions on their RFRs were rejected in recent weeks with a

3  notice indicating that they are not eligible for refugee status.  *See* M.C. Supp. Decl. ¶¶ 4-8 & Exs.

4  A, B.

5          Meanwhile, the humanitarian crisis that led to the creation of the CAM program has not

6  abated.  Declaration of John Feeley ("Feeley Decl.") ¶¶ 12, 14-16, 21-56.  Indeed, in the past year,

7  DOS has issued Level Three travel advisories for each of the CAM countries, noting that gang

8  activity is widespread, and that murder, assault, rape, and kidnapping are common.  *Id.* ¶¶ 30, 36,

9  41.  The Northern Triangle countries have some of the highest murder rates in the world, and

10  hundreds of thousands of people have been forcibly displaced in recent years in El Salvador.  *Id.* ¶¶

11  28, 36-37, 40, 45-46.

12          Despite this ongoing crisis, the Trump Administration has continued to target Latinos for

13  discriminatory treatment, fueled by the President's animus against Latinos.  *See* Asimow Decl, Exs.

14  27–36.  The Trump Administration terminated Temporary Protected Status for El Salvador,

15  Nicaragua, and Honduras, *see id.* Exs. 37-38, instituted a policy of separating migrant parents from

16  their children and held migrant children in cages at the U.S.-Mexico border, *see id.* at Ex. 39, and

17  ended the Deferred Action for Childhood Arrivals ("DACA") program, *see id.* at Ex. 40.  President

18  Trump's rhetoric has recently reached a fever pitch; he referred to some undocumented Latino

19  immigrants as "animals," *id.* at  Ex. 41, speculated that migrants seeking asylum "could be

20  murderers and thieves and so much else," *id.* at Ex. 42, and demanded that migrants be deported

21  "immediately, with no Judges or Court Cases," *id.* at Ex. 43.

22                              **ANALYSIS**

23          The Court should grant Plaintiffs' motion because Plaintiffs satisfy either of the two

24  alternative Ninth Circuit tests for preliminary relief.  *See Disney Enters., Inc. v. VidAngel, Inc.*, 869

25  F.3d 848, 856 (9th Cir. 2017).  Specifically, Plaintiffs (1) are "likely to succeed on the merits,"

26  (2) are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of

27  equities tips in [their] favor," and (4) "an injunction is in the public interest."  *Winter v. Nat'l Res.*

28  *Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Plaintiffs likewise succeed under the alternative

1   "sliding scale test" because there are "serious questions going to the merits," the "balance of

2   hardships tips sharply" in their favor, "there is a likelihood of irreparable injury," and "the

3   injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–

4   35 (9th Cir. 2011). Plaintiffs meet either test.

5   **I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

6           Plaintiffs are likely to succeed on the merits of each and every claim that the CAM Parole

7   program termination and mass rescission are unlawful and unconstitutional, and therefore also

8   present serious questions going to the merits. Success on any one of these claims would require the

9   agencies' actions to be set aside and the program reinstated for applicants in the pipeline when it

10  was terminated—or, at a minimum, that the mass rescission of conditional approval for parole be

11  vacated. *See, e.g.*, *Regents of the Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1049–50 (N.D. Cal.

12  2018) (granting plaintiffs' preliminary injunction of government's rescission of DACA program and

13  ordering program reinstated on same terms and conditions as were in effect before unlawful

14  government action); *see also Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399,

15  1409 (D.C. Cir. 1998) (holding that "the ordinary result" of finding that agency action is unlawful

16  "is that the rules are vacated—not that their application to the individual petitioners is proscribed")

17  (citation omitted).

18  **A.      The CAM Parole Termination and Mass Rescission Likely Violated the APA.**

19  **1.      The Termination of CAM Parole and the Mass Rescission in August 2017 Likely Violated the APA.**

20          The official termination of the CAM Parole program and mass rescission should be set aside

21  under the APA because they are final agency actions that are "'arbitrary, capricious, [or] an abuse

22  of discretion.'" *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015)

23  (en banc) (quoting 5 U.S.C. 706(2)(A)). The termination and mass rescission qualify as final

24  agency actions because they mark the "consummation" of the agencies' decision-making process

25  and were decisions "by which rights or obligations have been determined, or from which legal

26  consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997); *Or. Nat. Desert Ass'n v.*

27  *U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (noting that the requirements are interpreted

28  "in a pragmatic and flexible manner").

1    Here, the Government acted in an arbitrary and capricious manner in at least three ways,

2    each of which is sufficient to establish a violation of the APA.  *First*, the APA requires an agency to

3    "articulate a satisfactory explanation for its action including a rational connection between the facts

4    found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,

5    463 U.S. 29, 42–43 (1983) (internal quotation marks omitted); *Ctr. for Biological Diversity v. U.S.*

6    *Dep't of Interior*, 623 F.3d 633, 648 (9th Cir. 2010) (Ninth Circuit "insist[s] that agencies support

7    and explain their conclusions with evidence and reasoned analysis").  And where, as here, the

8    agency action changes a prior policy that "engendered serious reliance interests," the APA imposes

9    a heightened duty on the agency to provide a "more detailed justification" for the policy change.

