DANIEL B. ASIMOW (SBN 165661)
daniel.asimow@arnoldporter.com
MATTHEW H. FINE (SBN 300808)
matthew.fine@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, California 94111
Telephone:    415.471.3100
Facsimile:    415.471.3400

JOHN A. FREEDMAN (appearance *pro hac vice*)
john.freedman@arnoldporter.com
GAELA K. GEHRING FLORES*
gaela.gehringflores@arnoldporter.com
DAVID J. WEINER (CA SBN 219753)
david.weiner@arnoldporter.com
DANA O. CAMPOS*
dana.campos@arnoldporter.com
MATEO MORRIS*
mateo.morris@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Telephone:    202.942.5000
Facsimile:    202.942.5999

LINDA EVARTS (appearance *pro hac vice*)
levarts@refugeerights.org
KATHRYN C. MEYER (appearance *pro hac vice*)
kmeyer@refugeerights.org
MARIKO HIROSE (appearance *pro hac vice*)
mhirose@refugeerights.org
INTERNATIONAL REFUGEE ASSISTANCE PROJECT
40 Rector Street, 9th Floor
New York, NY 10006
Telephone:    646.459.3057
Facsimile:    212.533.4598

PHILLIP A. GERACI*
phillip.geraci@arnoldporter.com
SUSAN S. HU*
susan.hu@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone:    212.836.8000
Facsimile:    212.836.8689

*Attorneys for Plaintiffs*

**Pro Hac Vice* motion forthcoming

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| S.A.; *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; *et al.*,<br><br>Defendants. | Case No. 3:18-cv-03539-LB<br><br>**DECLARATION OF S.F.** |

Yo, S.F., a mi leal saber y entender, por la presente, declaro lo siguiente:

1. Soy de nacionalidad Hondureña. Tengo 31 años de edad. Vivo en un pequeño pueblo cerca de la frontera con El Salvador, que queda como a cuatro horas en carro de Tegucigalpa, la capital. Vivo con mis dos hijas biológicas, a las que estoy criando en mi casa, H.F. y A.F.

2. Estoy casada con J.F., quien es el padre biológico de H.F. y de A.F. Mi esposo vive en Queens, Nueva York.

3. H.F. tiene ocho años y A.F. tiene dos. Las dos son de nacionalidad hondureña y claro, no están casadas

4. Obtuve un título después de cuatro años en una universidad de Tegucigalpa, Honduras, y soy docente en un jardín infantil. H.F. va a la escuela y está en tercer grado. A.F. aún está muy pequeña para ir a la escuela. Durante el día, cuando estoy trabajando, mi madre que vive cerca de nosotros, cuida a A.F.

5. Yo enseño en una comunidad rural, cerca de mi pueblo, que queda cerca de la frontera salvadoreña. Yo soy la única maestra allí. Un fin de semana en septiembre del 2017, alguien fue a mi salón y manchó las paredes con aerosol, incluyendo frases como: "Mara Salvatrucha," "M-S 13," y "Esto es para la maestra del jardín infantil" dibujando un pene. Yo descubrí el grafiti al llegar el lunes en la mañana. Le mandé fotografías a la policía y ellos llegaron pero no hicieron nada después. Yo se que ese grafiti era para mí porque decía "esto es para la maestra del jardín infantil" y yo soy la única maestra de jardín infantil en mi escuela. Tengo mucho miedo de ser el blanco de los pandilleros otra vez. Siempre le pongo seguro a la puerta cuando doy clases.

6. Esta no es la primera vez que me amenazan. En febrero del 2017, recibí una llamada ya muy tarde en la noche donde me pedían dinero (que llevara 20.000 Lempiras a un lugar especifico). El que me llamó me dijo que sabía donde vivía y que sabía que tengo a mi esposo en los Estados Unidos. Desconozco la identidad del que me llamó; estaba muy asustada. Poco después de esa llamada, recibí dos más provenientes de números desconocidos y no contesté. Vivimos en un pueblo muy pequeño y todo mundo se conoce. En mi pueblo se sabe que yo soy la

Case 3:18-cv-03539-LB   Document 24-6   Filed 07/12/18   Page 3 of 14

única adulta en mi casa.

