UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

S.A., et al.,

          Plaintiffs,

    v.

DONALD J. TRUMP, et al.,

          Defendants.

Case No. 18-cv-03539-LB

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

Re: ECF Nos. 31, 32

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................................ 3

STATEMENT ...................................................................................................................................... 6

1. The Immigration and Nationality Act and Parole Generally ...................................................... 6

2. The Complaint ............................................................................................................................ 6

   2.1   September–December 2014: The Creation of the CAM Parole Program ........................ 6

   2.2   2014–2016: The Operation of the CAM Program............................................................. 8

   2.3   2015–Present: Donald Trump's Statements Regarding Latinos .................................... 11

   2.4   January 2017: Executive Order 13,767 ......................................................................... 14

   2.5   January 2017: The Alleged "Secret Shutdown" of the CAM Program.......................... 15

   2.6   February 2017: The Kelly Memorandum ....................................................................... 17

   2.7   August 2017: Termination of the CAM Parole Program ............................................... 19

3. The Administrative Record ..................................................................................... 20

    3.1    2014–2016: The Record Regarding the Operation of the CAM Parole Program .......... 20

    3.2    August 2017: The Record Regarding the Termination of the CAM Parole Program ..... 27

STANDARD OF REVIEW ......................................................................................... 31

1. Administrative Procedure Act Claims ..................................................................... 31

2. Other Claims ........................................................................................................... 33

ANALYSIS .................................................................................................................. 34

1. Standing ................................................................................................................... 34

2. Administrative Procedure Act ................................................................................. 36

    2.1    Termination of the CAM Parole Program Going Forward ................................. 36

        2.1.1    Whether termination violated the APA for failure to articulate a "satisfactory explanation" ..................................................................... 37

        2.1.2    Whether termination violated the APA for failure to provide explanations in the Federal Register ..................................................... 46

        2.1.3    Whether termination violated the APA for failure to take into account "serious reliance interests" ................................................................... 47

        2.1.4    Whether termination violated the APA for failure to "consider an important aspect of the problem" ................................................................. 51

        2.1.5    Whether DHS's decision to stop processing CAM Program applications from January 2017 to August 2017 was a "secret shutdown" of the Program that violated the APA ................................................................. 52

    2.2    Rescinding Conditional Approvals of Parole ..................................................... 53

3. Due Process ............................................................................................................. 56

4. Equal Protection ...................................................................................................... 59

5. Equitable Estoppel ................................................................................................... 63

CONCLUSION ........................................................................................................... 64

United States District Court
Northern District of California

# INTRODUCTION

Under the Immigration and Nationality Act ("INA"), the Secretary of Homeland Security has discretion to parole foreign nationals into the United States "temporarily" and "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit[.]" 8 U.S.C. § 1182(d)(5)(A). Parole does not constitute admission in a valid immigration or nonimmigrant status, but it allows a foreign national to enter and physically be present in the United States.

In 2014, the government instituted a program called the Central American Minors ("CAM") Program, which allowed parents who were lawfully present in the United States to apply to bring their children and other qualifying family members in three countries — Honduras, Guatemala, and El Salvador, collectively known as the "Northern Triangle" — to reunite with them in the United States. A goal of the Program was to discourage children from making the long and dangerous journey from the Northern Triangle to the United States to try to reunite with their parents; the Program sought to achieve this goal by allowing applicant parents to apply for their beneficiary children while their children remained in their original countries.[1]

The CAM Program had two components: a refugee component and a parole component. U.S. Citizenship and Immigration Services ("USCIS"), an agency within the U.S. Department of Homeland Security ("DHS"), first evaluated beneficiaries to see if they qualified for refugee status (which, among other things, requires persecution or a well-founded fear of persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion"). If the beneficiaries qualified, USCIS referred them for approval as refugees under the CAM Refugee Program. If they did not qualify, USCIS automatically considered them for parole into the United States under the CAM Parole Program.

---

[1] Some documents related to the CAM Program use the term "applicant" to refer to the parents present in the United States, while others use it to refer to the children or qualifying family members in the Northern Triangle countries. This order uses "applicant" to refer to the parents present in the United States, "beneficiary" to refer to the children or qualifying family members in the Northern Triangle countries, and "participant" to refer to applicants and beneficiaries.

By the end of 2016, USCIS had interviewed over 5,500 beneficiaries. It approved 99% for either refugee resettlement or parole under the CAM Program: it approved approximately 30% interviewed beneficiaries as refugees and approximately 99% of the remaining beneficiaries (69% out of 70%) for parole. Over 1,335 beneficiaries arrived in the United States.

In January 2017, following a change in presidential administrations, incoming president Donald Trump issued an Executive Order that (among other things) directed the Secretary of Homeland Security to "take all appropriate action" to ensure that DHS exercised its parole authority "only on a case-by-case basis" and "only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole." DHS stopped processing CAM Program applications — including the applications for beneficiaries who had been conditionally approved for parole and were awaiting processing to finalize their arrangements to travel to the United States — and began a review of the CAM Parole Program. In August 2017, DHS announced that it was terminating the CAM Parole Program. It also announced that it was rescinding parole for the approximately 2,700 beneficiaries who had been conditionally approved for parole but who had not yet traveled to the United States.[2] It stated that those individuals, and other individuals who wanted to apply for parole, could still do so independent of the CAM Parole Program but that it would no longer award parole through the Program.

The plaintiffs in this case — applicant parents lawfully residing in the United States who applied to the CAM Program, their beneficiary children in Northern Triangle countries, and the nonprofit immigrant-rights organization CASA — filed this putative class-action lawsuit against President Trump, DHS, USCIS, the Secretary of Homeland Security, the Director of USCIS, the State Department, the Secretary of State, and the United States, alleging that the government's termination of the CAM Parole Program and its rescinding of conditional approvals of parole were unlawful. The plaintiffs bring the following four categories of claims:

---

[2] DHS did not rescind parole for any beneficiary who had entered the United States before the time it terminated the CAM Parole Program.

1.  claims under the Administrative Procedure Act ("APA"), arguing that the government's termination of the CAM Parole Program and rescinding of conditional approvals for parole were arbitrary and capricious,

2.  a claim under the Due Process Clause, arguing that the applicant-parent plaintiffs have a constitutionally protected liberty interest in the companionship and society of their family members in Central America, and that the government deprived them of this liberty interest without due process by terminating the CAM Parole Program in an arbitrary, irrational, and unlawful manner,

3.  a claim under the equal-protection component of the Due Process Clause, arguing that the government's termination of the CAM Parole Program was substantially motivated by discriminatory animus by President Trump and the Trump Administration toward Latinos, and

4.  a claim for equitable estoppel, arguing that the government engaged in affirmative misconduct by publicly representing between January 2017 and August 2017 that the CAM Parole Program was still in operation, when it actually had been secretly terminated.

The putative class is all applicants and beneficiaries who applied for the CAM Program before August 16, 2017, who were denied refugee status under the CAM Refugee Program, and who then were denied parole under the CAM Parole Program due to its termination.[3]

The plaintiffs moved for a preliminary injunction (1) enjoining the government from terminating the CAM Parole Program and (2) requiring the government to reinstate the conditional approvals of parole that were rescinded pursuant to that termination. The defendants moved to dismiss the complaint.

---

[3] The plaintiffs do not bring any claims with respect to the refugee portion of the CAM Program or any government actions regarding that portion. They bring claims only regarding the parole portion. *See* Compl. – ECF No. 3 (¶ 3), 40–44 (¶¶ 128–50). Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

This order addresses the defendants' motion to dismiss. (The court will address the plaintiffs' motion for a preliminary injunction in a separate order.) The court denies the motion to dismiss the plaintiffs' APA claims as they relate to the government's mass-rescinding conditional approvals of parole made under the CAM Parole Program. In all other respects, the court grants the defendants' motion to dismiss.

## STATEMENT

### 1. The Immigration and Nationality Act and Parole Generally

The INA provides that the Secretary of Homeland Security "may, [subject to certain exceptions], in [her] discretion parole into the United States temporarily under such conditions as [s]he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States[.]"[4] 8 U.S.C. § 1182(d)(5)(A). The INA also provides that "such parole of such alien shall not be regarded as an admission of the alien[.]" Id. The INA further provides that "when the purposes of such parole shall, in the opinion of the [Secretary], have been served[,] the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." Id. The Secretary's parole authority is in turn delegated to various DHS officials. 8 C.F.R. § 212.5(a).

### 2. The Complaint

#### 2.1 September–December 2014: The Creation of the CAM Parole Program

The government first proposed the CAM Program on September 18, 2014, as part of the President's annual recommendations to Congress on proposed refugee admissions for the following year, pursuant to 8 U.S.C. § 1157(d) and (e).[5] The annual Presidential Determination on

---

[4] Section 1182(d)(5)(A) refers to the Attorney General, but pursuant to 6 U.S.C. § 557, that authority has now been transferred to the Secretary of Homeland Security. See, e.g., In re Arrabally, 25 I. & N. Dec. 771, 777 n.5 (B.I.A. 2012).

[5] Compl. – ECF No. 1 at 12 (¶ 36).

Refugee Admissions incorporated these recommendations and provided that people in Honduras, Guatemala, and El Salvador "may, if otherwise qualified, be considered refugees for the purpose of admission to the United States within their countries of nationality or habitual residence." *Presidential Determination on Refugee Admissions for Fiscal Year 2015*, 79 Fed. Reg. 69,753, 69,753–54 (Sept. 30, 2014).

The CAM Program was structured as a dual refugee/parole program.[6] Under the CAM Refugee Program, certain Central American parents lawfully living in the United States could apply for their minor children and qualifying family members to be considered for refugee resettlement while the family members were still in in Honduras, Guatemala, and El Salvador.[7] Minor children and qualifying family members could be accepted as refugees if they could establish that they qualified for resettlement under U.S. law, that is, by demonstrating that they had a well-founded fear of persecution based on race, religion, nationality, membership in a particular social group, or political opinion.[8] Under the CAM Parole Program, minors and qualifying family members who were considered under the CAM Refugee Program but did not meet the specific eligibility criteria for refugee admission were automatically considered for parole pursuant to 8 U.S.C. § 1182(d)(5).[9]

In November 2014, the Departments of State and Homeland Security released a fact sheet regarding the program (the "November 2014 Fact Sheet").[10] The fact sheet stated in part:

---

[6] *Id.* (¶ 37).

[7] *Id.*

[8] *Id.*; *accord* 8 U.S.C. § 1101(a)(42) (defining "refugee" as requiring, among other things, persecution or a well-founded fear of persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion").

[9] Compl. – ECF No. 1 at 12–13 (¶ 38).

[10] Fact Sheet, Bureau of Population, Refugees, and Migration, U.S. Dep't of State and U.S. Dep't of Homeland Sec., *In-Country Refugee/Parole Program for Minors in El Salvador, Guatemala, and Honduras With Parents Lawfully Present in the United States* (Nov. 14, 2014), *available at* https://2009-2017.state.gov/j/prm/releases/factsheets/2014/234067.htm (last visited Dec. 10, 2018) (November 2014 Fact Sheet) (cited by Compl. – ECF No. 1 at 13 (¶ 38)). The court may take notice of the fact sheet under the incorporation-by-reference doctrine. *Knievel v. ESPN*, 393 F.3d 1068, 1076–77 (9th Cir. 2005).

Beginning in December 2014, a parent lawfully present in the United States will be able to file Department of State form DS-7699 requesting a refugee resettlement interview for unmarried children under 21 in El Salvador, Guatemala, or Honduras. Under certain circumstances, if the second parent resides with the child in the home country and is currently married to the lawfully present parent in the United States, the second parent may be added to the child's petition and considered for refugee status, and if denied refugee status, for parole. . . .

. . . .

DHS will conduct interviews with each child to determine whether he or she is eligible for refugee status and admissible to the United States. . . .

Applicants found by DHS to be ineligible for refugee status in the United States will be considered on a case-by-case basis for parole, which is a mechanism to allow someone who is otherwise inadmissible to come to the United States for urgent humanitarian reasons or significant public benefit. An individual considered for parole may be eligible for parole if DHS finds that the individual is at risk of harm, he/she clears all background vetting, there is no serious derogatory information, and someone has committed to financially support the individual while he/she is in the United States. . . . Parole is temporary and does not confer any permanent legal immigration status or path to permanent legal immigration status in the United States.[11]

The CAM Program began accepting applications on December 1, 2014.[12] In mid-2016, the government expanded the CAM Program to allow additional immediate family members of qualifying minor children to apply as "derivative" beneficiaries.[13]

### 2.2    2014–2016: The Operation of the CAM Program

Individuals had to apply to the CAM Refugee Program before they could be considered for the CAM Parole Program. The process was as follows.

---

[11] November 2014 Fact Sheet. The complaint characterizes the fact sheet as stating that children and qualifying family members "were" eligible for parole if they were at risk of harm, cleared background vetting, had no serious derogatory information, and had someone committed to financially supporting them. Compl. – ECF No. 1 at 13 (¶ 38). The actual fact sheet states that individuals who met those requirements "may be" eligible for parole. *See Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F.3d 1005, 1008 (9th Cir. 2015) ("'[W]e need not accept as true allegations contradicting documents that are referenced in the complaint.'") (quoting *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008)).

[12] Compl. – ECF No. 1 at 17 (¶ 44).

[13] *Id.* at 14 (¶ 41).

First, a parent lawfully residing in the United States had to file an application with the assistance of a "resettlement agency" (a nonprofit organization partially funded by the government to welcome refugees into the country) and provide proof of identity, proof of legal status in the United States, and a passport photo of the beneficiary child.[14] Second, the International Organization for Migration ("IOM") — the intergovernmental organization that the State Department contracted to run its Resettlement Support Center in Latin America — invited the child to come to the capital of the country where the child was located so that IOM could interview the child, take the child's biometric data and background information, prepare a case file, and initiate security checks.[15] Third, USCIS verified the relationship between parent and child through documentary evidence and DNA tests.[16] (The parent had to pay for DNA testing, but USCIS reimbursed the parent if the testing confirmed a parent-child relationship.[17]) Fourth, USCIS conducted an interview with the child in the country capital.[18] Fifth, after confirming security-check results and DNA-test results, USCIS made a determination on the refugee application and notified beneficiaries of that determination by either a decision letter or a phone call.[19] For beneficiaries who received letters, if refugee status was denied, the letter checked one of several boxes to explain the reason for the denial and outlined the process to request a review of the refugee determination.[20] The letter then indicated whether the child was eligible for the CAM Parole Program.[21]

---

[14] *Id.* (¶ 42(a)).

[15] *Id.* (¶ 42(b)).

[16] *Id.* at 14–15 (¶ 42(c)).

[17] *Id.* at 15 (¶ 42(c)).

[18] *Id.* (¶ 42(d)).