10   *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009); *see, e.g.*, *Encino Motorcars,*

11   *LLC v. Navarro*, — U.S. —, 136 S. Ct. 2117, 2125–27 (2016) (agency's policy change was

12   arbitrary and capricious where agency provided "almost no reasons at all" rather than providing the

13   required "good reasons for the new policy").  Here, when the agencies officially acknowledged the

14   termination of the CAM Parole program in the August 16, 2017 Federal Register notice, they failed

15   to provide *any* reasons—let alone good reasons—for their change in policy, or for the mass

16   rescission of conditional approval for parole for nearly 3,000 children and family members.  *See*

17   Asimow Decl., Ex. 1 (announcing without explanation that "DHS is rescinding the discretionary

18   CAM parole policy," "will no longer consider or authorize parole" under CAM, and all conditional

19   approval for parole is "rescinded").

20       *Second*, agency action is arbitrary and capricious where the agency "entirely failed to

21   consider an important aspect of the problem," including reliance interests generated by its prior

22   policies.  *See State Farm*, 463 U.S. at 42–43; *Fox*, 556 U.S. at 515 (holding that "[i]t would be

23   arbitrary and capricious to ignore" serious reliance interests); *Encino Motorcars*, 136 S. Ct. at 2126

24   (when an agency changes a policy, it must address the "serious reliance interests . . . engendered . . .

25   [by] longstanding policies").  Here, there is no evidence that Defendants considered the serious

26   reliance interests of CAM applicants who incurred thousands of dollars in program fees and

27   associated travel expenses, and took the dangerous risk of applying for the program, with the

28   reasonable expectation that if children were approved for parole and completed processing, they

1   would be able to reunite with their parents in the United States, *see* S.A. Decl. ¶¶ 7–10; A.B. Decl.

2   ¶¶ 13, 19; R.C. Decl. ¶¶ 10–11, 13–14; D.D. Decl. ¶¶ 6–10; G.E. Decl. ¶¶ 9–10, 14; J.F. Decl. ¶ 14.

3   *See also* Asimow Decl. Ex. 6 at 6-7 (USCIS report recognizing high costs associated with the

4   program); Yungk Decl. ¶ 16 (discussing increased risk of violence due to applying to program).

5   Nor is there evidence that, in mass rescinding conditional approval for parole, Defendants

6   considered the impact on the children and family members whom Defendants had already

7   determined, on a case-by-case basis, merited parole because they were "at risk of harm."  There is

8   similarly no evidence that Defendants considered the impact on parents, many of whom reasonably

9   relied on Defendants' representations when they invested thousands of dollars in furniture, bedding,

10   and clothing to prepare for their children's imminent arrival.  *See, e.g.*, S.A. Decl. ¶ 10; R.C. Decl. ¶

11   17; D.D. Decl. ¶ 11; G.E. Decl. ¶ 12.  Just as in the DACA context, the Administration cannot

12   disregard participants' reliance interests in terminating an immigration program.  *See, e.g.*, *Regents*

13   *of the Univ. of Cal.*, 279 F. Supp. 3d at 1044–46; *NAACP v. Trump*, 298 F. Supp. 3d 209, 238–40

14   (D.D.C. 2018); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 431–32 (E.D.N.Y. 2018).

15        In addition, there is no evidence that Defendants considered another fundamentally

16   "important aspect of the problem," *State Farm*, 463 U.S. at 42–43:  that conditions in the Northern

17   Triangle countries that led to the inception of the CAM program have only worsened.  Feeley Decl.

18   ¶¶ 12, 14-16, 21-56.  These country conditions predictably result in Central American children

19   undertaking the dangerous journey by land to the United States and seeking relief at the border, *id.*

20   ¶¶ 17-24—a humanitarian crisis the CAM program was intended to and did address, *id.* ¶¶ 21-23—

21   and the program's abrupt termination needlessly jeopardized children's lives, *id.* ¶ 23.  *See also*

22   Asimow Decl. Ex. 44 (noting that the number of unaccompanied minors at ports of entry "increased

23   by 636 percent from April 2017 to April 2018").

24        *Third*, the mass rescission of conditional parole is arbitrary and capricious or otherwise not

25   in accordance with law for the additional reason that it is impermissibly retroactive.  *See Bowen v.*

26   *Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law").  An

27   agency cannot enforce a rule with retroactive effect where Congress has not "expressly conferred

28   power on the agency" to do so.  *Elim Church of God v. Harris*, 722 F.3d 1137, 1140-41 (9th Cir.

2013); *see also Bowen*, 488 U.S. at 208, 212-13 (invalidating retroactive rule where statute does not confer power on the agency to issue such rules). Here, Congress has not expressly conferred this power on DHS, *see* 8 U.S.C. § 1182(d)(5)(A); 6 U.S.C. § 112(e); 5 U.S.C. § 301, so the only question is whether the mass rescission is retroactive.