7.    El hombre que mató al padre de J.F.'s vive muy cerca del jardín infantil donde yo enseño y ya ha amenazado a mi esposo y a mi madre en el pasado.  Le tengo miedo.

8.    J.F. solicitó por medio del programa de CAM por parte mía y por parte de nuestras dos hijas.  Aplicamos porque aquí no se puede vivir con tanta inseguridad.  Las niñas y yo estamos constantemente aterradas.  Queremos un mejor futuro para nuestras hijas.  Las niñas y yo también queremos reunirnos con mi esposo.  J.F. lleva unos 20 años viviendo en los Estados Unidos.

9.    Mi primo que vive en los Estados Unidos, se llevó a su hija a los Estados Unidos por medio de CAM, y nos contó acerca del programa.

10.   El proceso de solicitud de CAM fue increíblemente largo para nosotros.  Nuestro mayor gasto fue la gasolina; nos costaba alrededor de 2.000 Lempiras cada vez que íbamos a Tegucigalpa, y nos tocó ir cuatro veces.  Mi hermano era el que nos llevaba pero mi esposo pagaba los gastos.  Cada viaje duraba todo el día; entre el viaje de ida de cuatro horas, la espera para que nos llamaran cuando llegabamos, y después el viaje de vuelta a casa.  Nuestras citas siempre eran temprano en la mañana, aunque una vez allá, tomaba horas para que nos llamaran.  Teníamos que irnos a las 3AM para poder estar en las oficinas a las 8AM.  No tenemos parientes cercanos en Tegucigalpa y tampoco podíamos quedarnos en un hotel ya que es caro y también porque es peligroso.  He escuchado de mujeres que viajaban solas y que fueron violadas en hoteles.  Yo tenía miedo; es muy peligroso viajar en lo oscuro y teníamos que irnos antes del amanecer para cada entrevista.  Nos tocaba viajar por zonas donde los pandilleros suelen parar los carros y buses para asaltar y agredir a los pasajeros.

11.   La Organización Internacional para las Migraciones (OIM) nos hizo una pre-evaluación alrededor de julio del 2016.

12.   Después, en el otoño del 2016, las niñas y yo nos sometimos a un examen de ADN.

13.   Alrededor de noviembre del 2016, también tuvimos una entrevista con funcionarios estadounidenses en la OIM.

14.   Después de esa cita, como por todo un año, no recibimos nada de información.  Le dije a mi esposo que llamara porque a mi nadie de las oficinas aquí me daba nada de información;

-2-
DECLARATION OF S.F.                                                                                                    No. 3:18-cv-03539-LB

pero, él tampoco pudo hacer ningún progreso.  Yo pensaba que por el cambio de gobierno, las cosas se iban a poner más difícil pero nunca me imaginé que el programa se iba a terminar.  Ya habíamos llegado tan lejos y gastado tanto dinero.  Nunca me imaginé que nos iban a dejar con las manos vacías después de tanto esfuerzo.`

15.    A finales de octubre del 2017, más o menos un año después del examen de ADN, recibí una llamada de la OIM, diciéndome que fuera a la oficina en Tegucigalpa para tener noticias.  Yo esperaba que por fin hubieran aprobado nuestro caso.  Mis hijas y yo fuimos a la OIM unos dos días después, por ahí por el primero de noviembre del 2017.  Allí nos dieron unas notificaciones diciendo que las niñas no eran elegibles para el reasentamiento de refugiadas.  El funcionario nos dijo que eran noticias difíciles de dar y que no lo quería hacer, pero que las niñas no habían sido elegidas para obtener estatus de refugiadas y que el programa de permisos condicionales había sido cerrado. Él nos dijo que las niñas tenían 90 días para presentar un pedido para que se revisara el que se le haya negado el estatus de refugiadas (RFR, for sus siglas en inglés). H.F. se puso a llorar y me preguntó: "¿Entonces ya no me voy a ir a vivir con mi papá?".  A lo cual el hombre contestó, creanme, a nosotros no nos gusta tener que darles esta noticia.