[19] *Id.*

[20] *Id.*

[21] *Id.*

If USCIS approved a beneficiary for the CAM Parole Program, the letter said:

> You have been conditionally approved for parole into the United States. Final approval is conditioned upon successful completion of any remaining clearances that are required in the screening process. These clearances include medical examination by a U.S. approved panel physician, completion of security clearance procedures, and verification of family relationships. Please see attached information sheet for next steps that must be completed for you to be paroled into the United States.[22]

If USCIS conditionally approved a beneficiary for parole, the beneficiary had to undergo a medical examination in the country capital at the parent's expense.[23] USCIS told the beneficiary that "IOM will contact your relative in the United States to collect payment for the medical exam" and that "[a]fter receiving payment, IOM will contact you to arrange your exam."[24] If the beneficiary cleared the examination, he or she received a medical clearance valid for six months.[25]

Next, USCIS told the beneficiary that "[i]f the medical results clear, IOM will contact your relatives in the United States to arrange for your flight" and that "[a]fter IOM receives payment for your travel, [it] will submit the travel itinerary to USCIS."[26] After receiving the travel-itinerary form from IOM, USCIS "will . . . [p]erform final security checks, [e]nsure the medical exam results remain valid until date of travel, and [v]erify that your relative still has a qualifying legal presence in the United States."[27] "[I]f we decide that you have met all requirements for parole under this program, we will issue Form I-512L, Authorization for Parole of an Alien Into the United States" and that "IOM will give you this document and your plane ticket the day you fly to the United States."[28]

---

[22] *Id.* at 15–16 (¶ 42(e)).

[23] *Id.* at 16 (¶ 42(f)).

[24] *Id.*

[25] *Id.*

[26] *Id.* (¶ 42(g)).

[27] *Id.* (¶ 42(h)).

[28] *Id.* (emphasis removed).

Finally, after travel arrangements were made, the beneficiary traveled to a U.S. port of entry, where DHS Customs and Border Protection could authorize parole for a period of up to two years.[29] USCIS told the beneficiary that it "will consider CAM parole extension requests for the duration of the program."[30]

During the approximately two-and-a-half years that the CAM Program was in operation, more than 13,000 people applied, at least 1,627 individuals were able to settle in the United States as refugees, and an additional 1,465 people were able to enter the United States as parolees.[31]

### 2.3  2015–Present: Donald Trump's Statements Regarding Latinos

Donald Trump launched his 2016 presidential campaign with the claim that Latin America was "not sending their best" people to the United States: "They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists.... It's coming from all over ... Latin America."[32] Candidate Trump continued to categorize Latinos as gang members, killers, and rapists in promising to deport and exclude Latinos from the country.[33]

The complaint lists five examples of statements by Candidate Trump or President-Elect Trump before his inauguration:

1. "On August 21, 2015, when asked to respond to a report that two of his supporters had urinated on a sleeping Latino man and then beat him with a metal pole, Candidate Trump responded, 'people who are following me are passionate. They love this country and want this country to be great again. They are passionate.'"

2. "In May 2016, Candidate Trump referred to anti-Trump protestors who carried the Mexican flag on Twitter as 'criminals' and 'thugs.'"

---

[29] *Id.* at 17 (¶ 42(i)).

[30] *Id.*

[31] *Id.* (¶ 44).

[32] *Id.* at 18 (¶ 45) (ellipses in original).

[33] *Id.* (¶ 46).

3. "In June 2016, Candidate Trump stated that Judge Gonzalo Curiel [of the Southern District of California] could not be fair in presiding over a lawsuit because he was 'Hispanic.'"

4. "In October 2016, during a presidential debate, then-candidate Trump responded to a question about immigration by referring to Latino immigrants as 'bad hombres' and promising that 'we're going to get them out.'"

5. "In December 2016, President-Elect Trump referred to an article about a recent crime wave on Long Island and said 'They come from Central America. They're tougher than any people you've ever met.... They're killing and raping everybody out there. They're illegal. And they are finished.'"[34]

The complaint lists eleven examples of statements by President Trump after his inauguration:

1. "On January 25, 2017, shortly after signing executive orders calling for immediate construction of a wall along the southern U.S. border and withholding federal funds from 'sanctuary' cities, President Trump condemned the 'unprecedented surge' of migrants from Central America for eroding safety in the United States, claiming that these two orders 'will save thousands of lives.'"

2. "On January 27, 2017, newly-inaugurated President Trump and Mexico's President Peña Nieto discussed President Trump's proposal for a border wall over the phone. During that transcribed conversation, President Trump once again referred to Mexicans as 'tough hombres.'"

3. "On February 3, 2017, during a visit to the Customs and Border Protection training center, President Trump said 'You know they're bad. They're pouring in from El Salvador, Guatemala, Honduras, Mexico, all over. They're just pouring into our country!'"

---

[34] *Id.* (ellipsis in original).

4. "In February 2017, President Trump said 'What has been allowed to come into our country, when you see gang violence that you've read about like never before, and all of the things — much of that is people that are here illegally ... They're rough and they're tough ... So we're getting them out.'"

5. "On June 21, 2017, President Trump implied that thousands of immigrants are members of the Central American gang MS-13. He said 'These are true animals. We are moving them out of the country by the thousands, by the thousands.'"

6. "Similarly, on June 28, 2017, President Trump suggested that the MS-13 gang had taken over swaths of U.S. territory, and said: 'They are bad people. And we've gotten many of them out already... We're actually liberating towns, if you can believe that we have to do that in the United States of America. But we're doing it, and we're doing it fast.'"

7. "On August 25, 2017, President Trump pardoned former Maricopa County Sheriff Joe Arpaio, who was to be sentenced for criminal contempt for failing to comply with a federal judge's order to stop racially profiling Latinos. Before issuing the pardon, President Trump asked rhetorically, 'Was Sheriff Joe convicted for doing his job?' After issuing the pardon, President Trump sent a tweet calling Mr. Arpaio 'an American patriot.'"

8. "On September 5, 2017, in conjunction with the Administration's announcement of the termination of the DACA [Deferred Action for Childhood Arrivals] program, President Trump issued a statement decrying 'the massive surge of unaccompanied minors from Central America including, in some cases, young people who would become members of violent gangs throughout our country, such as MS-13.'"

9. "On January 11, 2018, President Trump infamously referred to El Salvador as a 'shithole country' during a meeting with lawmakers about immigration, asking 'Why are we having all these people from shithole countries come here?' He then suggested that the United States should bring more people from countries such as Norway, which has an overwhelmingly white population."

10. "In February 2018, President Trump claimed that immigrants from El Salvador, Guatemala, Honduras, and Mexico are 'just pouring into our country .... These countries are not our friends, you know. We think they're our friends, and we send them massive aid ... and they're pouring drugs into our country and they're laughing at us' — returning to his common refrain that Central Americans are somehow gaming the U.S. immigration system."

11. "In May 2018, President Trump said of people crossing the Mexican border into the United States: 'You wouldn't believe how bad these people are. These aren't people. These are animals.'"[35]

## 2.4   January 2017: Executive Order 13,767

On January 20, 2017, Donald Trump was inaugurated as president of the United States.

On January 25, 2017, President Trump issued Executive Order 13,767, entitled Border Security and Immigration Enforcement Improvements. Exec. Order No. 13,767, 82 Fed. Reg. 8793 (2018).[36] The Order stated in part:

> **Section 1.** *Purpose.* Border security is critically important to the national security of the United States. Aliens who illegally enter the United States without inspection or admission present a significant threat to national security and public safety. Such aliens have not been identified or inspected by Federal immigration officers to determine their admissibility to the United States. The recent surge of illegal immigration at the southern border with Mexico has placed a significant strain on Federal resources and overwhelmed agencies charged with border security and immigration enforcement, as well as the local communities into which many of the aliens are placed.
>
> . . . .
>
> **Sec. 11.** *Parole, Asylum, and Removal.* It is the policy of the executive branch to end the abuse of parole and asylum provisions currently used to prevent the lawful removal of removable aliens.

---

[35] *Id.* at 29–30 (¶ 82) (ellipses in original).

[36] *Id.* at 23 (¶ 62). The court can take judicial notice of the Executive Order under the incorporation-by-reference doctrine because it is cited in the complaint, *Knievel v. ESPN*, 393 F.3d 1068, 1076–77 (9th Cir. 2005), and as a matter of public record, *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).

(a) The Secretary [of Homeland Security] shall immediately take all appropriate action to ensure that the parole and asylum provisions of Federal immigration law are not illegally exploited to prevent the removal of otherwise removable aliens.

. . . .

(d) The Secretary shall take appropriate action to ensure that parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised only on a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole.

*Id.* at 8793, 8795–96.

### 2.5    January 2017: The Alleged "Secret Shutdown" of the CAM Program

Shortly after President Trump took office in January 2017, the government took the following actions with respect to the CAM Program.

<u>Interviews:</u> USCIS stopped interviews of all CAM Program beneficiaries, thereby blocking all CAM Program applications at the interview stage from being processed.[37] Within the first seven days of the Trump presidency, USCIS cancelled more than 2,000 CAM Program interviews that were scheduled to take place in January, February, and March 2017.[38] The interviews were cancelled in anticipation of an Executive Order suspending the U.S. Refugee Admissions Program — what would later become Executive Order 13,769, Protecting the Nation from Foreign Terrorist Entry into the United States, issued on January 27, 2017.[39] While the Order was enjoined in part on February 3, 2017, USCIS did not reinstate CAM Program interviews.[40] Instead, USCIS confirmed on February 3, 2017, that all USCIS interviews in El Salvador, Honduras, and Guatemala through the end of March 2017 were cancelled.[41]

---

[37] Compl. – ECF No. 1 at 18–19 (¶ 48).

[38] *Id.* at 19 (¶ 48).

[39] *Id.*

[40] *Id.* (citing *Washington v. Trump*, No. C17-0141JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017)).

[41] *Id.*

Issuing determinations: The government stopped issuing decisions to CAM Program beneficiaries who had been interviewed.[42] The government did not notify the public that it was doing so.[43]

Medical examinations: The government stopped scheduling medical examinations for CAM Program beneficiaries who had been interviewed and received a determination before January 2017 that they were conditionally approved for parole.[44] The government did not notify the public or CAM Program participants that it was doing so.[45] IOM continued to solicit and accept funds from Program applicants during this time.[46]

Travel to the United States: The government blocked travel to the United States for CAM Program beneficiaries who had been interviewed, received a determination that they were conditionally approved for parole, and cleared their medical examinations.[47] On or about January 22, 2017 (two days after President Trump took office), an IOM employee told one of the plaintiffs in this case that IOM had received new orders that all CAM Program cases were frozen for 120 days and that no CAM Program case could be processed because the government had changed its position and IOM had to wait for orders from the new administration.[48] IOM continued to solicit and accept payments for plane tickets from CAM Program applicants during this time.[49]

The government did not notify the public that it was shutting down the CAM Parole Program.[50] The USCIS program webpage for CAM Program participants stated that "[c]urrently there is no planned end date for the CAM parole program" and "[t]here is currently no filing

---

[42] Id. (¶ 49).

[43] Id.

[44] Id. (¶ 50).

[45] Id.

[46] See id. (¶¶ 50–51).

[47] Id. at 19–20 (¶ 52).

[48] Id. at 20 (¶ 53).

[49] See id. (¶¶ 54–55).

[50] Id. at 21 (¶ 56).

deadline for this program."[51] The USCIS program webpage for conditionally approved CAM

Program beneficiaries stated, "[w]e encourage your relative to book the travel within the time

period suggested by IOM to avoid additional processing delays and costs if the medical exam or

security checks expire."[52] A State Department website discussing the CAM Program expansion

stated that "[a] qualifying, lawfully present parent who filed a CAM AOR [affidavit of

relationship] from December 1, 2014, through November 30, 2016, and wishes to request access

for expanded category relatives will need to file an amended DS-7699 prior to September 30,

2017" and that "[a]n amended AOR form filed on or before this date will be processed regardless

of where the qualifying child is in the process as long as the relationships of the expanded

category relatives can be verified through DNA testing."[53] At least five webpages controlled by

USCIS, the State Department, and the U.S. embassies in El Salvador and Honduras represented

that the CAM Program continued to be in operation.[54] IOM contacted at least one of the plaintiffs

in this case after the government allegedly "shut down" the CAM Parole Program to tell her that

she needed to send $2,500 for her daughter's and grandson's plane tickets and that they would be

able to travel to the United States after payment was received.[55] IOM may have accepted payments

from other plaintiffs for plane tickets as well.[56] These participants never received travel

arrangements to the United States.[57]

## 2.6 February 2017: The Kelly Memorandum

On February 17, 2017, then-Secretary of Homeland Security John Kelly issued a

memorandum (the "Kelly Memo") to the Acting Commissioner of U.S. Customs and Border

Protection, the Acting Director of U.S. Immigration and Customs Enforcement, the Acting

---

[51] *Id.* (¶ 57).

[52] *Id.* (¶ 58).

[53] *Id.* at 21–22 (¶ 59).

[54] *Id.* at 22 (¶ 60).

[55] *Id.* at 20 (¶ 55).

[56] *See id.* (¶ 54).

[57] *Id.* (¶¶ 54–55).

Director of USCIS, the Acting General Counsel of DHS, the Acting Assistant Secretary for International Affairs, and the Acting Undersecretary for Management.[58] The memorandum stated in part:

> This memorandum implements the Executive Order entitled "Border Security and Immigration Enforcement Improvements," issued by the President on January 25, 2017, which establishes the President's policy regarding effective border security and immigration enforcement through faithful execution of the laws of the United States. It implements new policies designed to stem illegal immigration and facilitate the detection, apprehension, detention, and removal of aliens who have no lawful basis to enter or remain in the United States. It constitutes guidance to all Department personnel, and supersedes all existing conflicting policy, directives, memoranda, and other guidance regarding this subject matter, except as otherwise expressly stated in this memorandum.
>
> . . . .

**K. Proper Use of Parole Authority Pursuant to Section 212(d)(5) of the INA**

> The authority to parole aliens into the United States is set forth in section 212(d)(5) of the INA [8 U.S.C. § 1182(d)(5)], which provides that the Secretary may, in his discretion and on a case-by-case basis, temporarily parole into the United States any alien who is an applicant for admission for urgent humanitarian reasons or significant public benefit. Upon careful scrutiny, the statutory language appears to strongly counsel in favor of using the parole authority sparingly and only in individual cases where, after careful consideration of the circumstances, parole is necessary because of demonstrated urgent humanitarian reasons or significant public benefit.
>
> The practice of granting parole to certain aliens in pre-designated categories in order to create immigration programs not established by Congress, has contributed to a border security crisis, undermined the integrity of the immigration laws and the parole process, and created an incentive for additional illegal immigration.
>
> Therefore, the Director of USCIS, the Commissioner of CBP, and the Director of ICE shall ensure that, pending the issuance of final regulations clarifying the appropriate use of the parole power, appropriate written policy guidance and training is provided to employees within those agencies exercising parole authority, including advance parole, so that such employees are familiar with the proper exercise of parole under section 212(d)(5) of the INA and exercise such parole

---

[58] Memorandum from John Kelly, Sec'y of Homeland Sec., to Kevin McAleenan, Acting Comm'r, U.S. Customs and Border Prot., et al., *Implementing the President's Border Security and Immigration Enforcement Improvement Policies* (Feb. 17, 2017) (Kelly Memo) – ECF No. 33-5 (AR000022–34) (cited by Compl. – ECF No. 1 at 23 (¶ 63)). The court can take judicial notice of the Executive Order under the incorporation-by-reference doctrine. *Knievel*, 393 F.3d at 1076–77.

authority only on a case-by-case basis, consistent with the law and written policy guidance.[59]

### 2.7    August 2017: Termination of the CAM Parole Program

On August 16, 2017, the government publicly announced the termination of the CAM Parole Program by publishing a notice in the Federal Register.[60] The notice stated in part:

> As of August 16, 2017, USCIS will no longer consider or authorize parole under the CAM Parole Program. In addition, USCIS will notify individuals who have been conditionally approved for parole under this program and who have not yet traveled that the program has been terminated and their conditional approval for parole has been rescinded. . . .
>
> Although DHS is terminating the CAM Parole Program, individuals who have been paroled into the United States under the CAM Parole program will maintain parole until the expiration of that period of parole unless there are other grounds for termination of parole under DHS regulations at 8 CFR 212.5(e).