As the use of the term "rescission" itself indicates, the agencies' action here is retroactive. *See Schlegel v. Wells Fargo Bank, NA*, 720 F.3d 1204, 1210-11 (9th Cir. 2013) (discussing plain meaning of "revocation" to be synonymous with "rescinding"). A rule has retroactive effect if it, *inter alia*, "creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *Elim*, 722 F.3d at 1141 (internal quotation marks omitted). In answering this question, the Court must ask whether the rule "attaches new legal consequences to events completed before its enactment," relying on its "sound instincts," and "familiar considerations of fair notice, reasonable reliance, and settled expectations." *Id.* (internal quotation marks omitted). Here, as discussed above, the mass rescission upended settled expectations and reasonable reliance for nearly 3,000 applicants who had already been conditionally approved for parole. *See supra* at 7-8. It attached a new legal consequence by revoking their conditional approval status and requiring them, if they wanted to reunite with their families in the United States, to re-initiate a different avenue for relief. Asimov Decl. Ex. 1 (noting that CAM applicants "may apply for parole consideration independent of the CAM program" using USCIS Form I-131). This circuit has rejected this type of agency attempt at unfair retroactivity, and the Court should also do so here. *See, e.g.*, *Kankamalage v. INS*, 335 F.3d 858, 863 (9th Cir. 2003) (holding that an agency cannot make applicant ineligible for discretionary relief based on past conviction where relief was available at time of conviction); *Cort v. Crabtree*, 113 F.3d 1081, 1086-87 (9th Cir. 1997) (holding Bureau of Prisons could not limit eligibility for substance abuse program and associated early release to prisoners already in the program or deemed eligible for it).

### 2.   The Secret Shutdown of CAM Parole Likely Violated the APA.

Even if the ultimate termination of the CAM Parole program and the mass rescission of parole in August 2017 were not arbitrary and capricious, the secret shutdown of the CAM Parole program in January 2017 was. The secret shutdown—which entailed cancelling 2,000 scheduled

- 13 -

CAM interviews and stopping all processing of individuals conditionally approved for parole—violated the APA because the agencies undertook the action *sub silencio*, failed to comply with their public notice obligations, and failed to follow their own procedures.

*First*, a basic requirement of the APA when an agency changes its policy is that it display awareness that it is changing its position—"[a]n agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations*, 556 U.S. at 515–16.  Yet, that is exactly what the Administration did by secretly and chaotically shutting down the CAM Parole program days after President Trump's inauguration in January 2017.  For seven months, the Administration continuously and publicly represented that the CAM Parole program remained in effect and solicited funds from applicants, while *sub silentio* cancelling all scheduled CAM interviews, *see* Evarts Decl., Exs. 1-5, and halting processing of applicants who had been conditionally approved for parole, even after they paid for plane tickets and had flights scheduled.  *See supra* at 7-8.

*Second*, Defendants' secret shutdown of the CAM Parole program violated 5 U.S.C. § 552(a)(1)(D), which requires agencies to "currently publish in the Federal Register" not only "substantive rules of general applicability"—which are typically subject to notice and comment under 5 U.S.C. § 553—but also all "statements of general policy or interpretations of general applicability."  5 U.S.C. § 552(a)(1)(D).  Where the agency fails to publish a matter that is required to be published under this section, "a person may not in any manner . . . be adversely affected by" it, "[e]xcept to the extent that a person has actual and timely notice" of it.  5 U.S.C. § 552(a)(1).  Courts have enforced this section, including in the immigration context, by holding that secret policy changes cannot be applied to the detriment of those who were not given notice of them.  *See, e.g.*, *United States ex rel. Parco v. Morris*, 426 F. Supp. 976, 978, 986 (E.D. Pa. 1977) (granting voluntary departure where application would have been granted under the former policy and policy change had not been published in the Federal Register as required); *see also Anderson v. Butz*, 550 F.2d 459, 462–63 (9th Cir. 1977) (holding that a secret rule change regarding qualification for food stamps could not be applied to the plaintiff class because it was not published in the Federal Register); *Herron v. Heckler*, 576 F. Supp. 218, 232–34 (N.D. Cal. 1983) (ordering agency to

- 14 -

1    restore benefits to plaintiff when agency relied on unpublished criteria to deny benefits).  The

2    shutdown of the CAM Parole program constituted the adoption of a new interpretation of general

3    applicability, and for seven months conditionally approved applicants were harmed by the lack of

4    notice when they continued to pay program fees and associated expenses without any possibility of

5    relief.  *See, e.g.*, S.A. Decl. ¶ 13 (mother planned to use tax refund to visit family, but could not

6    because she paid $2,500 for flights in February 2017).

7           *Third*, Defendants' secret shutdown also violated the *Accardi* principle, another norm

8    intended to protect the public against arbitrary, secret conduct by agencies**.  *See United States ex rel.***

9    ***Accardi v. Shaughnessy***, 347 U.S. 260, 265–67 (1954).  Under *Accardi*, agencies have a duty to

10   abide by their own guidance, especially where the guidance confers benefits on—or is intended to

11   protect the interests of—individuals.  *See id.*; *see, e.g.*, *Alcaraz v. INS*, 384 F.3d 1150, 1162 (9th

12   Cir. 2004) (administrative agencies are required to adhere to their own internal procedures, and

13   collecting cases); *Nat'l Ass'n of Home Builders v. Norton,* 340 F.3d 835, 852 (9th Cir. 2003)

14   (holding agency motion arbitrary and capricious where it failed to follow its own sub regulatory

15   policy); *Mendenhall v. Nat'l Transp. Safety Bd.*, 92 F.3d 871, 875 (9th Cir. 1996) (same).  With the

16   secret shutdown, however, the agencies did the opposite: they flouted their own public-facing