16.    Solamente nos dieron unos papeles diciendo que las niñas habían sido rechazadas; la OIM no tenía documentos sobre el estatus de mi solicitud de CAM.  Mi esposo y yo pasamos cerca de un mes llamando a la OIM para tratar de obtener información sobre mi caso, y al final, la OIM me mandó un correo electrónico diciendo que mi caso se había cerrado.

17.    A finales de Enero del 2018 y con la ayuda pro bono de abogados, mis dos hijas presentaron pedidos de revisión (RFRs), pero aún no han obtenido una decisión.

18.    H.F. estaba muy triste.  Me seguía preguntado cuando se iba a ir a vivir con su padre. Ella está claramente enojada; no entiende bien la situación, y cree que es culpa de su padre.

19.    Para mí es muy difícil tener que criar a mis hijas sola, sin mi esposo.  Trabajo a tiempo completo y tengo que cuidar a mi madre que sufre de diabetes.

20.    Temo por mi seguridad y por la de mis niñas.  Usualmente, las mujeres y las niñas aquí en Honduras, son abusadas física y sexualmente.  Parece como si nuestras vidas no importaran. Mi miedo es que mis niñas y yo seamos vulnerables por el hecho de no vivir con un hombre.

-3-

DECLARATION OF S.F.　　　　　　　　　　　　　　　　　　　　　　　　　　　　No. 3:18-cv-03539-LB

21. En especial, la comunidad para la que trabajo tiene mucho conflicto. Está justo en la frontera con El Salvador y en esa comunidad, hay mucha gente que se encuentra involucrada en las pandillas. Puedo darme cuenta de quien pertenece a las pandillas, por su ropa floja, sus cabezas rapadas, sus tatuajes, porque andan perforados y por su modo de hablar.

22. Tengo miedo de utilizar mi nombre real en esta demanda porque temo que mi participación y la de mis hijas en la misma, podría poner en peligro nuestras vidas. Por lo que sé, los pandilleros averiguan la información de los Hondureños que viven en los Estados Unidos y la usan para ir detrás de sus familiares en Honduras, amenazandolos con violencia si ellos no pagan altas cantidades de dinero.

23. También tengo miedo que la participación mia y de mis hijas en esta demanda en contra de funcionarios del gobierno de los Estados Unidos, ponga en riesgo el estatus legal de mi esposo en los Estados Unidos y nuestra habilidad de solicitar entrada a los Estados Unidos. Tengo entendido que el gobierno se ha enfocado en deportar a activistas inmigrantes que no son ciudadanos. No me gustaría que nuestra participación en esta demanda impacte negativamente el estatus de mi esposo, ni la oportunidad mía y de mis hijas de que, en el futuro, se nos permita entrar a los Estados Unidos.

24. Por estas razones, siento que por la seguridad de mi familia, es necesario que se me permita seguir adelante bajo un seudónimo.

Declaro bajo pena de perjurio y en conformidad con las leyes de los Estados Unidos de America que todo lo anterior es verdad y es correcto.

Ejecutado en Honduras, el 6 de junio del 2018.

                                                /s/ *S.F.*
                                                S.F.

**ATTESTATION OF CONCURRENCE IN THE FILING**

I, Daniel B. Asimow, am the ECF user whose identification and password are being used to file the foregoing Declaration.  Pursuant to Civil Local Rule 5-1(i)(3), I declare that concurrence has been obtained from the signatory to file this document with the Court.

                                                          /s/ *Daniel B. Asimow*
                                                        DANIEL B. ASIMOW

# ENGLISH TRANSLATION

DANIEL B. ASIMOW (SBN 165661)
daniel.asimow@arnoldporter.com
MATTHEW H. FINE (SBN 300808)
matthew.fine@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, California 94111
Telephone: 415.471.3100
Facsimile: 415.471.3400

JOHN A. FREEDMAN (appearance *pro hac vice*)
john.freedman@arnoldporter.com
GAELA K. GEHRING FLORES*
gaela.gehringflores@arnoldporter.com
DAVID J. WEINER (CA SBN 219753)
david.weiner@arnoldporter.com
DANA O. CAMPOS*
dana.campos@arnoldporter.com
MATEO MORRIS*
mateo.morris@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Telephone: 202.942.5000
Facsimile: 202.942.5999