*Termination of the Central American Minors Parole Program*, 82 Fed. Reg. 38,926, 38,927 (Aug. 16, 2017). The notice further stated:

> This discretionary change in policy does not preclude such individuals from applying for parole consideration independent of the CAM program by filing USCIS Form I-131, Application for Travel Document, consistent with the instructions for that form. Parole will only be issued on a case-by-case basis and only where the applicant demonstrates an urgent humanitarian or a significant public benefit reason for parole and that applicant merits a favorable exercise of discretion. Any alien may request parole to travel to the United States, but an alien does not have a *right* to parole.
>
> . . . . [Individuals who were conditionally approved for parole under the CAM Parole Program] may apply for parole consideration independent of the CAM program by filing USCIS Form I-131, Application for Travel Document, consistent with the instructions for that form.

*Id.* (emphasis in original).

After this announcement, "IOM told CAM Parole Program beneficiaries whose conditional approval for parole was rescinded — all of whom had been previously deemed ineligible for refugee resettlement under the CAM Refugee Program — that they could file a request for review

---

[59] Kelly Memo – ECF No. 33-5 at 2 (AR000022), 10 (AR000030).

[60] Compl. – ECF No. 1 at 23 (¶ 64).

('RFR') of the denial of refugee status within 90 days of the notice of the rescission."[61] Many affected CAM Parole Program beneficiaries filed RFRs, including several of the plaintiffs here.[62] Many of those who filed RFRs in 2017 or early 2018 have not yet received decisions on their RFRs.[63]

## 3. The Administrative Record

In connection with their motion to dismiss the plaintiffs' APA claims, the defendants filed the administrative record pursuant to 5 U.S.C. § 706.[64] Among other things, the administrative record documents the following additional facts.

### 3.1 2014–2016: The Record Regarding the Operation of the CAM Parole Program

As noted above, the government began accepting applications for the CAM Program on December 1, 2014.

On December 5, 2014, the State Department issued press guidance regarding the CAM Program (the "December 2014 Guidance").[65] The guidance stated in part:

> **Key Messages:**
>
> - As part of the effort to address the underlying causes of this migration, the Administration has launched an "in-country" refugee and parole processing for certain minors in El Salvador, Guatemala, and Honduras. This program will allow parents who are lawfully present in the United States to request U.S. resettlement for children under the age of 21 who are still in one of these three countries.
>
> - We are establishing in-country processing in El Salvador, Guatemala, and Honduras to provide a **safe, legal, and orderly alternative** to the dangerous journey that some children are currently undertaking to join parents in the United States.

---

[61] *Id.* at 25 (¶ 70).

[62] *Id.* at 26 (¶ 71).

[63] *Id.* (¶ 72).

[64] Admin. Record – ECF No. 33.

[65] Press Guidance, Bureau of Population, Refugees and Migration, U.S. Dep't of State, *In-Country Processing for Children in El Salvador, Guatemala, and Honduras* (Dec. 5, 2014) (December 2014 Guidance) – ECF No. 33-11 (AR000053–55).

- This program is part of the Administration's **integrated and comprehensive approach to addressing the underlying economic and security challenges** facing Central American countries with increased unlawful migration across the southwest U.S. border last summer.

- Our goal in the United States and in Central America is to extend protection to those with legitimate humanitarian claims while providing an effective deterrent for irregular migration driven by dangerous criminal smuggling networks.

- Taken together with the efforts of Central American leaders and other key stakeholders **to address the underlying causes of migration**, this measure will help end the practice of sending children on this dangerous journey.[66]

  . . . .

- This program is one of many measures the United States is putting in place to help reduce the number of parents and others who are paying smugglers to lead minors on the dangerous journey to the United States. It offers a real alternative to children who may have legitimate claims to refugee status.

- The Departments of State and Homeland Security launched new public information campaigns, in coordination with the Central American governments, warning about the dangers of irregular migration and delivering the message that unaccompanied children are not given a "permiso" or permit to stay in the United States upon arrival at the border, and many will ultimately be returned to their country of origin.

In November 2015, the State Department issued additional press guidance regarding the CAM Program (the "November 2015 Guidance").[67] The guidance stated in part:

**Key Messages:**

- The Central American Minors program provides a safe, legal, and orderly alternative to the dangerous journey that some children have undertaken to join their parents in the United States.

- While the program launched 11 months ago, **most of the approximately 5,000 applications received so far have come in the last three to four months.**

  . . . .

---

[66] *Id.* at 2–4 (AR000053–55) (emphasis in original).

[67] Press Guidance, Bureau of Population, Refugees and Migration, U.S. Dep't of State, *Central American Minors Program* (Nov. 5, 2015) (November 2015 Guidance) – ECF No. 33-12 (AR000056–63).

**Q: What is the goal of the Central American Minors Program?**

- We established the program in 2014 to provide a safe, legal, and orderly alternative to the dangerous journey that some children are currently undertaking to join their parents in the United States.

- Our goal is to protect families with legitimate humanitarian claims while discouraging people from sending their children on the dangerous journey to the United States.

. . . .

**Q: What is the current status of application processing?**

- The U.S. Department of Homeland Security recently completed its first round of 90 interviews in Central America and has conditionally approved approximately 12 percent for refugee admission; about 84 percent were recommended for parole. Approximately 1 percent were denied and approximately 2 percent are undergoing additional review.

. . . .

**Q. Will the Administration consider ending this program, given the low refugee approval rate?**

- This program has just begun. No assumptions or conclusions should be made about longer-term trends and outcomes based on the limited sample of cases to date.

- We will continue the program in FY2016. This program was designed as a hybrid refugee/parole program, and 96% of the first set of applicants were approved for either refugee admission or parole.[68]

In November 2015, USCIS issued an information sheet regarding the CAM Parole Program.[69]

The info sheet stated in part:

> Individuals who applied for, but were denied, refugee status under the in-country refugee program in Guatemala, Honduras, or El Salvador, are considered for parole into the United States under the CAM parole program. This Fact Sheet describes key parts of the process of obtaining parole for conditionally approved applicants.

> **General Parole Information**

> The Secretary of Homeland Security may, in his or her discretion, parole any foreign national applying for admission to the United States into the United States temporarily for urgent humanitarian reasons or significant public benefit. (See

---

[68] *Id.* at 2–4 (AR000056–58) (emphasis in original).

[69] U.S. Citizenship & Immigration Servs., U.S. Dep't of Homeland Sec., *Central American Minors (CAM) Parole Program: Information for Conditionally Approved Applicants* (Nov. 23, 2015) – ECF No. 33-48 (AR000462–66).

Immigration and Nationality Act (INA) Section 212(d)(5)). Parole allows an individual, who may be inadmissible or otherwise ineligible for a visa or refugee status, to come to and stay in the United States for a temporary period.

A person who has been paroled ("parolee") is not admitted into the United States for purposes of immigration law. Parole allows an individual to be lawfully present in the United States temporarily and to apply for work authorization. Although a parolee is lawfully present in the United States for the time period authorized, parole is by nature temporary and does not confer or lead to legal immigration status in the United States.

. . . .

**Parole Termination or Expiration**

Your parole status may be terminated if:

- You depart the United States;

- You violate any laws of the United States; or

- The DHS Secretary in his discretion decides to terminate parole.[70]

In February 2016, the State Department issued additional press guidance regarding the CAM Program (the "February 2016 Guidance").[71] The guidance stated in part:

**Key Messages:**

- The Central American Minors program provides a safe, legal, and orderly alternative to the dangerous journey that some children have undertaken to join their parents in the United States.

- While the program launched 13 months ago, most of the approximately 6,500 applications received so far have come in the last six months. To date, the Department has performed its initial screening of nearly 3,000 of these applicants, and DHS has completed more than 600 final interviews.

- Forty-eight individuals have arrived in the United States via the program so far, 37 from El Salvador and 11 from Honduras.

. . . .

---

[70] *Id.* at 2 (AR000462), 5 (AR000465).

[71] Press Guidance, Bureau of Population, Refugees and Migration, U.S. Dep't of State, *Central American Minors Program* (Feb. 2, 2016) (February 2016 Guidance) – ECF No. 33-14 (AR000073– 76). The guidance is dated "February 2, 2015" as opposed to "2016," but this appears to be a typo (the guidance refers to the CAM Program's having been launched "13 months ago," which would place it in February 2016, not February 2015).

**Q: What is the goal of the Central American Minors Program?**

- We established the program in 2014 with the goal to protect families with legitimate humanitarian claims while discouraging people from sending their children on the dangerous journey to the United States.

- Ensuring the safety of people in the region and deterring the exploitation of undocumented migrants requires cooperation and partnership. Central American governments must take the lead on creating better economic, social, governance and security conditions in their countries, and we are commit[t]ed to helping them, as evidenced by Congress's FY 2016 appropriation of up to $750 million in foreign assistance.

**Q. Will the Administration consider ending this program, given the low rates?**

- We will continue the program in FY2016. No assumptions or conclusions should be made about long-term outcomes based on the limited sample of cases to date.

- This program was designed as a hybrid refugee/parole program, and 98 percent of applicants interviewed to date were approved for either refugee admission or parole.[72]

In May 2016, the State Department issued additional press guidance regarding the CAM Program (the "May 2016 Guidance").[73] The guidance stated in part:

**<u>Key Messages</u>:**

- The Central American Minors program provides a safe, legal, and orderly alternative to the dangerous journey that some children have undertaken to join their parents in the United States.

- While the program launched in December 2014, most of the approximately 8,500 applications received so far have come in the last nine months. To date, the Department has performed its initial screening of more than 5,500 of these applicants, and DHS has completed more than 1,500 final interviews. The number of final interviews will increase significantly over the next six months.

- More than three hundred individuals have arrived in the United States via the program so far.

  . . . .

---

[72] *Id.* at 2–4 (AR000073–75).

[73] Press Guidance, Bureau of Population, Refugees and Migration, U.S. Dep't of State, *Central American Minors Program* (May 24, 2016) (May 2016 Guidance) – ECF No. 33-15 (AR000077–80). The guidance is dated "May 24, 2015" as opposed to "2016," but this appears to be a typo (the guidance refers to the fact that most applications have come "in the last nine months," whereas May 2015 was less than nine months after the CAM Program was launched).

**Q: What is the goal of the Central American Minors Program?**

- We established the program in December 2014 with the goal to protect families with legitimate humanitarian claims while discouraging people from sending their children on the dangerous journey to the United States.

. . . .

**Q. Will the Administration consider ending this program, given the low rates?**

- The Central American Minors pro[g]ram is an important part of our efforts to protect Central Americans at risk of harm and expand resettlement opportunities in the region. We have no plans to end the program.

- Although the program took some time to get started, we continue to receive a number of applications and more than 300 children have arrived to the United States via the program so far.

- This program was designed as a hybrid refugee/parole program, and 98 percent of applicants interviewed to date were approved for either refugee admission or parole.[74]

In July 2016, the State Department issued additional press guidance regarding the CAM Program (the "July 2016 Guidance").[75] The guidance stated in part:

**Q. What are the current statistics on CAM applications and arrivals?**

- While the program launched in December 2014, most of the approximately 9,500 applications received so far have come in the last nine months.

- To date, the Department of State has performed its initial screening of more than 6,800 of these applicants, and the Department of Homeland Security has completed 2,900 final interviews and decisions.

- Out of these, 99% (2,884) have been approved either for refugee resettlement or for parole. We expect that the number of final interviews will increase significantly over the next six months.

- More than 600 individuals have arrived in the United States via the program so far and we expect the pace of arrivals to increase as those approved to come to the United States complete the necessary post-decision steps for arrival.

---

[74] *Id.* at 2–4 (AR000077–79).

[75] Press Guidance, Bureau of Population, Refugees and Migration, U.S. Dep't of State, *Central American Minors Program Expansion, Protection Transfer Agreement, and In-Country Referrals* (July 28, 2016) (July 2016 Guidance) – ECF No. 33-16 (AR000081–96).

**Q. How many individuals have qualified for refugee status under the existing program compared to parole?**

- 267 have entered the US as refugees and another 400 have entered under parole.

  . . . .

**Q: What is the goal of the Central American Minors Program?**

- We launched the program in December 2014 with the goal of protecting children with legitimate humanitarian claims while discouraging people from placing their children in the hands of smugglers for a dangerous journey to the United States.

- We also believe it is critical for Central American governments to take the lead on creating better economic, social, governance and security conditions in their countries, and we are commi[t]ted to helping them, as evidenced by Congress's FY 2016 appropriation of up to $750 million in foreign assistance to Central America, and our FY 2017 budget proposal.[][76]

In November 2016, the State Department issued additional press guidance about the CAM Program (the "November 2016 Guidance").[77] The guidance stated that 99% of CAM Program participants that had been interviewed were approved for either refugee resettlement or parole:

**Q. What are the current statistics on CAM applications and arrivals?**

- The program launched in December 2014 and has received approximately 10,400 applications.

- To date, the Department of State has performed its initial screening of nearly 9,000 of these applicants, and the Department of Homeland Security has interviewed more than 5,500 individuals.

- Out of these, 99 percent have been approved either for refugee resettlement or for parole.

- More than 1335 individuals have arrived in the United States via the program so far.[78]

The guidance noted that there was no guarantee, and the State Department could not speculate, about whether the CAM Program would continue after President-Elect Trump was inaugurated.[79]

---

[76] *Id.* at 5–6 (AR000084–85).

[77] Press Guidance, Bureau of Population, Refugees and Migration, U.S. Dep't of State, *Central American Minors Program Expansion* (Nov. 15, 2016) (November 2016 Guidance) – ECF No. 33-17 (AR000097–105).

[78] *Id.* at 8 (AR000103).

### 3.2 August 2017: The Record Regarding the Termination of the CAM Parole Program

As noted above, the government announced the termination of the CAM Parole Program on August 16, 2017.

On August 15, 2017, the USCIS issued leadership guidance regarding the termination of the CAM Program ("2017 Leadership Guidance").[80] The guidance stated in part:

**Termination of the Central American Minors (CAM) Parole Program**

Effective Aug. 16, 2017, USCIS will no longer automatically consider or offer parole for individuals in El Salvador, Guatemala, and Honduras under the Central American Minor (CAM) Parole program. Individuals who have been conditionally approved for parole under this program and have not yet traveled will be notified that their conditional offer of parole has been rescinded. Refugee processing under the CAM Refugee program continues. DHS parole regulations at 8 CFR § 212.5 continue to apply.

. . . .