17   guidance to CAM applicants that stated that once applicants are conditionally approved for parole,

18   they will be authorized for parole and able to travel to the United States so long as they successfully

19   complete all required processing.  Specifically, the government's websites informed CAM

20   applicants until Summer 2017 that: (1) after receiving payment for their medical exam, IOM "will"

21   contact them to arrange their medical exam; (2) if their medical results clear, IOM "will" contact

22   their parents to arrange their flights; (3) after receiving payment for flights, IOM "will" submit the

23   travel itinerary to USCIS; (4) after receiving the itinerary, USCIS "will" perform final security

24   checks and ensure the medical check remains valid and the US-parent continued to qualify for the

25   program; and (5) if the applicant met all requirements, USCIS "will" issue Form I-512L, which

26   IOM "will" provide to them with their plane ticket on the day they fly to the United States.  *See*

27

28

Asimow Decl. Ex. 13[3]; *see also* 8 C.F.R. § 212.5(f) (stating that "[w]hen parole is authorized … the alien *shall* be issued an appropriate document authorizing travel" to the United States) (emphasis added).  But between January and August 2017, the agencies did not follow any of these procedures that they told the public they were following.  *See, e.g.*, D.D. Decl. ¶¶ 9–10, 13–19, 22–23; R.C. Decl. ¶¶ 14–16, 18, 23; S.A. Decl. ¶¶ 9, 11–12; G.E. Decl. ¶¶ 14–17; J.F. Decl. ¶¶ 16–17; A.B. Decl. ¶¶ 14–16; *see also* Asimow Decl. Ex. 26.

It is the fundamental tenet of the administrative state that agencies must "avoid the inherently arbitrary nature of unpublished ad hoc determinations."  *Morton v. Ruiz*, 415 U.S. 199, 232 (1974).  Because of the Administration's secret shutdown, almost 3,000 conditionally approved children and family members—who would have been expected to travel to safety in the United States within a few weeks or months of President Trump's inauguration—never traveled.  *See* Asimow Decl. Ex. 13 (USCIS website noting that medical clearances were valid for only six months and security checks were time-limited, so applicants should "book the travel [to the United States] within the time period suggested by IOM to avoid additional processing delays and costs if the medical exam or security checks expire").  The secret shutdown in January 2017 should be set aside; to return to the status quo *ex ante*, Defendants must reinstate conditional approval for parole status and complete processing of these individuals, following their public guidance.

### B.    The CAM Parole Termination and Mass Rescission Likely Violated the Equal Protection Guarantee of the Fifth Amendment.

Plaintiffs are likely to succeed on their claim that the termination of the CAM Parole program and mass rescission violate the Fifth Amendment's equal protection guarantee.  Even in the immigration context, where Congress (and, in some instances the Executive) enjoys relatively broad power, a classification without a rational basis is unlawful.  *Trump v. Hawai'i*, 585 U.S. —, 138 S. Ct. 2392, 2418-19 (2018) (applying rational basis review to claim that executive order discriminated against Muslims in violation of First Amendment).  And, when Government action is premised on a "bare . . . desire to harm a politically unpopular group," it lacks a rational basis.  *Id.*

---

[3] These websites are accessible through the Internet Archive's Wayback Machine, which preserves web pages as of specified dates.  *See* https://archive.org/about.

at 2420 (citing *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)).  Moreover, while

deference may be appropriate when a policy articulates a rational basis, *see id.* at 2420-22, it is

permissible to consider the statements of decision-makers as to their true motivation, including

campaign statements from President Trump.  *Id.* at 2417-18.

       In *Trump v. Hawai'i*, the Court found that the policy at issue articulated a series of facially

legitimate and bona fide purposes, was the result of a "worldwide review process undertaken by

multiple Cabinet officials and their agencies," and was consistent with a purpose to prevent entry by

foreigners from countries that did not properly share security information with the United States.

*Id.* at 2420-21.  Here, in contrast, Defendants have not given any reason—let alone a facially

legitimate and bona fide one—for their actions.

       Defendants' actions in this case are precisely the kind that cannot survive rational basis

review, and the record has several aspects encompassing both direct and circumstantial evidence of

an improper purpose.  *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520,

540 (1993) (stating that evidence may be considered in determining the discriminatory object of a

facially neutral policy in equal protection and other cases) (citing *Village of Arlington Heights v.

Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).  *First*, the Trump Administration's policy

exclusively disadvantages Latinos—a group which President Trump has targeted with vitriol

throughout his presidential campaign and his presidency.  Asimow Decl. Exs. 17-36, 41-43, 46.

The President's words have translated into policy, as this Administration has put in place a series of

measures targeting Latinos for disfavored treatment, including the reckless and inhumane policy of

putting children in cages and separating them from their parents without any notice or plans for

reuniting them, the termination of Temporary Protected Status for hundreds of thousands of Central

Americans, and the rescission of the DACA program affecting hundreds of thousands of young

Latinos.  *Id.* at Exs. 37-40, 45; *see, e.g.*, *Hunter v. Underwood*, 471 U.S. 222, 228–33 (1985)

(facially neutral state constitutional provision was motivated by racial animus where historical

evidence, including statements of Constitutional Convention's president, demonstrated intent to

discriminate against African Americans); *Perry v. Brown*, 671 F.3d 1052, 1093–95 (9th Cir. 2012)

(relying on ballot summary promise "eliminat[ing] right of same-sex couples to marry" as evidence

1  of voters' discriminatory intent), *vacated for lack of standing by Hollingsworth v. Perry*, 133 S. Ct.