LINDA EVARTS (appearance *pro hac vice*)
levarts@refugeerights.org
KATHRYN C. MEYER (appearance *pro hac vice*)
kmeyer@refugeerights.org
MARIKO HIROSE (appearance *pro hac vice*)
mhirose@refugeerights.org
INTERNATIONAL REFUGEE ASSISTANCE
PROJECT
40 Rector Street, 9th Floor
New York, NY 10006
Telephone: 646.459.3057
Facsimile: 212.533.4598

PHILLIP A. GERACI*
phillip.geraci@arnoldporter.com
SUSAN S. HU*
susan.hu@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: 212.836.8000
Facsimile: 212.836.8689

*Attorneys for Plaintiffs*

*Pro Hac Vice* motion forthcoming

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| S.A.; *et al*.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; *et al*.,<br><br>　　　　　Defendants. | Case No. 3:18-cv-03539-LB<br><br>**DECLARATION OF S.F.** |

I, S.F., upon my personal knowledge, hereby declare as follows:

1. I am a national of Honduras. I am 31 years old. I live in a small town in Honduras near the border with El Salvador, about a four-hour drive from the capital of Tegucigalpa. I live with my two biological daughters, H.F. and A.F., who I am raising in my household.

2. I am married to J.F., who is also the biological father of H.F. and A.F. My husband lives in Queens, New York.

3. H.F. is eight years old and A.F. is two years old. They are Honduran nationals and, of course, unmarried.

4. I received a four-year degree from a university in Tegucigalpa, Honduras, and I work as a kindergarten teacher. H.F. goes to school and is in third grade. A.F. is still too young for school. My mother, who lives near us, watches A.F. during the day when I'm at work.

5. I teach in a rural community near my town, very close to the Salvadoran border. I am the only teacher there. Over the weekend in September 2017, someone came to my classroom and spray painted on the walls phrases including "Mara Salvatrucha," "M-S 13," and "this is for the kindergarten teacher" and drew a penis. I noticed the graffiti first thing Monday morning. I sent photos to the police and the police came, but did nothing to follow up. I know the graffiti was meant for me because the message said "this is for the kindergarten teacher"—I am the only kindergarten teacher at my school. I am very afraid they will target me again. I always lock my classroom door when I am teaching.

6. This was not the first time I have been threatened. In February 2017, I received a phone call around late at night asking for money ($20,000 lempiras to be dropped in a specific place). The caller told me that he knew where I lived and that I have a husband in the United States. I don't know the identity of the caller—I was very scared. I received two more calls shortly after from unknown numbers and did not answer. We live in a very small town, and everyone knows everyone else. It's common knowledge in our town that I am the only adult in my home.

7. The man who murdered J.F.'s father lives very close to the kindergarten where I teach, and he has threatened my husband and my mother in the past. I am afraid of him.

8. J.F. applied to the CAM program on my behalf and on behalf of our two daughters.

-1-

1   We applied because you can't live here with so much insecurity.  The girls and I are constantly

2   terrified.  We want a better future for our daughters.  The girls and I also want to reunite with my

3   husband.  J.F. has been living in the United States for about 20 years.

4         9.     My cousin who is in the United States brought his daughter to the U.S. through

5   CAM, and he told us about the program.

6         10.    The CAM application process was incredibly long for us. Our biggest cost was gas—

7   it cost us around 2,000 lempiras each time we went to Tegucigalpa, and we went four times. My

8   brother took us but my husband paid the expenses.  Each trip took up an entire day, between the

9   four-hour ride there, waiting to be called for our appointment once we arrived, and then the ride

10  home.  Our appointments were often scheduled early in the morning—though, once there, we would

11  not be called for hours—and we had to leave around 3:00 AM in order to be at the offices by 8:00

12  AM.  We don't have a close relative in Tegucigalpa and couldn't stay in a hotel, both because it was

13  expensive and because it is dangerous. I've heard that women traveling alone have been raped in

14  hotels there.  I was afraid: it is very dangerous to travel here when it's dark, and we had to leave

15  before sunrise to attend each interview. We would travel through areas that were known to be places

16  where gang members stopped cars and buses and robbed and assaulted the passengers.