**Reason for Termination**

In accordance with section 11 of President Trump's Executive Order entitled *Border Security and Immigration Enforcement Improvements*, Acting Secretary of Homeland Security Elaine Duke has decided to rescind the program, which automatically considered for parole all individuals found ineligible for refugee status under the in-country refugee program in Guatemala, Honduras, or El Salvador. The CAM Parole program was implemented as part of an integrated strategy to address factors contributing to increases in migration from Central America to the United States. However, as indicated by the executive order, DHS is pursuing a new strategy to secure the U.S. southern border.[81]

USCIS issued a contemporaneous document captioned "RTQ [response to queries]: Termination of CAM Parole Program" (the "2017 RTQ") setting out talking points for USCIS to respond to inquiries about the end of the CAM Program.[82] The RTQ stated in part:

---

[79] *Id.* at 10 (AR000105).

[80] Leadership Guidance, U.S. Citizenship & Immigration Servs., U.S. Dep't of Homeland Sec. (Aug. 15, 2017) (2017 Leadership Guidance) – ECF No. 33-33 (AR000182).

[81] *Id.* at 2 (AR000182).

[82] Response to Queries, U.S. Citizenship & Immigration Servs., U.S. Dep't of Homeland Sec., *Termination of CAM Parole Program* (2017 RTQ) – ECF No. 33-9 (AR000045–50). The document is undated, but it indicates on its face that it was contemporaneous with the termination of the CAM Parole Program, *see id.* at 2 (AR000045) ("Effective immediately, USCIS will no longer consider or

**Talking points:**

- Effective immediately, USCIS will no longer consider or offer parole under the CAM Parole program.

    . . . .

- USCIS will issue notices to individuals conditionally offered parole under the CAM Parole program, who have not yet traveled, notifying them that the CAM Parole program has been terminated and their conditional offer of parole has been rescinded.

    . . . .

<u>If asked only:</u>

**Q1: Why did it take the government so long to notify these individuals that their conditional offer of parole was rescinded?**

A1: Executive Order 13767, issued on Jan. 25, 2017, instructed DHS to take appropriate action to ensure that its parole policies are not illegally exploited and that parole is granted "only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole." Then-Secretary of Homeland Security John Kelly issued an implementing memorandum on Feb. 20, 2017, directing DHS to undertake a review of its various parole policies. Since that time, we conducted a careful review of the Central American Minors (CAM) Parole program, and Acting Secretary of Homeland Security Elaine Duke decided to terminate the program. As stated in the Federal Register notice, we are notifying the affected public, including individuals who were conditionally approved for parole but have not yet traveled or who have already been paroled into the United States.

. . .

**Q3: When did USCIS stop processing applications for parole?**

A3: While the CAM program was under review, USCIS ceased considering or offering parole or further processing individuals who had been conditionally approved for parole under the program. The agency ceased these actions in February 2017.

**Q3a: Why did DHS wait until August to terminate the program if it stopped processing individuals for the program back in February?**

A3a: Following the issuance of the President's Executive Order, then-Secretary of Homeland Security John Kelly issued an implementing memorandum on Feb. 20, 2017, directing DHS to undertake a review of its various parole policies. Since that time, we conducted a careful review of the Central American Minors (CAM) Parole

---

offer parole under the CAM Parole program."), and the government represented at the motion hearing before the court that it was in fact a contemporaneous document.

program, and Acting Secretary of Homeland Security Elaine Duke decided to terminate the program upon completion of that review.

**Q4: What happened to individuals who received notification that they were conditionally approved for parole pending successful completion of background and medical checks? Will the process continue for them? How many people will this affect?**

A4: All conditionally approved applicants for parole under the CAM Parole program without confirmed travel arrangements to the United States will be sent notices of the CAM Parole program's termination, including notification that they will not receive parole under the program. There are approximately 2,700 individuals currently conditionally approved. Any individual who received access to the CAM Refugee/Parole program for whom a final parole determination had not yet been issued is no longer being considered for parole under the program

**Q5: Even though DHS is terminating the CAM Parole program, is parole still available to affected individuals?**

A5: Potentially. This termination of the CAM Parole program does not preclude such individuals from applying for parole consideration independent of the CAM Parole program by filing USCIS Form I-131, Application for Travel Document, consistent with the instructions for that form. Parole will only be issued on a case-by-case basis and only where the applicant demonstrates an urgent humanitarian or a significant public benefit reason for parole and that applicant merits a favorable exercise of discretion. Any foreign national may request parole to travel to the United States, but a foreign national does not have a right to parole.

**Q6: Why is the program being terminated?**

A6: Executive Order 13767, *Border Security and Immigration Enforcement Improvements*, issued on Jan. 25, 2017, instructed DHS to take appropriate action to ensure that parole is granted "only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole." Former Secretary of Homeland Security John Kelly then issued an implementing memorandum on Feb. 20, 2017, directing DHS to undertake a review of its parole guidance. Since that time, DHS conducted a careful review of the Central American Minors (CAM) Parole program and has decided to terminate the program. The decision to terminate the program was made because the CAM Parole program provided parole very broadly and not in accordance with the statu[t]e and the President's Executive Order.

**Q7: By eliminating this program, do you anticipate there will be an upswing in the number of UACs [unaccompanied alien children] who attempt to enter the United States illegally?**

A7: The CAM Refugee program is unaffected by the termination of the CAM Parole program and will continue to provide a means through which vulnerable children in-country may be considered for resettlement to the United States. DHS continues to work with other Executive Branch agencies and the governments of the Northern Triangle countries and Mexico to discourage irregular migration and secure the U.S. southern border.

. . . .

**Q10: What percentage of those approved under CAM were refugees vs parolees?**

A10: As of July 13, 2017, 7,306 CAM applicants had been interviewed by USCIS. Of the cases that have been issued decisions, 30% have been approved as refugees, 69% have been recommended for parole, and 1% were denied for both refugee status and parole.

. . . .

**Q14: How does eliminating the CAM Parole program contribute to the security and prosperity of the Northern Triangle? Or the United States?**

A14: The decision to terminate the CAM Parole program was made by the Acting Secretary of Homeland Security as a result of the program review undertaken following issuance of Executive Order 13767, *Border Security and Immigration Enforcement Improvements*. DHS recognizes the need to make progress on economic and security priorities, and is currently working with U.S. interagency, foreign, and non-government counterparts on next steps for engagement to advance objectives and deliverables from the June 15–16 Conference on Prosperity and Security in Central America.

**Q15: Are there any other meaningful routes of relief for these individuals? Is humanitarian parole a realistic option?**

A15: The termination of CAM parole does not impact the CAM Refugee program, which continues to assist vulnerable children in-country who qualify as refugees. Additionally, the termination of the CAM Parole program does not preclude individuals from applying for parole consideration by following the standard parole application process. USCIS will still consider such applications for parole on a case-by-case basis and will authorize parole only where the applicant demonstrates an urgent humanitarian or a significant public benefit reason for parole and merits a favorable exercise of discretion.

**Q16: For applicants who were conditionally approved, wasn't it determined that they are at significant risk? Does the United States believe that these children are no longer in danger?**

A16: The review and subsequent termination of the CAM Parole Program is unrelated to the risk of harm that USCIS evaluates within each CAM Parole case. Additionally, the termination of the CAM Parole program does not preclude individuals from applying for parole consideration by following the standard parole application process. USCIS will still consider such applications for parole on a case-by-case basis and will authorize parole only where the applicant demonstrates an urgent humanitarian or a significant public benefit reason for parole and merits a favorable exercise of discretion.[83]

---

[83] *Id.* at 2–6 (AR000045–49).

USCIS told CAM Program participants that the termination of the CAM Parole Program did not preclude them from applying for parole independent of the Program by filing a USCIS Form I-131.[84] USCIS told participants that "[p]arole will only be issued on a case-by-case basis and only where the applicant demonstrates by filing USCIS Form I-131, an urgent humanitarian or a significant public benefit reason for parole and that the applicant merits a favorable exercise of discretion."[85] USCIS additionally told participants that they could submit a Request for Review of their denied refugee cases within 90 days of when their conditional offer of parole was rescinded, even if their RFRs would have otherwise been untimely.[86] USCIS additionally told participants that it would refund them for any expenses they may have paid for travel arrangements or for medical exams that had not been completed (but not for medical exams that had been completed).[87]

## STANDARD OF REVIEW

### 1. Administrative Procedure Act Claims

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The challenged agency action (if not made reviewable by statute) must be a "final agency action for which there is no other adequate remedy in a court[.]" 5 U.S.C. § 704; *see Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017) ("§ 704's requirement that to proceed under the APA, agency action must be final or

---

[84] U.S. Citizenship & Immigration Servs., U.S. Dep't of Homeland Sec., *Central American Minors (CAM): Information for Parole Applicants* (Aug. 16, 2017) (August 2017 Info Sheet) – ECF No. 33-6 at 2 (AR000036); Form Letter from U.S. Citizenship & Immigration Servs. to CAM Program Beneficiaries (Rescission Form Letter) – ECF No. 33-46 at 2–3 (AR000454–55).

[85] August 2017 Info Sheet – ECF No. 33-6 at 3 (AR000036); *accord* Rescission Form Letter – ECF No. 33-46 at 2–3 (AR000454–55).

[86] August 2017 Info Sheet – ECF No. 33-6 at 4 (AR000037); Rescission Form Letter – ECF No. 33-46 at 2 (AR000454).

[87] August 2017 Info Sheet – ECF No. 33-6 at 4 (AR000037); Rescission Form Letter – ECF No. 33-46 at 2 (AR000454).

otherwise reviewable by statute is an independent element without which courts may not determine APA claims."). To constitute a "final agency action," two conditions must be met: "'first, the action must mark the consummation of the agency's decision making process . . . it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198–99 (9th Cir. 1998) (ellipsis in original) (quoting *W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1196 (9th Cir. 1997)).

The APA provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be — (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2). "'Review under the arbitrary and capricious standard is deferential[.]'" *Friends of the Santa Clara River v. U.S. Army Corps. of Eng'rs*, 887 F.3d 906, 920 (9th Cir. 2018) (quoting *Nat'l Ass'n of Home Builders v. Defenders. of Wildlife*, 551 U.S. 644, 658 (2007)). "[A court's] proper role is simply to ensure that the agency made no 'clear error of judgment' that would render its action 'arbitrary and capricious,' and [courts] require only 'a rational connection between facts found and conclusions made' by the defendant agencies." *Id.* (some internal quotation marks and internal brackets omitted) (quoting *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (en banc), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008); *Conservation Congress v. Finley*, 774 F.3d 611, 617 (9th Cir. 2014)). "Accordingly, [courts] will not vacate an agency's decision unless the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* at 921 (some internal quotation marks and internal brackets omitted) (quoting *Nat'l Ass'n of Home Builders*, 551 U.S. at 658); *accord Sierra Club v. Bosworth*, 510 F.3d 1016, 1022 (9th Cir. 2007) ("[Courts] are 'not empowered to substitute [their] judgment for that of the agency.'") (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by California v. Sanders*, 430 U.S. 99 (1977)).

"Nevertheless, to withstand review[,] 'the agency must articulate a rational connection between the facts found and the conclusions reached.'" *Sierra Club*, 510 F.3d at 1023 (internal brackets omitted) (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1156–57 (9th Cir. 2006), *abrogated on other grounds by Winter*, 555 U.S. 7). "[Courts] will defer to an agency's decision only if it is 'fully informed and well-considered,' and [they] will disapprove of an agency's decision if it made 'a clear error of judgment.'" *Id.* (some internal quotation marks omitted) (quoting *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988); *West v. Sec'y of the Dep't of Transp.*, 206 F.3d 920, 924 (9th Cir. 2000)). "Furthermore, when an agency has taken action without observance of the procedure required by law, that action will be set aside." *Id.* (citing *Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562, 567–68 (9th Cir. 2000)).

"[W]ith respect to [an] APA claim, [a c]ourt may consider matters outside the pleadings without converting [a m]otion to [d]ismiss to a motion for summary judgment." *Herguan Univ. v. Immigration & Customs Enforcement*, 258 F. Supp. 3d 1050, 1063 (N.D. Cal. 2017). "'When a party seeks review of agency action under the APA before a district court, the district judge sits as an appellate tribunal.'" *Id.* (internal brackets omitted) (quoting *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)). "In APA cases the administrative record is 'the whole record,' which 'consists of all documents and materials directly or indirectly considered by agency decision-makers.'" *Id.* at 1063–64 (quoting *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989); *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993)). "Accordingly, [a c]ourt may consider the [administrative record], without converting [a motion to dismiss] to a motion for summary judgment." *Id.*

## 2. Other Claims

In evaluating the defendants' motion to dismiss the plaintiffs' non-APA claims, the court is limited to considering the complaint, documents incorporated into the complaint by reference, and matters of which it may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (citing 5B Wright & Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004 and supp. 2007)). The court must accept all well-pleaded factual allegations in the complaint as

true. *Id.* (citing *Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993)). The court need not accept as true conclusory allegations in the complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of what the claims are and the grounds upon which they rest. *See* Fed. R. Civ. P. 8(a)(2); *Twombly*, 550 U.S. at 555. A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a claim for relief above the speculative level[.]" *Twombly*, 550 U.S. at 555 (citations omitted).

To survive a motion to dismiss, a complaint must contain sufficient factual allegations, which when accepted as true, "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (some internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557).

## ANALYSIS

### 1. Standing

Federal-court jurisdiction extends only to "cases" and "controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547, (2016). "The 'irreducible constitutional minimum' of standing consists of three elements." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that

1    is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed

2    by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560–61; *Friends of the Earth, Inc.*

3    *v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). "The plaintiff, as the party

4    invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* (citing *FW/PBS,*

5    *Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)). "Where, as here, a case is at the pleading stage,

6    the plaintiff must 'clearly allege facts demonstrating' each element." *Id.* (internal ellipsis omitted)

7    (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). "'As a general rule, in an injunctive case [a]

8    court need not address standing of each plaintiff if it concludes that one plaintiff has standing.'"

9    *Atay v. County of Maui*, 842 F.3d 688, 695 (9th Cir. 2016) (quoting *Nat'l Ass'n of Optometrists &*

10   *Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009)).

11       The government argues that the beneficiary-children plaintiffs currently residing outside of the

12   United States lack standing.[88] The government also argues that CASA lacks standing to pursue

13   relief on its own behalf.[89] The government does not dispute that the applicant-parent plaintiffs

14   residing in the United States have standing based on their interests in being reunited with their

15   family members.[90] *Accord Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018) ("We agree that a

16   person's interest in being united with his relatives is sufficiently concrete and particularized to

17   form the basis of an Article III injury in fact."). As the applicant parents are plaintiffs with respect

18   to all of the claims in the complaint and all of the relief sought, their presence is sufficient to

19   render this case justiciable, and it is unnecessary to address at this juncture whether the

20   beneficiary-children plaintiffs or CASA independently have standing.

---

[88] Defs. Mot. to Dismiss – ECF No. 32 at 29–30.

[89] *Id.* at 30–31. The government does not challenge whether CASA has associational standing to pursue relief on behalf of its members in the United States. *Id.* at 30.

[90] *See id.* at 29–31.