2  2652 (2013).

3          *Second*, Defendants' actions represented a sharp departure from this country's normal

4  process of gradually phasing out humanitarian programs like parole.  *Arlington Heights*, 429 U.S. at

5  267 (departures from normal procedure may be evidence of discriminatory purpose); *see, e.g.*,

6  *Avenue 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 507 (9th Cir. 2016) (recognizing city's

7  departure from normal procedures as evidence of intent to discriminate against Latinos).  Such

8  program phase-outs involve careful planning and coordination for months or years in advance of

9  program termination with the goal of mitigating the risk to vulnerable applicants who have incurred

10  costs and potentially put themselves in danger by relying on the program in lieu of alternate relief

11  options.  Yungk Decl. ¶¶ 11-21.  The Administration's mass rescission of conditional approval for

12  parole status for nearly 3,000 people—some of whom expected to travel to the U.S. in days or

13  weeks—is also an abrupt departure from the standard U.S. practice of processing those in the

14  pipeline.  *Id.* ¶ 14.

15          *Third*, as discussed above, Defendants failed to provide any reason for the termination of the

16  CAM Parole program, the mass rescission of parole, or the chaotic, irregular way in which the

17  program was terminated.  *Perry*, 671 F.3d at 1093 (lack of reasonable non-discriminatory

18  explanation for action resulted in "'the inevitable inference that the disadvantage imposed is born of

19  animosity toward,' or . . . mere disapproval of 'the class of persons affected'" (quoting *Romer v.*

20  *Evans*, 517 U.S. 620, 634 (1996)).  Notably, the humanitarian crisis that the program was designed

21  to address has only worsened—Central American children continue to flee danger in their countries

22  and to make the dangerous journey to the border.  Feeley Decl. ¶ 15–16, 24–25.  Indeed, President

23  Trump and his Administration have expressed concern about the crisis and associated child

24  smuggling, illegal border crossings, and increase in asylum applications, *see* Asimow Decl., Ex. 46–

25  48, but they have never explained why they terminated a program that enabled thousands of

26  children to avoid the dangerous land journey through an application process in their home countries

27  that reunited many children with parents lawfully in the United States.  *See* Feeley Decl. ¶¶ 18-25

28  ("[T]he CAM Program was the primary option for relief for children from the Northern Triangle

MOTION FOR PRELIMINARY INJUNCTION; MEMO P&A IN SUPPORT THEREOF          No. 3:18-cv-03539-LB

1    who had parents legally residing in the United States" who "lack [other] legal options . . . to flee a

2    worsening humanitarian crisis[.]").  As a result, the profoundly troubling record showing an intent

3    to discriminate against Latinos stands unrebutted and speaks for itself, amply establishing Plaintiffs'

4    likelihood  of success on their claim that the CAM Parole termination and mass rescission were

5    motivated by a "bare . . . desire to harm" Latinos in violation of the Constitution's equal protection

6    guarantee.

7
         C.       **The CAM Parole Termination and Mass Rescission Likely Violated the Due
8                   Process Clause.**

9             Plaintiff parents are also likely to succeed on their Procedural Due Process claims.  Plaintiff

10   parents, who are lawfully present in the United States, have constitutionally protected liberty

11   interests in the companionship of their children.  *See Rosenbaum v. Washoe Cty.*, 663 F.3d 1071,

12   1079 (9th Cir. 2011) ("A parent has a fundamental liberty interest in companionship with his or her

13   child." (citation and internal quotation marks omitted)); *see also Zadvydas v. Davis*, 533 U.S. 678,

14   693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including

15   aliens, whether their presence here is lawful, unlawful, temporary, or permanent").  Courts review

16   this claim in the immigration context where, as here, the government fails to set forth a "facially

17   legitimate and bona fide reason" for depriving U.S. persons of their liberty interest in family

18   reunification.  *See supra* at 8, 11-12; *see, e.g.*, *Cardenas v. United States*, 826 F.3d 1164, 1171,

19   1172-73 (9th Cir. 2016) (adopting as a threshold question whether the government provided a

20   "facially legitimate and bona fide reason").

21            In this case, the mass rescission of parole violated Due Process because it vacated case-by-

22   case findings of eligibility for parole without any advance notice to applicants or any opportunity to

23   be heard "at a meaningful time and in a meaningful manner."  *Mathews v. Eldridge*, 424 U.S. 319,

24   333 (1976) (analyzing whether agency's regulations and procedures for terminating disability

25   benefits comported with this due process standard).  Under *Mathews*, the Court must balance three

26   factors in evaluating the process due: "the private interest that will be affected," "the risk of an

27   erroneous deprivation of such interest through the procedures used, and the probable value, if any,

28   of additional or substitute procedural safeguards," and "the Government's interest."  *Id.* at 335.

1    Here, all three of the factors favor Plaintiffs: the interest in family reunification and humanitarian

2    assistance is high, *Hawai'i v. Trump*, 859 F.3d 741, 784 (9th Cir. 2018), *vacated as moot*, No. 16-

3    1540, 2017 WL 4782860 (Oct. 24, 2017), the risk of erroneous deprivation is high, and the

4    government interest is low given that the Defendants have already once decided, on a case-by-case

5    basis, that these individuals are entitled to conditional parole status.