17        11.    We were prescreened by the International Organization for Migration (IOM) in

18  approximately July 2016.

19        12.    Later, the girls and I did the DNA test, in the fall of 2016.

20        13.    We also had an interview with U.S. officials at IOM in approximately November

21  2016.

22        14.    Then, for a whole year after this appointment, we received absolutely no

23  information.  I told my spouse to call because I was getting absolutely no information from anyone

24  in the offices here, but he could not make any progress either.  I was thinking that because of the

25  change of government things had gotten more difficult, but I never imagined that they would end

26  the program.  We had gotten so far and spent so much money.  I never thought they would leave us

27  hanging after so much effort.

28        15.    About a year after the DNA test, I received a phone call from IOM in approximately

-2-

DECLARATION OF S.F.                                                               No. 3:18-cv-03539-LB

1   late October 2017, telling me to come into their office in Tegucigalpa for news.  I expected that they
2   had finally approved our case.  My daughters and I met with IOM approximately two days later, on
3   or about November 1, 2017.  There, we were given notices saying the girls were ineligible for
4   refugee resettlement.  The official told us it was difficult news to give and he didn't want to do it,
5   but that the girls had not been chosen for refugee status and the parole program was closed.  He told
6   us that the girls had 90 days to submit Requests for Review ("RFRs") of their refugee status denials.
7   H.F. started to cry and said: "So I won't go to live with my father?"  The man said, believe me, we
8   don't want to give you this news.

9         16.   We only got papers saying that the girls had been denied—IOM didn't have any
10  documents about the status of my CAM application.  My husband and I spent about a month calling
11  IOM to try to get information about my case, and eventually IOM sent me an email with a
12  document saying my case had been closed.

13        17.   With the help of pro bono attorneys, my daughters both submitted RFRs in late
14  January 2018, but they still haven't received decisions.

15        18.   H.F. was very sad. She kept asking when she would go to live with her father.  She's
16  definitely angry. She thinks it's her dad's fault—she doesn't understand the situation well.

17        19.   It's very hard for me to raise my young daughters alone without my husband.  I work
18  full-time and I take care of my mom, who is sick with diabetes.

19        20.   I'm afraid for me and my girls' safety.  Women and girls are often physically and
20  sexually abused in Honduras.  It's like our lives don't matter.  I fear that my girls and I are
21  vulnerable because we don't live with a man.

22        21.   The community that I work in, in particular, has a lot of conflict.  It is right on the
23  border with El Salvador, and there are a lot of people involved with gangs in that community.  I can
24  tell who belongs to a gang because of their baggy clothes, their shaved heads, their tattoos and
25  piercings, and how they talk.

26        22.   I am afraid to use my true name in this lawsuit because I fear that my and my two
27  daughter's participation in the lawsuit could put our lives in danger.  My understanding is that gang
28  members seek out information about the identities of Hondurans living in the United States and use

that information to target family members in Honduras, threatening them with violence if they do not pay large sums of money.  The most important thing for me is to not put my daughters in danger.

23.     I also fear that my and my daughters' participation in this lawsuit against U.S. government officials could jeopardize my husband's legal status in the United States and our ability to apply to enter the United States.  I understand that the government has targeted immigration activists who are non-citizens for deportation.  I do not want our participation in this lawsuit to adversely impact my husband's status or my and my daughters' ability to be admitted to the United States in the future.

24.     For these reasons, I feel that my family's security necessitates that I be allowed to proceed under a pseudonym.

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed in Honduras, on June 6, 2018.

/s/ *S.F.*
S.F.

# DECLARATION OFTRANSLATION

## Declaration of Translation

I, Sandra Lopez, hereby declare as follows:

1.  I am fluent in both English and Spanish and competent to translate from English into Spanish and *vice versa*.

2.  I translated the written Declaration of S.F. accurately and completely to the best of my abilities. I certify that the attached English and Spanish Declarations of S.F. are accurate and complete translations to the best of my abilities.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on date: 6/11/18

City, State: Berkeley, California.

Sandra Lopez