**2. Administrative Procedure Act**

DHS's termination of the CAM Parole Program can be seen as two related but distinct agency actions: (1) terminating the Program going forward for participants who had never been approved for parole and (2) rescinding conditional approvals of parole that had been made under the Program before its termination. *Cf. Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1048–49 (N.D. Cal. 2018) (*Regents I*) (distinguishing, in case involving government's attempt to terminate DACA program, between individuals who had received DACA benefits and those who had never obtained benefits), *aff'd*, 908 F.3d 476 (9th Cir. 2018) (*Regents III*); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 437 (E.D.N.Y. 2010) (*Batalla Vidal II*) (same). The court addresses these agency actions separately. *Cf. Catholic Soc. Serv. v. Shalala*, 12 F.3d 1123, 1128 (D.C. Cir. 1994) (in an APA action challenging an agency rule that may have both prospective and retrospective effects, the court can evaluate the prospective and retrospective portions separately).

**2.1 Termination of the CAM Parole Program Going Forward**

The plaintiffs argue that government's actions in terminating the CAM Parole Program violated the APA for the following reasons:

1. the government failed to articulate a satisfactory explanation for its actions, including a rational connection between the facts found and the choice made,[91]

2. the government failed to provide its reasons for its actions in the Federal Register,[92]

3. a failure by the government to take into account "serious reliance interests engendered by longstanding policies" violates the APA, and the government failed to take into account serious reliance interests in the CAM Parole Program,[93]

---

[91] Pls. Mot. for Prelim. Injunction – ECF No. 24 at 17; *see also* Pls. Mot. to Dismiss Opp'n – ECF No. 34 at 14 (incorporating arguments raised in preliminary-injunction motion).

[92] Pls. Mot. for Prelim. Injunction – ECF No. 24 at 17.

[93] *Id.* at 17–18 (internal brackets and ellipses omitted).

United States District Court
Northern District of California

4. a failure by the government to consider "an important part of the problem" violates the APA, and the government failed to consider "an important part of the problem" by failing to consider the country conditions in Northern Triangle countries and the risk that children from those countries face,[94] and

5. the government's decision in January or February 2017 to cease processing CAM Parole Program applications, while not publicly announcing that it was terminating the CAM Parole Program, was a "secret shutdown" that violated the APA.[95]

The court addresses each argument in turn.

### 2.1.1 Whether termination violated the APA for failure to articulate a "satisfactory explanation"

The plaintiffs argue that an agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[96]

"The reviewing court should not attempt itself to make up for [agency] deficiencies." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[Courts] will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1975)). DHS's reasons for terminating the CAM Parole Program are reasonably discernable here.

From its inception, the CAM Program granted parole broadly. Throughout its operation, the Program approved approximately 99% of beneficiaries who were interviewed and considered for parole.[97] The Program also was expanding geometrically and approving increasing numbers of beneficiaries for parole.[98]

_____

[94] *Id.* at 18.

[95] *Id.* at 19–23.

[96] *Id.* at 17 (citing *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

[97] Guidance issued throughout the life of the CAM Program consistently stated that 96–99% of beneficiaries who were interviewed were approved as refugees or for parole; the majority of beneficiaries were denied refugee status but were approved for parole. November 2015 Guidance –

Following the 2016 presidential election and the change in presidential administrations, the government changed its policy views on parole. In January 2017, President Trump issued Executive Order 13,767, which expressed a policy view that the parole provision in the INA had been "abuse[d]" and that "[i]t is the policy of the executive branch to end the abuse of parole and asylum provisions currently used to prevent the lawful removal of removable aliens." Exec. Order No. 13,767, 82 Fed. Reg. at 8795. President Trump directed then-Secretary of Homeland Security John Kelly to "take appropriate action to ensure that parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised only on a case-by-case basis in accordance with the plain language of the statute[.]" *Id.* at 8796.

---

ECF No. 33-12 at 4 (AR000058) (96% of interviewed beneficiaries were approved as refugees or for parole, 12% as refugees and 84% for parole); February 2016 Guidance – ECF No. 33-14 at 4 (AR000075) (98% of interviewed beneficiaries were approved as refugees or for parole); May 2016 Guidance – ECF No. 33-15 at 4 (AR000079) (98% of interviewed beneficiaries were approved as refugees or for parole); July 2016 Guidance – ECF No. 33-16 at 5–6 (AR000084–85) (99% of interviewed beneficiaries were approved as refugees or for parole, and 60% of beneficiaries who entered the United States were approved for parole, as compared to 40% approved as refugees); November 2016 Guidance – ECF No. 33-17 at 8 (AR000103) (99% of interviewed beneficiaries were approved as refugees or for parole).

The November 2015 Guidance broke down the approval rates for refugee status versus parole. 12% of interviewed beneficiaries were approved as refugees, November 2015 Guidance – ECF No. 33-12 at 4 (AR000058), and thus would not have been considered for parole. Of the remaining 88% of interviewed beneficiaries who were considered for parole, 84% were approved, which results in a parole-approval rate of approximately 95% (84/88). Later guidance did not break down the approval rates for refugee status versus parole. The 2017 RTQ broken down the approval rates for refugee status versus parole for the life of the CAM Program. 30% of interviewed beneficiaries were approved as refugees, 2017 RTQ – ECF No. 33-9 at 5 (AR000048), and thus would not have been considered for parole. Of the remaining 70% of interviewed beneficiaries who were considered for parole, 69% were approved, which results in a parole-approval rate of approximately 99% (69/70).

[98] *See* November 2015 Guidance – ECF No. 33-12 at 2–4 (AR000056–58) (90 interviews had been conducted, 96% were approved as refugees or for parole (12% as refugees, 84% for parole), and "**most of the approximately 5,000 applications received so far have come in the last three to four months**") (emphasis in original); February 2016 Guidance – ECF No. 33-14 at 2–4 (AR000073–75) (600 interviews had been conducted, 98% were approved as refugees or for parole, and "most of the approximately 6,500 applications received so far have come in the last six months"); May 2016 Guidance – ECF No. 33-15 at 2–4 (AR000077–79) (1500 interviews had been conducted, 99% were approved as refugees or for parole, and 300 beneficiaries had arrived in the United States, and "[t]he number of final interviews will increase significantly over the next six months"); July 2016 Guidance – ECF No. 33-16 at 5 (AR000084) (2900 interviews had been conducted, 99% were approved as refugees or for parole, and "[w]e expect that the number of final interviews will increase significantly over the next six months"); November 2016 Guidance – ECF No. 33-17 at 8 (AR000103) (5500 interviews had been conducted and 99% were approved as refugees or for parole).

In February 2017, Secretary Kelly issued a memorandum directing that parole authority should be used "sparingly and only in individual cases where, after careful consideration of the circumstances, parole is necessary because of demonstrated urgent humanitarian reasons or significant public benefit."[99] The Kelly Memo expressed a policy view that "[t]he practice of granting parole to certain aliens in pre-designated categories in order to create immigration programs not established by Congress, has contributed to a border security crisis, undermined the integrity of the immigration laws and the parole process, and created an incentive for additional illegal immigration."[100]

Following the issuance of the Kelly Memo, DHS conducted a review of the CAM Parole Program.[101] DHS found that as of July 13, 2017, the CAM Program had approved 99% of the beneficiaries who had been interviewed as refugees or recommended them for parole (30% as refugees, 69% for parole) and that only 1% had been denied both refugee status and parole.[102] DHS's review determined that "the CAM Parole program provided parole very broadly and not in accordance with the statu[t]e and the President's Executive Order."[103]

Following that review, DHS decided to terminate the CAM Parole Program and rescind conditional parole approvals for beneficiaries who had not yet entered the United States.[104] (It allowed beneficiaries who already had entered the United States to remain for the duration of their authorized parole and additionally allowed beneficiaries who had not entered the United States to apply for parole independent of the CAM Parole Program by filing a Form I-131.[105]) It recognized that the previous administration had implemented the CAM Parole Program "as part of an

---

[99] Kelly Memo – ECF No. 33-5 at 10 (AR000030).

[100] *Id.*

[101] *See* 2017 RTQ – ECF No. 33-9 at 3–4 (AR000046–47).

[102] *Id.* at 5 (AR000048).

[103] *Id.* at 4 (AR000047).

[104] *Id.* at 3–4 (AR000046–47). DHS continued to allow affected individuals to apply for parole independent of the CAM Parole Program. *Id.*

[105] 2017 RTQ – ECF No. 33-9 at 4–5 (AR000047–48).

integrated strategy to address factors contributing to increases in migration from Central America to the United States," but it noted that "as indicated by [President Trump's] executive order, DHS is pursuing a new strategy to secure the U.S. southern border."[106]

There is "a rational connection between facts found and conclusions made" by DHS. *Cf. Friends of the Santa Clara River*, 887 F.3d at 920 ("[Courts] require only 'a rational connection between facts found and conclusions made' by the defendant agencies."). The facts found were that the CAM Parole Program was granting parole to virtually all beneficiaries who were interviewed. The conclusion made was that doing so was not in keeping with the new administration's view of the parole statute and its policies on immigration. Whether the court agrees or disagrees with the government's conclusion, it is "not empowered to substitute [its] judgment for that of the agency," *Sierra Club*, 510 F.3d at 1022, and it cannot say that the agency's actions were arbitrary or capricious.

The plaintiffs cite to cases where courts have found that the government's attempts to terminate aspects of the Deferred Action for Childhood Arrivals ("DACA") or the Temporary Protected Status ("TPS") programs were arbitrary and capricious under the APA and argue that the termination of the CAM Parole Program similarly violates the APA. Those situations are distinct and distinguishable.

Under the DACA program, DHS declined to pursue removal proceedings against undocumented immigrants who came to the United States as children, have clean criminal records, and meet various educational or military-service requirements. *Regents III*, 908 F.3d at 489–90. In addition to the deferral of removal itself, the DACA program allowed deferred-action recipients to apply for employment authorization, enabling them to work legally, pay taxes, and participate in the mainstream economy. *Id.* at 490. DHS, under the Trump Administration, rescinded the DACA program. *Id.* at 491–92. Critically, DHS did not claim it was rescinding the DACA program because it disagreed with DACA on policy grounds. *See id.* Instead, it claimed that it was doing so

---

[106] 2017 Leadership Guidance – ECF No. 33-33 at 2 (AR000182).

only because court decisions striking down a different program (the Deferred Action for Parents of Americans program) had left it unable to legally defend DACA. *Id.* at 500–03 ("[T]he Acting Secretary [of Homeland Security] based the rescission of DACA solely on a belief that DACA was beyond the authority of DHS."); *accord Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 148 (E.D.N.Y. 2017) (*Batalla Vidal I*) ("In deciding to rescind the DACA program, Defendants expressly and exclusively relied on a legal determination that the program was unlawful and could not be sustained in court."); *NAACP v. Trump*, 298 F. Supp. 3d 209, 237 (D.D.C. 2018) ("[T]he Department [of Homeland Security] never stated, and the government does not now contend, that DACA's rescission reflected a change in the agency's immigration enforcement priorities."), *appeal docketed*, No. 18-5243 (D.C. Cir. filed Aug. 10, 2018).

By claiming that court decisions had left the DACA program legally unsupportable — instead of saying that it disagreed with DACA based on its own policy choices — DHS tried to rescind the program (which is popular and supported by a majority of Americans) without taking political responsibility for doing so. The DACA courts that have held that DHS's attempts to terminate DACA were arbitrary and capricious did so in large part because DHS tried to blame the courts for its decision instead of assuming responsibility and accountability itself. As the Ninth Circuit explained:

> [P]ublic accountability for agency action can only be achieved if the electorate knows how to apportion the praise for good measures and the blame for bad ones. Without knowing the true source of an objectionable agency action, "the public cannot 'determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall.'" . . . .
>
> . . . . When an agency justifies an action solely with an assertion that the law prohibits any other course, it shifts responsibility for the outcome from the Executive Branch to Congress (for making the law in question) or the courts (for construing it). If the Executive is correct in its interpretation of the law, then the public is correct to blame the other two branches for any resulting problems. But if the Executive is wrong, then it avoids democratic accountability for a choice that was the agency's to make all along. . . . "[A]n official cannot claim that the law ties her hands while at the same time denying the courts' power to unbind her. She may escape political accountability or judicial review, but not both."

*Regents III*, 908 F.3d at 498–99 (citations omitted); *accord Batalla Vidal II*, 279 F. Supp. 3d at 421 ("This rule . . . ensures that agencies are accountable for their decisions: If an agency makes a decision on policy grounds, it must say so, not act as if courts have tied its hands.").

Here, by contrast, the government and DHS are assuming accountability and responsibility for terminating the CAM Parole Program on policy grounds. This is a crucial distinction. President Trump announced his new policy on parole in Executive Order 13,767: "It is the policy of the executive branch to end the abuse of parole and asylum provisions currently used to prevent the lawful removal of removable aliens." Exec. Order 13,767, 82 Fed. Reg. at 8795. Secretary Kelly similarly memorialized that DHS policy's views were that "[t]he practice of granting parole to certain aliens in pre-designated categories in order to create immigration programs not established by Congress, has contributed to a border security crisis, undermined the integrity of the immigration laws and the parole process, and created an incentive for additional illegal immigration."[107] The government recognized that it was changing policy qua policy.[108] The issue that was present in the DACA cases — trying to shift responsibility to the courts for the decision to rescind a popular program instead of the agency itself claiming responsibility — is not present in the same way here.

Another factor that distinguishes this case from the DACA cases is that (in the opinion of many DACA courts), the government's legal assessment and analyses of DACA were wrong as a matter of law. *Regents III*, 908 F.3d at 510 ("[B]ecause the Acting Secretary [of Homeland Security] was . . . incorrect in her belief that DACA was illegal and had to be rescinded, plaintiffs are likely to succeed in demonstrating that the rescission must be set aside."); *Batalla Vidal II*, 279 F. Supp. 3d at 420–27 ("To the extent the decision to end the DACA program was based on the Attorney General's determination that the program is unconstitutional, that determination was

---

[107] Kelly Memo – ECF No. 33-5 at 10 (AR000030).

[108] *See* 2017 Leadership Guidance – ECF No. 33-33 at 2 (AR000182) ("The CAM Parole program was implemented as part of an integrated strategy to address factors contributing to increases in migration from Central America to the United States. However, as indicated by the executive order, DHS is pursuing a new strategy to secure the U.S. southern border.").

legally erroneous, and the decision was therefore arbitrary and capricious. . . . This conclusion was also arbitrary and capricious because it is based on an obvious factual mistake."); *but see Casa de Md. v. U.S. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758, 772–73 (D. Md. 2018) (holding that it was not arbitrary and capricious for the government to rescind DACA based on the belief that DACA was legally unsupportable in light of court decisions). By relying on legal analyses that were wrong as a matter of law, the government's decision to rescind DACA was necessarily arbitrary and capricious. *Regents III*, 908 F.3d at 505 ("[I]t is black letter law that where an agency purports to act solely on the basis that a certain result is legally required, and that legal premise turns out to be incorrect, the action must be set aside, regardless of whether the action *could* have been justified as an exercise of discretion.") (emphasis in original); *Batalla Vidal II*, 279 F. Supp. 3d at 420 ("An agency decision that is based on an erroneous legal premise cannot withstand arbitrary-and-capricious review."). In this case, the plaintiffs have not identified a similarly fatally flawed legal assessment or analysis by the government. DHS has expressed its view that the better interpretation of the statutory language of the parole statute is that it "appears to strongly counsel in favor of using the parole authority sparingly and only in individual cases where, after careful consideration of the circumstances, parole is necessary because of demonstrated urgent humanitarian reasons or significant public benefit."[109] That interpretation is not flawed in the same way that — according to the DACA courts — DHS's interpretation of the legality of DACA was flawed. In construing a predecessor version of the parole statute (that did not include the "case-by-case" requirement that the current version does), the Ninth Circuit held

> The legislative history of the parole provision indicates that Congress intended that temporary admission be granted infrequently. . . . ["]The parole provisions were designed to authorize the Attorney General to act only in emergent, individual, and isolated situations, such as the case of an alien who requires immediate medical attention, and not for the immigration of classes or groups outside of the limit of the law.["]

---

[109] Kelly Memo – ECF No. 33-5 at 10 (AR000030).