6          In addition, the termination of the parole program as a whole violates Procedural Due

7    Process, which further requires the government to refrain from issuing "wholly arbitrary or

8    irrational" rules, *Rea v. Matteucci*, 121 F.3d 483, 485 (9th Cir. 1997), and from conduct performed

9    outside of "the normal manner prescribed by law." *Samson v. City of Bainbridge Island*, 683 F.3d

10   1051, 1060 (9th Cir. 2012).  As explained above, the Trump Administration has not and cannot

11   identify any rational basis for the termination of the CAM Parole program.  For the same reasons

12   that the Trump Administration's actions are arbitrary and capricious under the APA, they also

13   constitute a Due Process violation.

14
15        **D.      Defendants Must be Equitably Estopped from Mass Rescinding Conditional
                    Approval for Parole.**

16         Plaintiffs are likely to succeed on the merits of their equitable estoppel claim.  The Ninth

17   Circuit has repeatedly held that an equitable estoppel claim can lie against the government in the

18   immigration context.  *See, e.g.*, *Salgado-Diaz v. Gonzales*, 395 F.3d 1158, 1165–66 (9th Cir. 2005)

19   (finding colorable equitable estoppel claim against INS based on alleged illegal arrest and coerced

20   removal); *Villena v. INS*, 622 F.2d 1352, 1361 (9th Cir. 1980) (estopping INS from claiming that

21   petitioner failed to pursue his claim for a visa preference classification in light of unjustified delay

22   in adjudicating the petition); *Sun Il Yoo v. INS*, 534 F.2d 1325, 1328 (9th Cir. 1976) (holding that

23   unjustified, unexplained delay in processing petitioner's visa status preference application was "the

24   kind of 'affirmative misconduct' on the Government's part that cannot be employed to penalize an

25   alien who appears to have always acted in good faith"); *see generally Watkins v. U.S. Army*, 875

26   F.2d 699, 705–11 (9th Cir. 1989) (en banc) (affirming district court's order enjoining the Army

27   from refusing to reenlist plaintiff based on equitable estoppel).  Here, there was "affirmative

28   misconduct on the part of the government" and "the government's wrongful act will cause a serious

injustice, and the public's interest will not suffer undue damage"—the threshold elements to an

equitable estoppel claim against the government. *Indus. Customers of Nw. Utils. v. Bonneville*

*Power Admin.*, 767 F.3d 912, 928 (9th Cir. 2014) (citations and internal quotation marks omitted).

Plaintiffs also easily establish the traditional elements of estoppel.

With respect to affirmative misconduct, the Government actively misrepresented the

availability of the CAM Parole program for seven months, publicly proclaiming that IOM and

USCIS "will" fully process applications and, for those deemed eligible for parole, arrange travel to

the United States as long as applicants successfully completed the steps and paid their fees.

Asimow Decl. Ex. 13. Indeed, the Trump Administration continued to solicit program fees for

medical examinations and plane tickets from Plaintiffs—giving them short deadlines to pay—even

though such examinations and flights were never actually scheduled. *See, e.g.*, S.A. Decl. ¶ 9; G.E.

Decl. ¶ 14. Defendants' pattern of false promises to CAM participants for seven months establishes

their affirmative misconduct. *See Socop-Gonzalez v. INS*, 272 F.3d 1176, 1184 (9th Cir. 2001)

(defining affirmative misconduct to mean a "deliberate lie" or "a pattern of false promises").

With respect to the public interest element, the remedy of equitable estoppel—reversing the

mass rescission of Plaintiffs' conditional approval for parole status—would not unduly damage the

public interest because Plaintiffs "already met the criteria for eligibility" for conditional parole at

the time the rescission occurred, and "[t]he public interest would not be burdened" by allowing

Plaintiffs to "have [their] claim properly considered as if the events arising out of the government's

actions had not occurred." *Salgado-Diaz*, 395 F.3d at 1166 (holding public interest was not

burdened where plaintiff met the criteria for eligibility before his allegedly unconstitutional

expulsion to Mexico). Far from damaging the public interest, estoppel would serve the public

interest by reversing the serious injustice to U.S.-based parents who went to great lengths to pay for

the costs of the program and their Central American children who put themselves at risk to apply.

*See supra* at 11-12.

Plaintiffs also satisfy the traditional elements of equitable estoppel. First, the Government

knew the true facts, given that they were responsible for the secret shutdown of the CAM Parole

program, as well as the public statements representing that the program remained available and the

continued solicitation of Plaintiff funds.  Second, the Government intended the necessary consequences of their actions—that is, that the program would stop processing CAM applications. *See, e.g.*, *Salgado-Diaz*, 395 F.3d at 1167 (noting that when border agents physically removed foreign national from the U.S., they "intended the consequences of their actions . . . essentially deporting him without a proceeding").  Third, Plaintiffs were ignorant of the true facts in that the Government did not announce that they had stopped all processing of CAM parole applications. Even the two Plaintiffs who were told that the CAM Parole program was "frozen" were only told because of inquiry to particular IOM staff, and were not given any reason to doubt that the program would continue.  *See, e.g.*, D.D. Decl. ¶¶ 16, 18.  As one Plaintiff stated: "I never doubted that my daughter would travel to the United States."  D.D. Decl. ¶ 20.  Finally, Plaintiffs relied on Defendants' conduct to their detriment, paying program fees, spending money on travel to CAM appointments, and paying for furniture, clothes, and luggage to prepare for their children's arrival in the United States.  *See, e.g.*, S.A. Decl. ¶¶ 7–10; R.C. Decl. ¶¶ 10-11, 13–15, 17.  Defendants cannot now enforce the CAM Parole mass rescission given their conduct.