*Mason v. Brooks*, 862 F.2d 190, 194 (9th Cir. 1988) (quoting S. Rep. No. 748, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.C.C.A.N. 3328, 3335).[110] Congress reemphasized this view of parole when it amended the parole statute to restrict the government's discretion to approve parole "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, tit. VI, subtit. A, § 602(a), 110 Stat. 3009, 3009-689 (1996) (amending 8 U.S.C. § 1182(d)(5)(A)). According to the House Judiciary Committee, this change was made because

> [t]he text of section 212(d)(5) [8 U.S.C. § 1182(d)(5)] is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, and not as a supplement to Congressionally-established immigration policy. In recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.

H.R. Rep. No. 104-469, at 140 (1996). The court cannot say that DHS's view — that the parole statute counsels in favor of awarding parole sparingly — is legally erroneous, or that its decision to terminate a program that awarded parole broadly was based on a flawed legal analysis in the same way that its attempt to terminate DACA were.[111]

The plaintiffs analogize to the TPS cases, but those are distinguishable too. The TPS program is a humanitarian program that authorizes DHS to temporarily permit nationals from certain countries to live and work in the United States when an ongoing armed conflict, environmental disaster, or other conditions prevent the safe return of those persons to their country of origin. *See* 8 U.S.C. § 1254a(b)(1)(A)–(C). Prior administrations (both Republican and Democratic) evaluated

---

[110] The version of the parole statute in effect at the time that *Mason* was decided read, "[t]he Attorney General may . . . in his discretion parole into the United States temporarily, under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States." *Mason*, 862 F.2d at 194 (ellipsis in original) (quoting 8 U.S.C. § 1182(d)(5) (1988)).

[111] The court expresses no opinion about whether the parole statute prohibits a program such as the CAM Parole Program, which awarded parole broadly. It holds only that the Trump Administration's view — that programs that award parole broadly are not consistent with the Administration's reading of the parole statute and thus should be terminated — is not based on a legally erroneous analysis.

whether to extend TPS status for countries beyond the period of their initial designation by considering both the originating conditions that led to the countries' initial designations and subsequent intervening events that prevented safe return of the countries' nationals. *See Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1110–12 & nn.18–22 (N.D. Cal. 2018) (*Ramos I*). In a break from past practice, in evaluating TPS designations, the Trump Administration allegedly shifted to considering only whether the originating conditions had abated and stopped considering subsequent intervening events. *Id.* at 1109–15. It then used that shift to de-designate four countries (Sudan, Haiti, Nicaragua, and El Salvador) from TPS status. *Id.* Critically, DHS did not acknowledge that it was changing how it was evaluating TPS status and gave no explanation for the change. *Id.* at 1116. Courts have held that this could constitute an APA violation because "[t]he APA constrains an agency's ability to change its practices or policies without acknowledging the change or providing an explanation." *Id.* at 1108, 1116; *Ramos v. Nielsen*, __ F. Supp. 3d __, No. 18-cv-01554-EMC, 2018 WL 4778285, at *10 (N.D. Cal. Oct. 3, 2018) (*Ramos II*) (finding that plaintiffs had pleaded an APA claim because "[t]he alleged changes in policy — eliminating consideration of intervening conditions not directly related to the originating condition — [are] substantive and highly consequential . . . . [but t]here is no dispute that DHS never acknowledged any change in practice and thus has not provided any explanation for any such change"), *appeal docketed*, No. 18-16981 (9th Cir. filed Oct. 12, 2018); *accord Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 416–17 (D. Mass. 2018) (same). Here, by contrast, DHS acknowledged that it was changing policy and explained why.[112] The challenges raised in the context of the TPS program do not apply in the same way here.

DHS's termination of the CAM Parole Program does not violate the APA for lack of a satisfactory explanation.

---

[112] *See* Exec. Order No. 13,767, 82 Fed. Reg. at 8795–96; Kelly Memo – ECF No. 33-5 at 2 (AR000022), 10 (AR000030).

### 2.1.2 Whether termination violated the APA for failure to provide explanations in the Federal Register

The plaintiffs fault DHS for not providing its reasons for terminating the CAM Parole Program in the Federal Register notice announcing the termination of the Program.[113]

In reviewing agency action to determine whether it is arbitrary or capricious, a court is not limited to the Federal Register. The APA provides that courts must review "the whole record," 5 U.S.C. § 706, which "'consists of all documents and materials directly or indirectly considered by agency decision-makers,'" *Herguan Univ.*, 258 F. Supp. 3d at 1064 (quoting *Thompson*, 885 F.2d at 555); *see Dist. Hosp. Partners, L.P. v. Sebelius*, 794 F. Supp. 2d 162, 171 (D.D.C. 2011) (rejecting suggestion to look solely to the Federal Register because "[t]o review an agency's action fairly, the Court should have before it neither more *nor less* information than did the agency when it made its decision[,] and so the APA requires review of 'the whole record'") (emphasis in original, internal brackets and ellipsis omitted) (quoting *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984)). DHS's reasons for terminating the CAM Parole Program are readily discernable from the whole record, and the plaintiffs cite no authorities to support their argument that the government's failure to list those reasons in its Federal Register notice renders its decision arbitrary or capricious.

Agency rules that are subject to the notice-and-comment provisions of 5 U.S.C. § 553 are subject to certain Federal Register reporting requirements. The notice-and-comment provisions do not apply to the CAM Parole Program's termination, however. First, the CAM Parole Program was not created through notice and comment, which suggests that its termination does not require notice and comment either. *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 273 (E.D.N.Y. 2018) (*Batalla Vidal III*) ("Plaintiffs' view that Defendants must use notice and comment to stop what started without notice and comment is not only counterintuitive, but also at odds with the general principle that the procedures needed to repeal or amend a rule as the same ones that were used to

---

[113] Pls. Mot. for Prelim. Injunction – ECF No. 24 at 17; Pls. Mot. to Dismiss Opp'n – ECF No. 34 at 16–17.

make the rule in the first place.") (citing *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015)); *cf. Regents III*, 908 F.3d at 513 ("The district court held that because DACA itself was a general statement of policy that did not require notice and comment, it could also be rescinded without those procedures. This proposition finds support in *Mada-Luna*, in which we concluded that a deferred-action Operating Instruction constituted a general statement of policy, and thus could be validly repealed and superseded without notice-and-comment proceedings.") (internal quotation marks and brackets omitted) (quoting *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1017 (9th Cir. 1987)). Second, the termination of the CAM Parole Program does not foreclose parole as a general matter — individuals may apply for parole by filing a Form I-131, and the government may continue to grant parole on a case-by-case basis — and the termination thus does not effect a new binding rule of substantive law that would be subject to notice and comment. *Cf. Regents III*, 908 F.3d at 513–14 (a rescission of DACA that "leaves in place the background principle that deferred action is available on a case-by-case basis. . . . is not a 'new binding rule of substantive law'" that requires notice-and-comment) (some internal quotation marks omitted) (citing *Mada-Luna*, 813 F.2d at 1014).

DHS's termination of the CAM Parole Program does not violate the APA for failure to provide its explanations in the Federal Register.

### 2.1.3    Whether termination violated the APA for failure to take into account "serious reliance interests"

The plaintiffs argue that agency action is arbitrary and capricious if the agency fails to take into account the "serious reliance interests engendered by longstanding policies," citing *Encino Motorcars LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016), and *FCC v. Fox Television Studios, Inc.*, 556 U.S. 502, 515 (2009).[114] Neither side addresses what the standard is for determining what reliance interests are "serious" or how much the agency must take them into account.[115]

---

[114] Pl. Mot. for Prelim. Injunction – ECF No. 24 at 17 (internal brackets and ellipses omitted).

[115] The D.C. Circuit addressed this issue in the context of an environmental permit where the regulated party and other interested parties submitted public comments to the agency (the EPA) in favor of or against the permit. The D.C. Circuit held that "'the extent to which an agency is obliged to address

CAM Parole Program participants who had not been conditionally approved for parole (for themselves, in the case of beneficiaries, or for their family members, in the case of applicants), and individuals who never applied to the Program, do not have a "serious reliance interest" in being approved for parole. Parole is at the discretion of DHS, 8 U.S.C. § 1182(d)(5)(A), and an application for parole that has not been approved does not engender a reliance interest. *See Wong v. United States*, 373 F.3d 952, 968 (9th Cir. 2004) ("The INA does not create any liberty interest in temporary parole that is protected by the Fifth Amendment. Rather, the statute makes clear that whether and for how long temporary parole is granted are matters entirely within the discretion of the [Secretary of Homeland Security]."); *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 298 F. Supp. 3d 1304, 1310 (N.D. Cal. 2018) (*Regents II*) ("Our court of appeals has accordingly held there is no protected interest in temporary parole, since such relief is 'entirely within the discretion of the [Secretary of Homeland Security].'") (quoting *Wong*, 373 F.3d at 967–68), *aff'd*, *Regents III*, 908 F.3d 476.

To the extent that the plaintiffs argue that parole may be discretionary in theory but that in practice, the CAM Parole Program awarded parole (or refugee status) in 99% of cases and participants therefore had a right to rely on an expectation that they would be awarded parole, their argument fails. As the plaintiffs acknowledge, USCIS told participants that applications would be considered for parole "on a case-by-case basis,"[116] and nothing in the CAM Parole Program materials suggested that parole was guaranteed. A liberal award of parole in the past under the Program does not create a "serious reliance interest" in being approved for parole under the

---

reliance will be affected by the thoroughness of public comments it receives on the issue. An agency cannot be faulted for failing to discuss at length matters only cursorily raised before it.'" *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 722 (D.C. Cir. 2016) (internal brackets and ellipsis omitted) (quoting *Encino Motorcars*, 136 S. Ct. at 2128 n.2 (Ginsburg, J., concurring)). It is not clear how to apply that standard here, where the agency action was not subject to public comment in the same way. The standard suggests, however, that the "serious reliance interests" test operates on a sliding scale — the greater the reliance interests, the greater the agency's obligation to take them into account, and the lesser the reliance interests, the lesser the agency's obligation — and further suggests that the agency should not be faulted for failing to raise and address sua sponte reliance interests that are less serious.

[116] Compl. – ECF No. 1 at 13 (¶ 38); Pls. Mot. for Prelim. Injunction – ECF No. 24 at 11; Pls. Mot. to Dismiss Opp'n – ECF No. 34 at 16, 24.

Program that DHS had to take into account. *See Regents II*, 298 F. Supp. 3d at 1311 ("An agency's past practice of generally granting a government benefit is also insufficient to establish a legal entitlement.") (citing *Gerhart v. Lake Cty.*, 637 F.3d 1013, 1020 (9th Cir. 2011)); *Garcia-Mir v. Meese*, 788 F.2d 1446, 1451 (11th Cir. 1986) (fact that government may have generously granted discretionary parole in the past does not give rise to an entitlement to parole); *cf. Regents III*, 908 F.3d at 515 ("[A] 99% renewal rate under DACA provides no evidence that the government shared an understanding that the DACA program would continue existing indefinitely to provide such renewals.").

To the extent that the plaintiffs argue that CAM Parole Program participants relied on the opportunity to apply for parole (as opposed to a right to receive parole), the plaintiffs have not pleaded why the termination of the Program implicates "serious reliance interests." Participants can still apply for parole by filing a Form I-131. The plaintiffs have not shown that a reliance interest in the CAM Parole Program in particular (as opposed to other opportunities to apply for parole) was a "serious reliance interest" that DHS had to take into account. Also, the plaintiffs do not establish how DHS did not sufficiently take into account those reliance interests by allowing participants to apply for parole through a different mechanism, a Form I-131. *See Termination of the Central American Minors Parole Program*, 82 Fed. Reg. at 38,927.

To the extent that the plaintiffs argue that CAM Parole Program participants who did not receive a decision on their applications had "serious reliance interests" because they paid costs to participate in the Program, the court disagrees. There were no fees to apply to the CAM Parole Program.[117] Parents had to pay the cost of DNA testing, but USCIS refunded those costs if DNA

---

[117] *See* Media Note, Office of the Spokesperson, U.S. Dep't of State, *Launch of In-Country Refugee/ Parole Program for Children in El Salvador, Guatemala, and Honduras with Parents Lawfully Present in the United States* (Dec. 3, 2014) (December 2014 Media Note) – ECF No. 33-10 (AR000051) ("Parents do not need to pay any fee to file [a CAM Program application] or for assistance in completing and submitting the form, but they are expected to cover the initial costs of DNA testing to confirm claimed biological parent-child relationships. Costs of DNA testing are reimbursable under certain circumstances."); Fact Sheet, Office of the Spokesperson, U.S. Dep't of State, *Fact Sheet: Expansion of the Central American Minors (CAM) Program* (Nov. 1, 2016) – ECF No. 33-18 at 3 (AR000107) ("There are no fees to file a [CAM Program application].").

testing confirmed a familial relationship (and the plaintiffs do not allege that they were denied refunds of DNA-testing costs).[118] Participants incurred costs for medical exams and travel arrangements only after USCIS conditionally approved beneficiaries for parole, so participants who did not receive a decision did not incur those costs.[119]

Participants did incur costs for tolls, gas, and food to travel to their country capitals.[120] While these costs might be consequential for participants, the court concludes that they do not create a "serious reliance interest" that DHS had to take into account. The costs were discrete, short-term costs. If these isolated costs were "serious reliance interests," then every agency action potentially would be subject to an APA challenge on a theory that the agency failed to take into account some cost that someone, somewhere, might have incurred because of an agency program. *Cf. Encino Motorcars*, 136 S. Ct. at 2126 (discussing "serious reliance interests" in the context of "longstanding policies" and, specifically, a labor-law regulatory interpretation that was in place for over two decades; a chanced interpretation "could necessitate systemic, significant changes" to employment agreements throughout an industry); *Regents I*, 279 F. Supp. 3d at 1046 (discussing "serious reliance interests" in the context of DACA over the course of years); *Batalla Vidal II*, 279 F. Supp. 3d at 431 (same).

DHS's termination of the CAM Parole Program going forward does not violate the APA for failure to take into account "serious reliance interests."

---

One plaintiff whose application was not conditionally approved for parole claimed that he paid certain "program fees," Compl. – ECF No. 34 (¶ 102), without further elaborating what those fees were. There is nothing in the complaint or the administrative record that indicates that DHS knew about those fees, and DHS cannot be faulted for not addressing unknown reliance interests. *See generally Mingo Logan Coal*, 829 F.3d at 722.

[118] Compl. – ECF No. 1 at 15 (¶ 42(c)).