## II.    PLAINTIFFS HAVE STANDING AND SUFFER IRREPARABLE HARM.

### A.    Parents and Children Have Standing and Are Irreparably Harmed.

Each parent and child plaintiff in this case had a CAM application pending at the time of the termination of the CAM Parole program and has suffered irreparable harm as a result of its termination sufficient to give them Article III standing.[4]  First and foremost, as the Supreme Court held recently, prolonged separation of family members—here, of parents and their children—is concrete harm that gives rise to Article III standing.  *Trump v. Hawai'i*, 138 S. Ct. at 2416.  And, it is a paradigmatic example of harm that is irreparable.  *See Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011) (recognizing that "important [irreparable harm] factors include separation from family members") (internal quotation marks omitted).  As painfully detailed in Plaintiffs' declarations, parents and children are harmed every day that they are away from each other, missing milestones big and small.  *See, e.g.*, D.D. Decl. ¶ 28 ("Whenever she's been sick, I've wanted to

---

[4] Moreover, only one party needs to establish standing to satisfy Article III's case or controversy requirement. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

1  take care of her, but I couldn't.  Every moment of happiness and sadness, I've wanted to be there.");

2  M.C. Decl. ¶ 12 ("I missed my parents so much and couldn't wait to hug them.").

3       Second, all children Plaintiffs who are stranded abroad are injured irreparably by the loss of

4  opportunity to escape the daily dangers of the Northern Triangle countries and travel to the safety of

5  the United States.  *See, e.g.*, *Abboud v. INS*, 140 F.3d 843, 847 (9th Cir. 1998) (lost opportunity of

6  immigrant visa is cognizable Article III injury); *Ibrahim v. DHS*, 669 F.3d 983, 993 (9th Cir. 2012)

7  (lost opportunity to come to United States was cognizable and redressable even where the

8  immigration benefit was discretionary); *cf. Leiva-Perez*, 640 F.3d at 969 (holding that likelihood of

9  physical danger if asylum-seeker is returned to their home country is part of irreparable harm

10  inquiry).  Just in the past year, J.A. had to temporarily flee her home to escape a gang member

11  threatening to hurt her or her son if she did not "date" him, J.A. Decl. ¶¶ 22–24; A.B.'s son had to

12  take the only job he could find, which requires him to travel to neighborhoods where the MS-13 is

13  active, A.B. Decl. ¶¶ 21–23; and J.C. was attacked by MS-13 gang members and required

14  emergency surgery, J.C. Decl. ¶¶ 7-9.  Every Plaintiff, parent and child, lives in fear every day.  *See,*

15  *e.g.*, D.D. Decl. ¶¶ 5, 26–30; M.C. Decl. ¶¶ 23–30; G.E. Decl. ¶¶ 6–7, 19–21; B.E. Decl. ¶¶ 7-10,

16  21; J.F. Decl. ¶¶ 20–22.

17       Finally, it is well-established that the deprivation of Plaintiff parents' constitutional rights,

18  as persons in the United States, to equal protection and due process "unquestionably constitutes

19  irreparable injury."  *Hernandez v. Sessions*, 872 F.3d 976, 994–95 (9th Cir. 2017) (citation and

20  internal quotation marks omitted).

21       **B.    CASA Has Standing and Is Irreparably Harmed.**

22       CASA is a membership organization with over 90,000 members, many of them Central

23  American.  *See* Escobar Decl. ¶¶ 3, 7.  CASA has associational standing to bring this case on behalf

24  of its members because (a) the members who applied for CAM Parole would otherwise have

25  standing to sue in their own right, Escobar Decl. ¶¶ 10, 21 (discussing one member with children

26  conditionally approved for parole who did not travel because of the mass rescission); (b) the

27  interests CASA seeks to protect through this lawsuit are germane to the organization's purpose to

28  "create a more just society by building power and improving the quality of life in low-income

1    immigrant communities," Escobar Decl. ¶¶ 3, 7-15; and (c) neither the claim asserted nor the relief

2    requested requires the participation of individual members.  *See Hunt v. Wash. State Apple Advert.*

3    *Comm'n*, 432 U.S. 333, 343 (1977) (setting forth requirements for associational standing).  Indeed,

4    in a similar case, a court found CASA to be a "prototypical example[]" of an organization with

5    associational standing.  *See Casa de Maryland v. DHS*, 284 F. Supp. 3d 758, 771 (D. Md. 2018).