[119] *See id.* at 16 (¶ 42(f)–(g)).

[120] *Id.* at 34 (¶ 102) ("A.B. spent approximately $100 for each of four trips his son had to make to San Salvador for CAM-related appointments."), 38 (¶ 118) ("Each time H.F., A.F., and their mother traveled to Tegucigalpa in connection with CAM — a nearly four-hour trip that required them to leave their house around 3:00 AM — J.F. sent them $200 to cover the costs of the trip, including tolls, gas, and food.").

### 2.1.4 Whether termination violated the APA for failure to "consider an important aspect of the problem"

The plaintiffs argue that agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem."[121] Neither side addresses the standard for determining "the problem" and its "important aspects."

In the Ninth Circuit, "[w]hether an agency has overlooked 'an important aspect of the problem' . . . turns on what a relevant substantive statute makes 'important.'" *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996). As one court noted, citing the Ninth Circuit, "[a]n 'important aspect of the problem' is not simply whatever plaintiffs would like the [agency] to consider. . . . The court is not free to invent 'important' things out of thin air and require the agency to consider them. It may only ensure that the agency's decision is supported by reasoned judgment and that the agency considered the factors it was required by law to consider." *N.C. Bus. Enters. Program v. United States*, 110 Fed. Cl. 354, 363 (2013) (citing *Or. Nat. Res. Council*, 92 F.3d at 798).

The plaintiffs argue that "important aspect[s] of the problem" are (1) reliance interests and (2) conditions in the Northern Triangle countries.[122] The court addressed the first issue in the previous section. Regarding the second issue, the plaintiffs argue that "conditions in the Northern Triangle that led to the inception of the CAM program have only worsened" and that "[t]hese country conditions predictably result in Central American children undertaking the dangerous journey by land to the United States and seeking relief at the border," and the defendants failed to consider these factors.[123]

The parole statute, 8 U.S.C. § 1182(d)(5)(A), vests the Secretary of Homeland Security with discretion over parole decisions. It expressly limits the Secretary to granting parole "only on a

---

[121] Pls. Mot. for Prelim. Injunction – ECF No. 24 at 17 (citing *Motor Vehicle Mfrs.*, 463 U.S. at 42–43).

[122] *Id.* at 17–18.

[123] *Id.* at 18; Pls. Mot. to Dismiss Opp'n – ECF No. 34 at 16.

case-by-case basis" for urgent humanitarian reasons or significant public benefit. 8 U.S.C.

§ 1182(d)(5)(A); *see* Pub. L. No. 104-208, div. C, tit. VI, subtit. A, § 602(a), 110 Stat. at 3009-689

(adding the "only on a case-by-case basis" requirement). It does not otherwise require the

Secretary to consider any particular factors or mandate how the Secretary must weigh competing

interests. Among other things, it does not require the Secretary to consider (1) the general country

conditions in the Northern Triangle or any other country or (2) whether Central American minors

would otherwise decide to journey by land to the United States — neither of which is a "case-by-

case basis" — in deciding what procedures she will establish or terminate for parole applications.

The previous administration might have weighed these considerations more heavily in establishing

the CAM Parole Program, but that does not obligate future administrations to consider and weigh

them similarly. *Cf. Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir.

2015) (en banc) ("[Agency] was entitled in 2003 to give more weight to socioeconomic concerns

than it had in 2001, even on precisely the same record. . . . There was a change in presidential

administrations just days after the [] Rule was promulgated in 2001. Elections have policy

consequences.").

DHS's termination of the CAM Parole Program does not violate the APA for failure to

consider "important aspects of the problem."

### 2.1.5 Whether DHS's decision to stop processing CAM Program applications from January 2017 to August 2017 was a "secret shutdown" of the Program that violated the APA

DHS stopped processing CAM Program applications between January 2017 but did not

announce the termination of the CAM Parole Program until August 2017. The plaintiffs

characterize this as a "secret shutdown" of the Program that was arbitrary and capricious and

violated the notice requirements in 5 U.S.C. § 552. Even if this were the case, DHS's subsequent

public termination of the CAM Parole Program in August 2017 moots that challenge, at least with

respect to DHS's decision to terminate the Program going forward. *See Util. Air Regulatory Grp.*

*v. EPA*, 744 F.3d 741, 750 (D.C. Cir. 2014) (holding that challenges to agency's failure to provide

notice of new rule were mooted by agency's later re-promulgation of the rule with notice, even if

the two rules were identical) (citing *Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regulatory*

*Comm'n*, 680 F.2d 810, 813–14 (D.C. Cir. 1982)). The standard relief for an APA challenge is to set aside the unlawful agency action. 5 U.S.C. § 706(2). Setting aside DHS's "secret shutdown" of the CAM Parole Program in January 2017 would afford the plaintiffs no relief in light of DHS's public termination of the Program in August 2017. The plaintiffs' objections to the "secret shutdown," as they relate to the termination of CAM Parole Program going forward, are moot.

## 2.2 Rescinding Conditional Approvals of Parole

The analysis is different with respect to DHS's decision to rescind all conditional approvals of parole that it issued before it terminated the CAM Parole Program in August 2017. Program participants who received conditional approvals of parole (and made arrangements based on those approvals) had more serious reliance interests than individuals who never received approvals. The court holds that DHS's failure to take into account and address those more serious reliance interests when it mass-rescinded parole for those participants was arbitrary and capricious.

The government first argues that those participants do not have reliance interests because their parole approvals were only "conditional."[124] But as the plaintiffs plead in their complaint and as the administrative record confirms, the only steps following conditional approval to travel to the United States and be fully paroled were nondiscretionary ones: the completion of a medical exam, final security checks, and making travel arrangements.[125] (By contrast, participants who had never

---

[124] Defs. Mot. to Dismiss – ECF No. 32 at 11; Defs. Mot. to Dismiss Reply – ECF No. 38 at 17.

[125] Compl. – ECF No. 1 at 16–17 (¶ 42(f)–(i)); Form Letter, U.S. Citizenship & Immigration Servs., U.S. Dep't of Homeland Sec., *Central American Minors Program: Notice of Ineligibility for Refugee Resettlement and Conditional Approval for Parole* – ECF No. 33-44 at 4 (AR000448) ("You have been conditionally approved for parole into the United States. Final approval is conditioned upon successful completion of any remaining clearances that are required in the screening process. These clearances include [a] medical examination by a U.S. approved panel physician, completion of security clearance procedures, and verification of family relationships. Please see attached information sheet for next steps that must be completed for you to be paroled into the United States."); U.S. Citizenship & Immigration Servs., U.S. Dep't of Homeland Sec., *Central American Minors (CAM) Parole Program: Information for Conditionally Approved Applicants* – ECF No. 33-48 at 2–3 (AR000462– 63) ("As explained in the letter denying your application for refugee status, you have been conditionally approved for parole into the United States, meaning that final approval of parole cannot be granted until certain additional steps have been completed. These steps include: • Favorable results of background and security checks conducted by USCIS; • Favorable results of a medical examination, conducted at your expense, and scheduled by International Office for Migration (IOM); • Coordination of travel arrangements, at your own expense, with IOM; • Verification of continued legal presence of your relative in the United States by USCIS; • Travel within the validity period of the parole

been approved were subject to discretionary decisions.) This distinction means that CAM Parole Program participants with approved applications for parole had "serious reliance interests." The government argues that the Secretary of Homeland Security retained discretion to rescind parole for participants who had conditionally approval.[126] But that does not mean that participants with approval had no reliance interests in their parole. *Cf. Batalla Vidal II*, 279 F. Supp. 3d at 432 (while DHS could in its discretion rescind DACA at any time, "it does not follow that [beneficiaries] had no *reliance* interests therein, such that Defendants were free to end the DACA program without considering such interests") (emphasis in original) (citing *Encino Motorcars*, 136 S. Ct. at 2124–26).

The government next argues that it took reliance interests into account because it did not rescind parole for beneficiaries who had arrived in the United States.[127] The court cannot see how this decision for beneficiaries in the United States takes into account the serious reliance interests of participants with conditional approval who had not arrived or whose family members had not arrived in the United States. The government also argues that it considered reliance interests when it offered to refund fees that participants paid for medical examinations and plane tickets.[128] This does not address the participants' reliance interests in the parole approvals. It also does not adequately address the fees paid because the government offered refunds only for medical exams that were not completed but did not offer refunds for exams that were completed.[129]

---

authorization letter (Form I-512). . . . IOM will contact your relative in the United States to collect payment for your medical examination. . . . If your medical exam clears, IOM will contact your relative in the United States to arrange your flight. . . After IOM receives payment for your travel to the United States, IOM will submit your travel itinerary to USCIS. We will: • Perform final security checks, • Ensure your medical exam results remain valid until date of travel, and • Verify that your relative in the United States still has a qualifying legal presence in the United States. If we decide that you have met all requirements for parole under this program, we will issue for you a Form I-512L, Authorization for Parole of an Alien Into the United States.").

[126] Defs. Mot. to Dismiss – ECF No. 32 at 20.

[127] *Id.*

[128] *Id.*

[129] August 2017 Info Sheet – ECF No. 33-6 at 4 (AR000037); Rescission Form Letter – ECF No. 33-46 at 2 (AR000454).

The court holds that when DHS mass-rescinded the conditional parole approvals of CAM Parole Program participants, it did not adequately take into account and address the participants' serious reliance interests. Consequently, its actions in mass-rescinding approvals were arbitrary and capricious and must be set aside under the APA.

The "serious reliance interests" requirement does not mean that DHS lacks the authority to rescind conditional approvals of parole for CAM Parole Program participants, notwithstanding the participants' reliance on their approvals. DHS has that authority. It has the authority to rescind parole even from Program beneficiaries who have arrived in the United States and similarly has the authority to rescind conditional approvals of applications where the beneficiaries are still outside the United States. *See* 8 U.S.C. § 1182(d)(5)(A). But DHS must recognize and acknowledge that Program participants who were approved for parole had serious reliance interests in that parole, take those reliance interests into account, and explain why it felt it appropriate to nonetheless mass-rescind their parole in the face of that reliance. This ensures transparency and accountability. If DHS thinks that Program participants' reliance on their parole is less important than its new policies in mass-rescinding that parole, it can make that choice, so long as it explains its reasons so that it can be held accountable. *Cf. NAACP*, 298 F. Supp. 3d at 249 (the government must explain its actions so that "members of the public know how their elected officials have used their enforcement powers, and they can hold those officials accountable by speaking out, by petitioning their representatives, or ultimately at the ballot box").

When it mass-rescinded conditional approvals, DHS failed to take into account and address the serious reliance interests of CAM Parole Program participants whom it had approved. Its mass-rescission was arbitrary and capricious in violation of the APA.[130]

*     *     *

---

[130] Because the court finds that DHS's mass-rescission of parole approvals was arbitrary and capricious because DHS failed to take into account serious reliance interests, it is unnecessary to address whether the mass-rescission was also arbitrary and capricious because it was impermissibly retroactive or because it violated DHS's own guidance and thus ran afoul of the doctrine in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

For the foregoing reasons, the court denies the defendants' motion to dismiss the plaintiffs' APA claims as they relate to the government's mass-rescinding of conditional approvals of parole. The court otherwise grants the defendants' motion to dismiss the plaintiffs' APA claims.

### 3. Due Process

The plaintiffs bring a claim on behalf of the plaintiffs in the United States for violation of due process.[131]

The Due Process Clause of the Fifth Amendment provides that no person may be "deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. "'A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution.'" *Regents III*, 908 F.3d at 514 (quoting *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994)). The applicant-parent plaintiffs claim as their protected interest a general constitutional liberty interest in "the companionship and society of their family members who are stranded in Central America."[132]

In *Gebhardt v. Nielsen*, 879 F.3d 980 (9th Cir. 2018), the Ninth Circuit held that the general right to familial companionship cannot form the basis of a due-process claim for a plaintiff in the United States challenging a government decision not to admit non-citizen family members located outside the United States. The plaintiff in *Gebhardt* was a U.S. citizen who filed legal-permanent-resident petitions for his non-citizen wife and her three non-citizen children. *Id.* at 983. USCIS approved the petitions initially but then revoked them based on the plaintiff's criminal conviction from years earlier. *Id.* at 983–84. The plaintiff challenged USCIS's denials of his petition, arguing that (among other things) "USCIS, by denying his petitions, denied him the fundamental right to preserve the integrity of his family." *Id.* at 988. The Ninth Circuit rejected that argument:

---

[131] Compl. – ECF No. 1 at 42 (¶ 137). The plaintiffs do not bring a due-process claim on behalf of any beneficiary children outside the United States. *See id.*

[132] *Id.*

> Plaintiff's theory is that he has a fundamental right to reside in the United States with his non-citizen relatives. But that theory runs headlong into Congress' plenary power over immigration. We acknowledge, of course, that individuals have a strong interest in living with their family members. But that interest cannot be so fundamental that it overrides Congress' plenary power in this domain. As we have said before, the generic right to live with family is "far removed" from the specific right to reside in the United States with non-citizen family members. . . . We therefore conclude that Plaintiff's substantive due process claim is not colorable, and we decline to consider it further.

*Id.* (citations omitted). So too here. The applicant-parent plaintiffs' right to familial companionship for their non-citizen children located outside the United States does not give rise to a protected interest that can form the basis of a due-process claim.[133]

The plaintiffs' authorities do not change this conclusion. The plaintiffs cite Justice Kennedy's concurring opinion in *Kerry v. Din*, 135 S. Ct. 2128 (2015), for the proposition that they have a protected interest.[134] In *Din*, the government denied an immigrant visa to the husband of a U.S. citizen. *Id.* at 2131 (plurality op.). The husband was a citizen and resident of Afghanistan. *Id.* The U.S.-citizen spouse challenged the denial because the government did not explain its reasons for the denial. *Id.* at 2131–32. The Ninth Circuit reversed the district court's order dismissing the case. *Id.* The Supreme Court then reversed the Ninth Circuit. *Id.* at 2138. In his concurring opinion, Justice Kennedy assumed for the sake of argument that the U.S. citizen plaintiff in the United States had a protected interest in the visa application of her non-U.S. citizen spouse and concluded that the government had provided her with sufficient due process in any event. *Id.* at 2139 (Kennedy, J., concurring). He expressly refrained from deciding the protected-interest issue,

---

[133] *Gebhardt* addresses the issue of the constitutional right to familial companionship specifically in the context of a plaintiff located in the United States and his non-citizen family members located outside the United States who were not separated due to any government action. The other cases that the plaintiffs cite are inapposite because they address familial companionship in the context of families who were all originally present in the United States and were separated by the government's actions. *Cf. Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1074–75, 1079–80 (9th Cir. 2011) (family members who were together in the United States were separated allegedly by the government's actions); *Kelson v. City of Springfield*, 767 F.2d 651, 653–55 (9th Cir. 1985) (same); *Morrison v. Jones*, 607 F.2d 1269, 1271–73, 1275 (9th Cir. 1979) (same).

[134] The Ninth Circuit has adopted Justice Kennedy's concurring opinion as the binding opinion in *Din*. *Cardenas v. United States*, 826 F.3d 1164, 1171–72 (9th Cir. 2016).

United States District Court
Northern District of California

writing that "[t]oday's disposition should not be interpreted as deciding whether a citizen has a protected liberty interest in the visa application of her alien spouse." *Id.* That opinion thus does not bear on the issue here.