6            Similarly, CASA has standing to bring this case based on the direct harm it suffered.  *See*

7    *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Valle del Sol Inc. v. Whiting*, 732 F.3d

8    1006, 1018–19 (9th Cir. 2013).  The termination and mass rescission "perceptibly impaired"

9    CASA's ability to carry out its mission to improve the quality of life in low-income immigrant

10   communities, specifically the large Central American community it serves.  *See Whiting*, 732 F.3d

11   at 1018 (quoting *Havens Realty Corp.*, 455 U.S. at 379); Escobar Decl. ¶¶ 15–18.  The chaotic

12   shutdown of the CAM Parole program required CASA to divert its time and resources to addressing

13   questions and confusion among its members and helping people find alternative solutions for family

14   reunification.  *See id.* ¶¶ 15, 17; *Havens Realty Corp.*, 455 U.S. at 379 (diversion of resources

15   confers Article III standing).  The termination of the CAM Parole program and mass rescission have

16   further frustrated CASA's mission and required CASA to re-organize, re-structure, and divert the

17   substantial resources it dedicated to the CAM program.  *See* Escobar Decl. ¶¶ 17-18; *Fair Hous.*

18   *Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012)

19   (organization has direct standing to sue where it can "show[] a drain on its resources from both a

20   diversion of its resources and frustration of its mission" (internal quotation marks omitted)).

21           As with individual plaintiffs, these harms are irreparable.  The CASA members who applied

22   for CAM Parole have experienced irreparable harm similar to the individual plaintiffs.  *See supra* at

23   22-23.  For CASA itself, the termination of CAM Parole has resulted in an irreparable loss of trust

24   from community members who filed CAM applications relying on CASA's representations about

25   the program.  Escobar Decl. ¶ 18 ("[M]any [applicant families] also felt [CASA] placed them at risk

26   of being targeted by the Trump administration's anti-immigrant policies as a result of submitting

27   significant private information to the government during the application process[.]"); *see Stuhlbarg*

28   *Int'l Sales Co v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened

1   loss of . . . goodwill certainly supports a finding of the possibility of irreparable harm").  CASA is

2   entitled to preliminary relief based on these irreparable harms.

3

### III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST TIP SHARPLY IN FAVOR OF A PRELIMINARY INJUNCTION.

4

5          Plaintiffs are entitled to preliminary relief because both the balance of equities and the

6   public interest tip in their favor—indeed, "sharply" so, such that they satisfy either standard for

7   preliminary relief.  *Cottrell*, 632 F.3d at 1134–35; *see also Nken v. Holder*, 556 U.S. 418, 435

8   (2009) (balance of harms and public interest factors "merge when the Government is the opposing

9   party").  Plaintiffs suffer irreparable harm every day, *see supra* at 22-24, and their attempts to rely

10  on the review of their refugee claims promised by Defendants have proven futile.  *See supra* at 8-9.

11  On the other side of the scale, the relief Plaintiffs seek is consistent with the public interest

12  according to Defendants' own statements.  *See* Asimow Decl. Ex. 48 (DHS Secretary Nielsen in

13  June 2018 describing surge in border crossings by Central American families and need to

14  disincentivize "dangerous and deadly" travel to the border, provide relief to those who "truly need"

15  it, and "protect alien children from human smuggling, trafficking, and other criminal actions while

16  enforcing our immigration laws"); Ex. 49 (Secretary of State Pompeo in June 2018 describing

17  multi-agency efforts to dissuade Central Americans from "mak[ing] this long, arduous and often

18  perilous trek up into Mexico to attempt to get into the United States").  The public interest is served

19  by "curtailing unlawful executive action," *Texas v. United States*, 809 F.3d 134, 187 (5th Cir.

20  2015), *aff'd by an equally divided Court*, — U.S. —, 136 S. Ct. 2271, 2272 (2016), and here the

21  Government has no legitimate interest in violating the Constitution, *see United States v. U.S. Coin*

22  *& Currency*, 401 U.S. 715, 726 (1971), or federal law, *Whiting*, 732 F.3d at 1029.

23                                            **CONCLUSION**

24          For the reasons set forth above, Plaintiffs request that this Court issue a preliminary

25  injunction setting aside the termination of the CAM Parole program—thereby vacating the mass

26  rescission of conditional parole approval—and reinstating the program for applicants in the pipeline

27  at the time it was officially terminated.

28

DATED: July 12, 2018.

Respectfully submitted,

/s/ *Daniel B. Asimow*

DANIEL B. ASIMOW
MATTHEW H. FINE
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, California  94111

JOHN A. FREEDMAN (appearance *pro hac vice*)
DAVID J. WEINER
GAELA K. GEHRING FLORES*
DANA O. CAMPOS*
MATEO MORRIS*
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC  20001-3743

PHILLIP A. GERACI*
SUSAN S. HU*
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY  10019-9710

*Pro Hac Vice* motion forthcoming

/s/ *Linda Evarts*

LINDA EVARTS (appearance *pro hac vice*)
KATHRYN C. MEYER (appearance *pro hac vice*)
MARIKO HIROSE (appearance *pro hac vice*)
INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
40 Rector Street, 9th Floor
New York, NY  10006

*Attorneys for Plaintiffs*

## ATTESTATION OF CONCURRENCE IN THE FILING

Pursuant to Civil Local Rule 5-1(i)(3), I declare that concurrence has been obtained from all signatories to file this document with the Court.

/s/ *Daniel B. Asimow*
DANIEL B. ASIMOW