The plaintiffs also cite *Bustamante v. Mukasey*, 531 F.3d 1059 (9th Cir. 2008), which involved a U.S.-citizen wife who brought a due-process claim after the government denied her non-citizen husband an immigrant visa. But the source of the protected interest at issue there was not a general constitutional liberty interest in familial companionship. Instead, the protected interest was statutory: a U.S. citizen's statutorily created entitlement to an immigration visa for his or her spouse. *See Ching v. Mayorkas*, 725 F.3d 1149, 1155–56 (9th Cir. 2013) ("[G]rant of an I-130 petition for immediate relative status is a nondiscretionary decision. Immediate relative status for an alien spouse is a right to which citizen applicants are entitled as long as the petitioner and spouse beneficiary meet the statutory and regulatory requirements for eligibility. This protected interest is entitled to the protections of due process.") (citing *Bustamante*, 531 F.3d at 1061–62, and other authorities). Because the plaintiff in *Bustamante* satisfied the threshold requirement of having a protected interest in a visa for her husband, the Ninth Circuit addressed the second question: whether the government had deprived her of that interest without sufficient procedural protections. *Bustamante*, 531 F.3d at 1062. *Bustamante* thus does not bear on the question here: whether the applicant-parent plaintiffs have a protected interest.

By contrast to the spousal immigrant visas in *Bustamante*, there is no statutorily created protected interest in parole. *Wong*, 373 F.3d at 968 ("The INA does not create any liberty interest in temporary parole that is protected by the Fifth Amendment. Rather, the statute makes clear that whether and for how long temporary parole is granted are matters entirely within the discretion of the [Secretary of Homeland Security]."); *Munoz v. Ashcroft*, 339 F.3d 950, 954 (9th Cir. 2003) ("Since discretionary relief is a privilege created by Congress, denial of such relief cannot violate a substantive interest protected by the Due Process Clause."); *Regents II*, 298 F. Supp. 3d at 1310 ("Our court of appeals has accordingly held there is no protected interest in temporary parole, since such relief is 'entirely within the discretion of the [Secretary of Homeland Security].' . . . [This] foreclose[s] any argument that plaintiffs have a protected interest in . . . advance parole[.]")

1    (citing *Wong*, 373 F.3d at 967–68). And *Gebhardt* forecloses the argument that a general

2    constitutional right to familial companionship gives rise to a protected interest in this context.

3    Because the plaintiffs have not made a threshold showing that they have a protected liberty or

4    property interest, the court dismisses their due-process claim.

5

6    **4. Equal Protection**

7        The plaintiffs bring a claim on behalf of the plaintiffs in the United States for violation of

8    equal protection.[135]

9        The Due Process Clause of the Fifth Amendment incorporates a guarantee of equal protection

10   and prohibits unjustified discrimination by federal actors. *United States v. Navarro*, 800 F.3d

11   1104, 1112 n.6 (9th Cir. 2015) (citing *Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954)). Courts

12   assess equal-protection claims against federal actors under the Fifth Amendment in the same way

13   that they assess equal-protection claims against state actors under the Fourteenth Amendment. *Id.*

14   (citing *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975)). The plaintiffs argue that the

15   government's termination of the CAM Parole Program and its mass-rescission of conditional

16   approvals of parole violate equal protection because the decisions were substantially motivated by

17   discriminatory intent and animus against Latinos, as evidenced by President Trump's history of

18   purported slurs and epithets toward Latinos.[136]

19       The termination of the CAM Parole Program and the rescission of conditional approvals of

20   parole affect the admission of foreign nationals into the United States.[137] As the Supreme Court

21   held in *Trump v. Hawaii*, "a circumscribed inquiry applies to any constitutional claim concerning

22   the entry of foreign nationals." *Trump*, 138 S. Ct. at 2420 n.5.

23

24   _____

     [135] Compl. – ECF No. 1 at 43 (Count IV header). The plaintiffs do not bring an equal-protection claim
25   on behalf of any beneficiary children outside the United States. *See id.*

26   [136] *Id.* (¶¶ 144–45).

     [137] The government did not rescind parole for beneficiaries who were in the United States at the time it
27   terminated the CAM Parole Program. *See Termination of the Central American Minors Parole
     Program*, 82 Fed. Reg. at 38,927.

28

The *Trump* case is instructive here. That case involved a challenge to the government's so-called "travel ban," a presidential proclamation limiting entry by foreign nationals from eight countries; most of the countries are predominately Muslim. *Trump*, 138 S. Ct. at 2405. The plaintiffs there argued that the primary purpose of the proclamation was to discriminate against Muslims. *Id.* at 2417. In support of their discrimination claims and as evidence of religious bias against Muslims, the plaintiffs cited purportedly anti-Muslim statements that President Trump made. *Id.*

In rejecting the plaintiffs' challenge, the Supreme Court wrote that "[f]or more than a century, this Court has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Trump*, 138 S. Ct. at 2418 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). The Court acknowledged that "although foreign nationals seeking admission have no constitutional right to entry, this Court has engaged in a circumscribed judicial inquiry when the denial of a visa allegedly burdens the constitutional rights of a U.S. citizen." *Id.* at 2419. "But [the Court] limited [its] review to whether the Executive gave a 'facially legitimate and bona fide' reason for its action." *Id.* (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 769 (1972)). "Given the authority of the political branches over admission, [the Court] held that 'when the Executive exercises this delegated power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification' against the asserted constitutional interests of U.S. citizens." *Id.* (internal brackets omitted) (quoting *Kleindienst*, 408 U.S. at 770).

The test that the Supreme Court applied in evaluating the presidential proclamation was whether "it is impossible to 'discern a relationship to legitimate state interests'" and "the policy is 'inexplicable by anything but animus.'" *Id.* at 2420–21. The Court held that the proclamation was premised on legitimate purposes, namely, "preventing entry of [foreign] nationals who cannot be adequately vetted and inducing other nations to improve their practices." *Id.* at 2421. The Court upheld the proclamation as "a facially neutral policy denying certain foreign nationals the privilege of admission." *Id.* at 2423.

1    While the Court considered President Trump's statements about Muslims, *see id.* at 2420, it

2    declined to credit the plaintiffs' argument that President Trump's statements supported a

3    constitutional challenge to the proclamation:

4    > The entry suspension is an act that is well within executive authority and could
     > have been taken by any other President — the only question is evaluating the
5    > actions of this particular President in promulgating an otherwise valid
     > Proclamation. . . . [T]he Government has set forth a sufficient national security
6    > justification to survive rational basis review. We express no view on the soundness
     > of the policy. We simply hold today that plaintiffs have not demonstrated a
7    > likelihood of success on the merits of their constitutional claim.

8

9    *Id.* at 2423.

10    The plaintiffs' challenge here to the termination of the CAM Parole Program is analogous to

11    the *Trump* plaintiffs' challenge to the presidential proclamation. In both cases, plaintiffs residing

12    in the United States challenge government policies that prevent their foreign relatives from

13    entering the United States.[138] In both cases, "[i]t cannot be said that it is impossible to 'discern a

14    relationship to legitimate state interests' or that the policy is 'inexplicable by anything but

15    animus.'" *Cf. Trump*, 138 S. Ct. at 2420–21. The government's view is that parole should be used

16    "sparingly and only in individual cases" and that "[t]he practice of granting parole to certain aliens

17    in pre-designated categories in order to create immigration programs not established by Congress,

18    has contributed to a border security crisis, undermined the integrity of the immigration laws and

19    the parole process, and created an incentive for additional illegal immigration."[139] These are

20    facially legitimate and bona fide reasons for terminating the CAM Parole Program. *Cf. Jeanty v.*

21    *Bulger*, 204 F. Supp. 2d 1366, 1377–78, 1381 (S.D. Fla. 2002) (finding that discouraging mass

22    migration of Haitians to the United States by applying parole criteria in a more restrictive manner

23    was a "facially legitimate and bona fide reason[]" for changing from a policy of favoring parole

24

25    [138] While the plaintiffs here are bringing an equal-protection claim under the Fifth Amendment, and
     the plaintiffs in *Trump* brought an Establishment Clause claim under the First Amendment, the
26    Supreme Court "ha[s] reaffirmed and applied its deferential standard of review across different
     contexts and constitutional claims." *Trump*, 138 S. Ct. at 2419.

27    [139] *See* Kelly Memo – ECF No. 33-5 at 10 (AR000030); *accord* Exec. Order 13,767, 82 Fed. Reg. at
     8795–96.

28

1   for certain low-risk Haitian nationals arriving in the United States to a policy of limiting parole),

2   *aff'd sub nom. Moise v. Bulger*, 321 F.3d 1336 (11th Cir. 2003). Because the government has

3   facially legitimate and bona fide reasons for terminating the CAM Parole Program, here, as in

4   *Trump*, the court cannot "look behind the exercise of that discretion, nor test it by balancing its

5   justification' against the asserted [equal-protection] constitutional interests of [the plaintiffs]." *Cf.*

6   *Trump*, 138 S. Ct. at 2419 (quoting *Kleindienst*, 408 U.S. at 770).[140]

7          Citing cases that do not involve the admission of foreign nationals into the United States, the

8   plaintiffs argue that the court should infer from President Trump's anti-Latino statements that the

9   government acted with discriminatory animus and thus violated their equal-protection rights. Their

10  arguments might carry more weight in the context of a program like the DACA or TPS programs

11  that involve only individuals located in the United States. *Cf. Regents III*, 908 F.3d at 518–20

12  (plaintiffs could plausibly plead an equal-protection that the government's decision to terminate

13  the DACA program was based on racial animus based on President Trump's anti-Latino

14  statements); *Ramos I*, 321 F. Supp. 3d at 1131–32 (same re the TPS program); *Ramos II*, __ F.

15  Supp. 3d __, 2018 WL 4778285, at *16–21 (same re the TPS program). But unlike the DACA or

16  TPS programs, the CAM Parole Program involves the admission of foreign nationals presently

17  outside the United States into the United States, and the court's review of constitutional equal-

18  protection claims thus is circumscribed. *Trump*, 138 S. Ct. at 2418–20 & n.5; *cf. Regents III*, 908

19  F.3d at 520 ("[DACA] differs from *[Trump v.] Hawaii* in several potentially important respects,

20

21  [140] The plaintiffs argue that these reasons do not match the government's actions in terminating the
    CAM Parole Program because, they allege, the Program operated on a case-by-case basis. Pls. Mot. to
22  Dismiss Opp'n – ECF No. 34 at 24. But the plaintiffs do not plead that the Program granted parole
    "sparingly," that it granted parole "only in individual cases," or that it did not "grant[] parole to certain
23  aliens in pre-designated categories in order to create immigration programs not established by
    Congress." Contrary to the plaintiffs' claims, there is no mismatch between the government's view
24  that parole should be granted sparingly and not used to create an immigration program not established
    by Congress and its decision to terminate the CAM Parole Program.

25     The plaintiffs also try to distinguish *Trump* by arguing that it was decided on a preliminary-injunction
    motion, not a motion to dismiss. Pls. Mot. to Dismiss Opp'n – ECF No. 34 at 23–24. They cite no
26  authorities to support their argument that a court cannot decide the question of whether the government
    has "facially legitimate and bona fide reasons" on a motion to dismiss. *Cf., e.g.*, *Bustamante*, 531 F.3d
27  at 1062–63 (evaluating whether government had a "facially legitimate and bona fide reason" for
    denying visa on a motion to dismiss).

28

including the physical location of the plaintiffs within the geographic United States") (citing *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 781 (9th Cir. 2014) (en banc)); *Ramos I*, 321 F. Supp. 3d at 1129 ("the TPS-beneficiaries here, unlike those affected by the Proclamation in *Trump*, are already in the United States" and hence "this case is unlike *Trump*; it does not implicate 'the admission and exclusion of foreign nationals,' who have 'no constitutional rights regarding [their] application' in light of the 'sovereign prerogative' 'to admit or exclude aliens'") (citing *Trump*, 138 S. Ct. at 2418; *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)); *Ramos II*, __ F. Supp. 3d __, 2018 WL 4778285, at *21 (same). The plaintiffs' general equal-protection cases are inapposite here.

The government has facially legitimate and bona fide reasons for terminating the CAM Parole Program. Because the court cannot test those reasons by balancing them against the plaintiffs' constitutional interests, *cf. Trump*, 138 S. Ct. at 2419–21, the court dismisses the plaintiffs' equal-protection claim.

## 5. Equitable Estoppel

The parties dispute whether equitable estoppel can be pleaded as an affirmative claim or whether it is only an affirmative defense.[141] The court need not resolve this question because the plaintiffs have not pleaded the elements of equitable estoppel as either a claim or defense.

Equitable estoppel requires that (among other things) the government engaged in "affirmative misconduct," which the Ninth Circuit has defined to mean a "deliberate lie" or "a pattern of false promises." *Socop-Gonzalez v. INS*, 272 F.3d 1176, 1184 (9th Cir. 2001) (en banc) (citing *Mukherjee v. INS*, 793 F.2d 1006, 1008 (9th Cir. 1986)). "Negligently providing misinformation to an alien does not meet this definition" and thus is insufficient to plead equitable estoppel. *Id.*

---

[141] *Compare* Defs. Mot. to Dismiss – ECF No. 32 at 25 ("'Equitable Estoppel is not an affirmative claim, but rather an affirmative defense.'") (quoting *Johnson v. Mazza*, No. 2:15-cv-09183-ODW(AS), 2016 WL 5842186, at *4 (C.D. Cal. Oct. 4, 2016)) *with* Pls. Mot. to Dismiss Opp'n – ECF No. 34 at 24 ("Ninth Circuit precedent recognizes an affirmative cause of action for equitable estoppel.") (citing *Watkins v. U.S. Army*, 875 F.2d 699 (9th Cir. 1989) (en banc)).

The plaintiffs allege that during the time between January and August 2017, when the government was purportedly engaged in a "secret shutdown" of the CAM Parole Program, (1) government web pages continued to represent that the Program was active and that participants should not delay in paying for plane tickets,[142] and (2) IOM contacted participants to solicit and accept payments for plane tickets.[143] This does not plead a deliberate lie or a pattern of false promises on the part of the government, as opposed to (for example) the government's negligently failing to update its websites and inform IOM of the purported shutdown (or IOM's not getting the message and inadvertently providing participants with incorrect information). The plaintiffs have not pleaded that the government engaged in a deliberate lie or a pattern of false promises, and the court thus dismisses their equitable-estoppel claim.

## CONCLUSION

The court grants in part and denies in part the defendants' motion to dismiss. The court denies the motion to dismiss the plaintiffs' APA claims as they relate to the government's mass-rescinding conditional approvals of parole made under the CAM Parole Program. In all other respects, the court grants the defendants' motion to dismiss.[144]

**IT IS SO ORDERED.**

Dated: December 10, 2018

_____
LAUREL BEELER
United States Magistrate Judge

---

[142] Compl. – ECF No. 1 at 21–22 (¶¶ 57–60).

[143] *Id.* at 20 (¶¶ 54–55).

[144] Because the court grants the defendants' motion to dismiss with respect to all claims other than a portion of the APA claims and President Trump is not named as a defendant in the APA claims, the court does not address the defendants' arguments regarding naming the president as a defendant.