UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| S.A., et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>DONALD J. TRUMP, et al.,<br><br>    Defendants. | Case No. 18-cv-03539-LB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Re: ECF No. 24 |

## INTRODUCTION

Under the Immigration and Nationality Act ("INA"), the Secretary of Homeland Security has discretion to parole foreign nationals into the United States "temporarily" and "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit[.]" 8 U.S.C. § 1182(d)(5)(A).[1] Parole does not constitute admission in a valid immigration or nonimmigrant status, but it allows a foreign national to enter and physically be present in the United States.

In 2014, the government instituted a program called the Central American Minors ("CAM") Program, which allowed parents who were lawfully present in the United States to apply to bring

---

[1] Section 1182(d)(5)(A) refers to the Attorney General, but pursuant to 6 U.S.C. § 557, that authority has now been transferred to the Secretary of Homeland Security. *See, e.g.*, *In re Arrabally*, 25 I. & N. Dec. 771, 777 n.5 (B.I.A. 2012).

their children and other qualifying family members in three countries — Honduras, Guatemala, and El Salvador, collectively known as the "Northern Triangle" — into the United States. A Program goal was to discourage children from making the long and dangerous journey from the Northern Triangle to the United States to try to reunite with their parents. The Program sought to achieve this goal by allowing applicant parents to apply for their beneficiary children while the children remained in their original countries.[2]

The CAM Program had two components: a refugee component and a parole component. U.S. Citizenship and Immigration Services ("USCIS"), an agency within the U.S. Department of Homeland Security ("DHS"), first evaluated beneficiaries to see if they qualified for refugee status (which, among other things, requires persecution or a well-founded fear of persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion"). If the beneficiaries qualified, USCIS referred them for approval as refugees under the CAM Refugee Program. If they did not qualify, USCIS automatically considered them for parole into the United States under the CAM Parole Program.

In January 2017, following a change in presidential administrations, President Donald Trump issued an Executive Order that (among other things) directed the Secretary of Homeland Security to "take all appropriate action" to ensure that DHS exercised its parole authority "only on a case-by-case basis" and "only when an individual demonstrates urgent humanitarian reasons or a significant public benefit derived from such parole." Exec. Order 13,767 § 11(d), 82 Fed. Reg. 8793, 8796 (2017). Beginning in January or February 2017, DHS stopped processing CAM Program applications — including the applications for beneficiaries who had been conditionally approved for parole and were awaiting processing to finalize their arrangements to travel to the United States — and began a review of the CAM Parole Program. In August 2017, DHS

---

[2] Some documents related to the CAM Program use the term "applicant" to refer to the parents present in the United States, while others use it to refer to the children or qualifying family members in the Northern Triangle countries. This order uses "applicant" to refer to the parents present in the United States, "beneficiary" to refer to the children or qualifying family members in the Northern Triangle countries, and "participant" to refer to applicants and beneficiaries.

announced that it was terminating the CAM Parole Program. It also announced that it was rescinding the decisions it had previously made under the Program for 2,714 beneficiaries whom it had conditionally approved for parole but who had not yet traveled to the United States.

The plaintiffs in this case — applicant parents lawfully residing in the United States who applied to the CAM Program, their beneficiary children in Northern Triangle countries, and the nonprofit immigrant-rights organization CASA — filed this putative class-action lawsuit, bringing claims under the Administrative Procedure Act ("APA"), the Due Process Clause, and the equal-protection component of the Due Process Clause, and a claim for equitable estoppel. The claims challenge as unlawful DHS's termination of the CAM Parole Program and its decision to rescind en masse its prior decisions to conditionally approve parole for the 2,714 beneficiaries (including named beneficiary-children plaintiffs in this case).

The defendants moved to dismiss the plaintiffs' claims. On December 10, 2018, the court granted in part and denied in part the defendants' motion to dismiss. *S.A. v. Trump*, __ F. Supp. 3d __, No. 18-cv-03539-LB, 2018 WL 6470253 (N.D. Cal. Dec. 10, 2018).[3] The court dismissed the plaintiffs' due-process, equal-protection, and equitable-estoppel claims and dismissed the APA claims challenging DHS's termination of the CAM Parole Program going forward. *Id.* The court denied the defendants' motion to dismiss the plaintiffs' APA claims challenging DHS's decision to mass-rescind conditional approvals of parole that issued before DHS terminated the Program in August 2017. *Id.* at *32–33. The court held that DHS acted arbitrarily and capriciously when it failed to take into account and address the serious reliance interests of participants who were conditionally approved for parole when it mass-rescinded those approvals. *Id.*

The plaintiffs moved for a preliminary injunction (1) enjoining DHS from terminating the CAM Parole Program and (2) vacating DHS's mass-rescission of conditional approvals of parole. With respect to the second request, the plaintiffs do not seek an injunction mandating that DHS admit any particular Program beneficiary into the United States. Instead, they seek only an order

---

[3] Order – ECF No. 51. Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

requiring DHS to continue to process the conditionally approved beneficiaries under the procedures that it had in place for processing the beneficiaries before it terminated the Program.[4]

The court held two hearings on the plaintiffs' motion: one on October 30, 2018 (a hearing on the plaintiffs' motion for a preliminary injunction and the defendants' then-pending motion to dismiss) and, following two rounds of supplemental briefing, a second hearing on February 14, 2019 on the plaintiffs' preliminary-injunction motion.

The court now grants in part and denies in part the plaintiffs' motion. Because the court dismissed the plaintiffs' claims challenging the termination of the CAM Parole Program going forward, it also denies the plaintiffs' motion to enjoin DHS from terminating the Program going forward. The court grants the plaintiffs' motion to enjoin DHS's mass-rescission of conditional approvals of parole, vacates the mass-rescission, and orders DHS to continue processing — under the DHS policies and procedures in place for processing beneficiaries before January 2017 — the 2,714 beneficiaries conditionally approved for parole.

### STATEMENT

The court's first order summarized the facts and allegations regarding the CAM Parole Program and the plaintiffs' claims. *S.A.*, __ F. Supp. 3d __, 2018 WL 6470253, at *3–19. The following facts are relevant to the plaintiffs' preliminary-injunction motion.

The CAM Program was structured as a dual refugee/parole program.[5] Under the CAM Refugee Program, certain Central American parents living lawfully in the United States could apply for their minor children and qualifying family members to be considered for refugee resettlement while the family members were still in in Honduras, Guatemala, and El Salvador.[6] Minor children and qualifying family members were accepted as refugees if they established that

---

[4] Pls. Suppl. Reply – ECF No. 67 at 3 ("Plaintiffs do not ask the Court to mandate a particular outcome in any given CAM application, but simply to require Defendants (including Border Patrol) to follow their own procedures that were in place during the last uncontested status.").

[5] Compl. – ECF No. 1 at 12 (¶ 37).

[6] *Id.*

they qualified for resettlement under U.S. law, that is, by demonstrating that they had a well-founded fear of persecution based on race, religion, nationality, membership in a particular social group, or political opinion.[7] If the minors and qualifying family members did not meet the eligibility criteria for refugee admission under the CAM Refugee Program, then they were automatically considered for parole under the CAM Parole Program pursuant to 8 U.S.C. § 1182(d)(5).[8]

Individuals had to apply to the CAM Refugee Program before they could be considered for the CAM Parole Program. The process was as follows.

First, a parent lawfully residing in the United States had to file an application with the assistance of a "resettlement agency" (a nonprofit organization partially funded by the government to welcome refugees into the country) and provide proof of identity, proof of legal status in the United States, and a passport photo of the beneficiary child.[9] Second, the International Organization for Migration ("IOM") — the intergovernmental organization that the State Department contracted to run its Resettlement Support Center in Latin America — invited the child to come to the capital of the country where the child was located so that IOM could interview the child, take the child's biometric data and background information, prepare a case file, and initiate security checks.[10] Third, USCIS verified the relationship between parent and child through documentary evidence and DNA tests.[11] (The parent had to pay for DNA testing, but USCIS reimbursed the parent if the testing confirmed a parent-child relationship.[12]) Fourth, USCIS conducted an interview with the child in the country capital.[13] Fifth, after confirming

---

[7] Id.; accord 8 U.S.C. § 1101(a)(42) (defining "refugee" as requiring, among other things, persecution or a well-founded fear of persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion").

[8] Compl. – ECF No. 1 at 12–13 (¶ 38).

[9] Id. at 14 (¶ 42(a)).

[10] Id. (¶ 42(b)).

[11] Id. at 14–15 (¶ 42(c)).

[12] Id. at 15 (¶ 42(c)).

[13] Id. (¶ 42(d)).

security-check results and DNA-test results, USCIS made a determination on the refugee application and notified beneficiaries of that determination by either a decision letter or a phone call.[14] For beneficiaries who received letters, if refugee status was denied, the letter checked one of several boxes to explain the reason for the denial and outlined the process to request a review of the refugee determination.[15] The letter then indicated whether the beneficiary was eligible for the CAM Parole Program.[16]

If USCIS approved a beneficiary for the CAM Parole Program, the letter said:

> You have been conditionally approved for parole into the United States. Final approval is conditioned upon successful completion of any remaining clearances that are required in the screening process. These clearances include medical examination by a U.S. approved panel physician, completion of security clearance procedures, and verification of family relationships. Please see attached information sheet for next steps that must be completed for you to be paroled into the United States.[17]

If USCIS conditionally approved a beneficiary for parole, then the beneficiary had to undergo a medical examination in the country capital at the parent's expense.[18] USCIS told the beneficiary that "IOM will contact your relative in the United States to collect payment for the medical exam" and "[a]fter receiving payment, IOM will contact you to arrange your exam."[19] If the beneficiary cleared the examination, he or she received a medical clearance valid for six months.[20]

Next, USCIS told the beneficiary that "[i]f the medical results clear, IOM will contact your relatives in the United States to arrange for your flight" and "[a]fter IOM receives payment for your travel, [it] will submit the travel itinerary to USCIS."[21] After receiving the travel-itinerary

---

[14] *Id.* (¶ 42(e)).

[15] *Id.*

[16] *Id.*

[17] *Id.* at 15–16 (¶ 42(e)).

[18] *Id.* at 16 (¶ 42(f)).

[19] *Id.*

[20] *Id.*

[21] *Id.* (¶ 42(g)).

form from IOM, USCIS "will . . . [p]erform final security checks, [e]nsure the medical exam results remain valid until date of travel, and [v]erify that your relative still has a qualifying legal presence in the United States."[22] "[I]f we decide that you have met all requirements for parole under this program, we will issue Form I-512L, Authorization for Parole of an Alien Into the United States," and "IOM will give you this document and your plane ticket the day you fly to the United States."[23]

Finally, after travel arrangements were made, the beneficiary traveled to a U.S. port of entry, where DHS Customs and Border Protection could authorize parole for a period of up to two years.[24] USCIS told the beneficiary that it "will consider CAM parole extension requests for the duration of the program."[25]

When DHS terminated the CAM Parole Program in August 2017, it mass-rescinded its approvals of conditional parole for 2,714 children and family members who were still being processed (meaning, they were completing the remaining post-approval clearances and had not yet traveled to the United States).[26]

---

[22] *Id.* (¶ 42(h)).

[23] *Id.* (emphasis removed).

[24] *Id.* at 17 (¶ 42(i)).

[25] *Id.*

[26] *Id.* at 30 (¶ 83), 38 (¶ 120); Response to Queries, U.S. Citizenship & Immigration Servs., U.S. Dep't of Homeland Sec., *Termination of CAM Parole Program* (2017 RTQ) – ECF No. 33-9 at 5 (AR000048).

The court makes a clarification to a footnote in its prior order. The court stated there that "30% of interviewed beneficiaries were approved as refugees, and thus would not have been considered for parole. Of the remaining 70% of interviewed beneficiaries who were considered for parole, 69% were approved, which results in a parole-approval rate of approximately 99% (69/70)." *Id.* The court should have said that "*of the cases that have been issued decisions*, 30% of interviewed beneficiaries were approved as refugees, and thus would not have been considered for parole. Of the remaining 70%, 69% were approved, which results in a parole-approval rate of approximately 99% (69/70)." 2017 RTQ – ECF No. 33-9 at 5 (AR000048). USCIS placed approximately 14% of interviewed beneficiaries (or approximately 1,000 beneficiaries) on an apparent indefinite hold (in most cases so that USCIS headquarters could review the applicants' known or suspected gang affiliations). Report to Congressional Addressees, U.S. Gov't Accountability Office, *Refugees[:] Actions Needed by State Department and DHS to Further Strengthen Application Screening Process and Assess Fraud Risks* (July 2017) (2017 GAO Report) – ECF No. 25-12 at 75 (p. 68). Those beneficiaries would not have received a decision on their initial refugee applications (and thus would not have been considered for parole under the CAM Parole Program in the first instance). Additionally, USCIS also rejected or

**STANDARD OF REVIEW**

"A party can obtain a preliminary injunction by showing that (1) it is 'likely to succeed on the merits,' (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in its favor,' and (4) 'an injunction is in the public interest.'" *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (internal brackets omitted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "A preliminary injunction may also be appropriate if a movant raises 'serious questions going to the merits' and the 'balance of hardships tips sharply towards' it, as long as the second and third *Winter* factors are satisfied." *Id.* (internal ellipsis omitted) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011)). "'[T]he elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.'" *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (quoting *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012)).

**ANALYSIS**

**1. Success on the Merits**

**1.1 Governing Law**

"Likelihood of success on the merits 'is the most important' *Winter* factor; if a movant fails to meet this 'threshold inquiry,' the court need not consider the other factors, in the absence of 'serious questions going to the merits.'" *Disney*, 869 F.3d at 856 (citing *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc); *All. for the Wild Rockies*, 632 F.3d at 1134–35).

"However, 'once the moving party has carried its burden of showing a likelihood of success on the

---

disqualified 5% of CAM Program beneficiaries at the DNA-testing stage before reaching the interview stage. *Id.* at 74 (p. 67).

The court notes that "findings of fact and conclusions of law made by a court in granting a preliminary injunction are not binding at trial on the merits." *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 631 n.5 (9th Cir. 2016) (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). If later developments in this case provide further clarity or updates regarding these numbers, then the court will update its calculations accordingly.

merits, the burden shifts to the non-moving party to show a likelihood that its affirmative defense will succeed.'" *Id.* (quoting *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007)).

### 1.2 Application

The plaintiffs have shown a likelihood of success on the merits of their claims that DHS's decision to mass-rescind conditional approvals of parole violated the APA. As the order denying the defendants' motion to dismiss explained, the plaintiffs' filings and the administrative record show that DHS failed to take into account and address the serious reliance interests of those conditionally approved participants before mass-rescinding their approvals, and its failure to do so was arbitrary and capricious in violation of the APA. *S.A.*, __ F. Supp. 3d __, 2018 WL 6470253, at *32–33. The defendants have not shown a likelihood of success on an affirmative defense.[27]

The plaintiffs have satisfied the first preliminary-injunction factor.

## 2. Irreparable Harm

### 2.1 Governing Law

"A plaintiff seeking preliminary relief must 'demonstrate that irreparable injury is likely in the absence of an injunction.'" *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (quoting *Winter*, 555 U.S. at 22). "The analysis focuses on irreparability, 'irrespective of the magnitude of the injury.'" *Id.* (quoting *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999)). "There must be a 'sufficient causal connection' between the alleged irreparable harm and the activity to be enjoined, and showing that 'the requested injunction would forestall' the irreparable harm qualifies as such a connection." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) (citing *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981–82 (9th Cir.

---

[27] *See* Defs. Suppl. Opp'n – ECF No. 61 (not arguing that the plaintiffs have not shown a likelihood of success on the merits or that the defendants have shown a likelihood of success on an affirmative defense). The defendants argue that DHS can cure the APA violation, *id.* at 4, but that is not the same as arguing that there was no APA violation or that the plaintiffs have not shown a likelihood of success on the merits.

2011)). "However, a plaintiff 'need not further show that the action sought to be enjoined is the exclusive cause of the injury.'" *Id.* (quoting *M.R. v. Dreyfus*, 697 F.3d 706, 728 (9th Cir. 2012)).

## 2.2 Application

### 2.2.1 CAM Parole Program participants

#### 2.2.1.1 Harm

The Ninth Circuit has recognized in the context of asylum, withholding-of-removal, and Convention Against Torture cases that a plaintiff's physical danger in his or her home country can constitute irreparable harm. *Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011). Additionally, "'other important irreparable harm factors include separation from family members, medical needs, and potential economic hardship.'" *Id.* at 969–70 (internal brackets omitted) (quoting *Andreiu v. Ashcroft*, 253 F.3d 477, 484 (9th Cir. 2001) (en banc)); *accord Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (separation from family members is "a substantial injur[y] and even irreparable harm[]"); *Regents of the Univ. of Cal v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1046 (N.D. Cal. 2018) (*Regents I*) (same), *aff'd*, 908 F.3d 476 (9th Cir. 2018) (*Regents II*).

The plaintiffs submitted evidence that the CAM Parole Program participants are suffering irreparable harm from prolonged family separation and, with respect to the beneficiary-children plaintiffs, irreparable harm from the physical danger they face in their countries of residence. The named applicant-parent and beneficiary-children plaintiffs submitted declarations attesting to physical danger, as evinced by beatings, the murders of their relatives, and rape and murder threats made against them. Named plaintiff D.D. (who lawfully resides in the United States) and her daughter A.D. (who resides in El Salvador) submitted declarations discussing how gangs killed a boy outside A.D.'s house and how A.D.'s father was shot and killed in broad daylight as he picked up his children from school.[28] Named plaintiff J.A. (who resides in El Salvador) and her mother S.A. (who lawfully resides in the United States) submitted declarations that gang members

---

[28] D.D. Decl. – ECF No. 6-10 at 9 (¶ 5); A.D. Decl. – ECF No. 24-7 at 8 (¶¶ 2–3).

approached J.A., that one gang member threatened her to "date" him and if she refused, he would take her by force, "bad things would happen to [her]," and "[her] family would never see [her] again," and that girls who refuse to "date" gang members are often kidnapped, raped, and sometimes killed.[29] Named plaintiffs M.C. and J.C. (who live in El Salvador) and their father R.C. (who lawfully resides in the United States) submitted declarations that gang members killed a neighbor of M.C.'s and J.C.'s, that a gang member who physically attacked and raped other girls was harassing M.C. to be his "girlfriend" and threatened that "[she] was going to pay for it with [her] family" if she refused, and that gang members demanded that J.C. join their gang and, after he refused, beat him unconscious and sent him to the hospital, injuring him so badly that he had to have emergency surgery to remove his spleen and remained bedridden for a month.[30] Named plaintiff B.E. (who resides in El Salvador) and his father G.E. (who lawfully resides in the United States) submitted declarations that gang members murdered B.E.'s uncle (G.E.'s brother) right outside of his house and, after B.E.'s grandfather testified at his uncle's murder trial, were threatening to kill B.E. in retaliation.[31] The plaintiffs also submitted declarations discussing the harm they have suffered from their familial separations, including missing important life events and the opportunity to care for sick family members.[32] This familial separation and risk of physical danger constitutes irreparable harm. *Cf. Leiva-Perez*, 640 F.3d at 969–70.[33]

---

[29] S.A. Decl. – ECF No. 6-12 at 10–11 (¶¶ 16–17); J.A. Decl. – ECF No. 6-13 at 9 (¶ 6), 12–13 (¶¶ 21–24).

[30] R.C. Decl. – ECF No. 6-11 at 11–12 (¶¶ 19–21); M.C. Decl. – ECF No. 6-15 at 10 (¶ 13), 11–12 (¶¶ 21–25); J.C. Decl. – ECF No. 6-17 at 6 (¶¶ 5–9), 8 (¶ 15).

[31] B.E. Decl. – ECF No. 6-16 at 8–9 (¶¶ 5–10), 11 (¶ 21); G.E. Decl. – ECF No. 6-18 at 8 (¶¶ 6–7), 10 (¶¶ 20–21).

[32] D.D. Decl. – ECF No. 6-10 at 12–13 (¶ 28); R.C. Decl. – ECF No. 6-11 at 9 (¶ 8); S.A. Decl. – ECF No. 6-12 at 10 (¶¶ 14–15); J.A. Decl. – ECF No. 6-13 at 13 (¶ 25); M.C. Decl. – ECF No. 6-15 at 10 (¶ 12); B.E. Decl. – ECF No. 6-16 at 10 (¶ 18); J.C. Decl. – ECF No. 6-17 at 7 (¶ 13); G.E. Decl. – ECF No. 6-18 at 9 (¶ 13).

[33] The defendants do not meaningfully contest that the plaintiffs are suffering irreparable harm. *See* Defs. Opp'n – ECF No. 32 at 28 (arguing about the balance of harms but not contesting that CAM Parole Program participant plaintiffs are suffering irreparable harm); Defs. Suppl. Opp'n – ECF No. 61 (not contesting that Program participant plaintiffs are suffering irreparable harm); Defs. Further Suppl. Br – ECF No. 70 at 2 (same). The plaintiffs also note that DHS, in originally conditionally approving beneficiaries for parole in the first place (before mass-rescinding those conditional approvals), necessarily made a determination that such beneficiaries were sufficiently at risk of harm in their home

### 2.2.1.2    Causal connection

The defendants contend that they did not cause the harm to the plaintiffs of family separation and danger in their country of residence and that the plaintiffs thus have not shown a sufficient causal connection between the alleged irreparable harm and the activity to be enjoined.[34] The court disagrees.

The Ninth Circuit's and Supreme Court's decisions on the so-called "travel ban" are instructive on this point. Broadly speaking, the travel-ban cases involved presidential executive orders limiting immigrant and non-immigrant entry into the United States from several enumerated countries (most of which are predominately Muslim). In one line of cases, an individual U.S. citizen of Egyptian descent, Ismail Elshikh (together with the State of Hawaii) brought a suit to challenge the executive orders. Dr. Elshikh alleged that the second of these executive orders ("EO-2") prevented his mother-in-law, a Syrian national residing in Syria, from obtaining a visa to travel to the United States to reunite with their shared family. *Hawaii v. Trump*, 859 F.3d 741, 762 (9th Cir. 2017) (*Trump I*), *stay granted in part and denied in part*, *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017) (*Trump II*), *vacated as moot*, *Trump v. Hawaii*, 138 S. Ct. 377 (2017) (*Trump III*). Dr. Elshikh's mother-in-law had not visited the United States for over ten years (long before EO-2 was issued), and hence her separation from her family members had not been directly caused by the executive order. *See id.* The Ninth Circuit

---

countries to warrant awarding them parole. *See* Fact Sheet, Bureau of Population, Refugees, and Migration, U.S. Dep't of State and U.S. Dep't of Homeland Sec., *In-Country Refugee/Parole Program for Minors in El Salvador, Guatemala, and Honduras With Parents Lawfully Present in the United States* (Nov. 14, 2014), *available at* https://2009-2017.state.gov/j/prm/releases/factsheets/2014/234067.htm (last visited Mar. 1, 2019) ("An individual considered for parole may be eligible for parole if DHS finds that the individual is at risk of harm, he/she clears all background vetting, there is no serious derogatory information, and someone has committed to financially support the individual while he/she is in the United States."). The defendants do not meaningfully contest those DHS determinations either. *See* 2017 RTQ – ECF No. 33-9 at 6 (AR000049) (DHS expressly stating that in terminating the CAM Parole Program, it was not determining that children were no longer in danger).

[34] Defs. Further Suppl. Br. – ECF No. 70 at 2 ("The harm to these plaintiffs consists of continued family separation and potential exposure to violence in their countries—situations that were not caused by defendants. For the children-plaintiffs, living with the identified harms is the status quo. By terminating the CAM program, the Trump Administration removed the helping hand that the Obama Administration had extended, but it did not cause the underlying harm.").

nonetheless held that Dr. Elshikh's showing of "prolonged separation from family members" constituted irreparable harm warranting an injunction barring the government from enforcing the travel ban. *Id.* at 782–83. The Ninth Circuit thus implicitly held that the causal-connection requirement was satisfied in that case. On a petition for a writ of certiorari, the Supreme Court considered the Ninth Circuit's injunction and left it in place with respect to individuals in the United States and family members abroad. *Trump II*, 137 S. Ct. at 2087.[35] The Supreme Court did not stay or set aside the Ninth Circuit's injunction for failure to satisfy a causal-connection requirement. *See id.*

The Supreme Court subsequently vacated the Ninth Circuit's order as moot after the government rescinded EO-2 and replaced it with a new executive order ("EO-3"). *Trump III*, 138 S. Ct. 377. On Dr. Elshikh's (and Hawaii's) renewed challenge to EO-3, the Ninth Circuit once again held that Dr. Elshikh made a showing of irreparable harm warranting an injunction. *Hawaii v. Trump*, 878 F.3d 662, 698–99 (9th Cir. 2017) (*Trump IV*), *rev'd*, *Trump v. Hawaii*, 138 S. Ct. 2392 (2018) (*Trump V*). The Ninth Circuit thus implicitly reaffirmed that the causal-connection requirement was satisfied in that case. (The Supreme Court ultimately reversed *Trump IV* on the issue of whether the plaintiffs had shown a likelihood of success on the merits, without addressing the issue of irreparable harm or any causal-connection requirement. *Trump V*, 138 S. Ct. at 2423.)

While the Ninth Circuit's decisions in *Trump I* and *Trump IV* were ultimately vacated or reversed (on grounds unrelated to the irreparable-harm prong), the decisions nonetheless provide insight into the application of the causal-connection requirement here. *See generally Doe v. Trump*, 288 F. Supp. 3d 1045, 1069 n.15 (W.D. Wash. 2017) (*Doe I*) ("*[Trump v.] Hawaii I* . . . remains persuasive authority despite the Supreme Court's vacatur.") (citing *Orhorhaghe v. INS*, 38 F.3d 488, 493 n.4 (9th Cir. 1994)), *recons. denied*, 284 F. Supp. 3d 1182 (W.D. Wash. 2018) (*Doe II*). Like this case, those cases involved a U.S. resident plaintiff separated from family members

---

[35] The Supreme Court stayed the injunction with respect to foreign nationals who did not have a "credible claim" of a "bona fide relationship" with a person or entity in the United States. *Trump II*, 137 S. Ct. at 2088.

living outside the United States. As in this case, in those cases the government was not the immediate direct cause of the familial separation, which long predated the government's actions. The Ninth Circuit nonetheless affirmed injunctions in those cases, thereby implicitly holding that there was a sufficient causal connection in those cases between the alleged irreparable harm (prolonged familial separation) and the activity to be enjoined (the government's travel ban preventing family members from traveling to the United States) to warrant injunctive relief. The court here similarly finds that there is a sufficient causal connection between alleged irreparable harm (prolonged familial separation and physical danger to the beneficiary-children plaintiffs) and the activity to be enjoined (the government's mass-rescission of beneficiaries' conditional parole into the United States). *Cf. Trump I*, 859 F.3d at 782–83; *Trump IV*, 878 F.3d at 698–99; *see Nat'l Wildlife*, 886 F.3d at 819 ("[A] plaintiff 'need not further show that the action sought to be enjoined is the exclusive cause of the injury.' . . . Irreparable harm may be caused by activities broader than those that plaintiffs seek to enjoin.") (quoting *M.R.*, 697 F.3d at 728).

The defendants also argue that even if the court were to vacate DHS's mass-rescission of conditional parole, DHS would retain discretion whether to ultimately grant or deny parole to any conditionally approved beneficiary. Whether DHS retains discretion or whether CAM Parole Program participants lack an enforceable "right" to parole in any individual case does not vitiate the causal connection or render injunctive relief inappropriate. *Cf. Kuang v. U.S. Dep't of Def.*, 340 F. Supp. 3d 873, 920–21 (N.D. Cal. 2018) (holding that "[d]elaying naturalization applications after applicants have been promised an expedited path to citizenship constitutes irreparable harm" and that "[w]hile Plaintiffs have no 'right to naturalization,' they can still suffer irreparable harm from unjustified delays in the process") (quoting *Kirwa v. United States*, 285 F. Supp. 3d 21, 42 (D.D.C. 2017)), *appeal docketed*, No. 18-13781 (9th Cir. filed Dec. 17, 2018); *see also Doe I*, 288 F. Supp. 3d at 1064–65 (executive order and agency memo that suspended certain derivative refugees from being able to enter the United States inflicted harm even if derivative refugees would be subject to additional requirements before they could enter the United States in any event because "[w]hether [a derivate refugee] has other hurdles to cross . . . does not diminish the fact that the [] provisions of the Agency Memo adds two more" and thus causes harm).

Vacating DHS's mass-rescission of conditional parole removes at least some of the hurdles, if not all, to the beneficiary-children plaintiffs' ability to travel to the United States and relieve the harm they and their parents suffer. As the Ninth Circuit has recognized, "[i]t is not an abuse of discretion for a court to issue an injunction that does not completely prevent the irreparable harm that it identifies." *Nat'l Wildlife*, 886 F.3d at 822.[36]

### 2.2.2 CASA

#### 2.2.2.1 Harm

The Ninth Circuit has recognized that an organizational plaintiff's suffering "ongoing harms to [its] organizational missions" can constitute irreparable harm. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). Courts within this circuit have granted preliminary injunctions to organizations on the basis of harm to the organizations' missions, reputations, goodwill, and funding.[37] For example, in *East Bay Sanctuary Covenant v. Trump*, __ F. Supp. 3d __, No. 18-cv-06810-JST, 2018 WL 6660080 (N.D. Cal. Dec. 19, 2018) (*East Bay II*), *appeal docketed*, No. 18-17436 (9th Cir. filed Dec. 26, 2018), four legal and social-services immigration organizations

---

[36] The court extended the defendants (and the plaintiffs) the opportunity to submit supplemental briefing specifically on the causal-connection requirement. Req. for Suppl. Briefing – ECF No. 69. The defendants did not cite any cases on point that establish that the causal-connection requirement has not been satisfied here.

The defendants first cite *Winter v. National Resources Defense Council, Inc.*, 555 U.S. 7 (2008). The plaintiffs there sought to enjoin the Navy from conducting sonar exercises that the plaintiffs alleged harmed marine mammals. *Id.* at 16–17. The plaintiffs' ultimate legal claims there, however, were that the Navy had to prepare an environmental-impact statement ("EIS"), not that it had to stop conducting sonar exercises. *Id.* at 32. The portion of the *Winter* opinion that the defendants cite is dictum about what the appropriate relief after a final judgment might be and how a permanent injunction barring sonar exercises (as opposed to an injunction tailored to the preparation of an EIS) might be an abuse of discretion. *Id.* at 32–33. This case does not address the causal-connection requirement for irreparable harm on a preliminary injunction. The defendants also cite *Fiallo v. Bell*, 430 U.S. 787, 792 (1977), to argue that the exclusion of aliens is a "fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control," and *Bruker v. City of New York*, No. 93Civ.3848(MGC) (HBP), 2003 WL 256801, at *6 (S.D.N.Y. Feb. 4, 2003), and *Gebhardt v. Nielsen*, 879 F.3d 980, 988 (9th Cir. 2018), to argue that the plaintiffs have no due-process right to reunite with their families. These arguments go to the merits of the plaintiffs' claims, not the separate issue of irreparable harm and its attendant causal-connection requirement. *Cf. Leiva-Perez*, 640 F.3d at 969 (consideration of irreparable harm should be "determined apart from merits issues").

[37] While purely monetary harm is not normally considered "irreparable," it may be irreparable in certain contexts, including in APA cases because the APA does not permit recovery of monetary damages. *Azar*, 911 F.3d at 581 (citing 5 U.S.C. § 702).

argued that a government rule that makes anyone who crosses the U.S. southern border somewhere other than at a designated point of entry ineligible for asylum, inflicted irreparable harm on the organizations. *Id.* at *7–8. The court there held that "the Organizations 'have established a likelihood of irreparable harm' based on their showing of serious 'ongoing harms to their organizational missions,' including diversion of resources and the non-speculative loss of substantial funding from other sources," warranting a preliminary injunction. *Id.* at *13 (citing *Valle del Sol*, 732 F.3d at 1029). Similarly, in *Doe I*, 288 F. Supp. 3d 1045, two organizations that provide services to and help resettle refugees in the United States argued that an executive order and agency memo suspending certain derivative refugees from entering the United States inflicted irreparable harm on them because resources that the organizations had devoted to resettling refugees would be wasted, and the organizations would have to divert resources to address fears raised by the executive order and agency memo, cancel established programs, lose relationships and goodwill with volunteers and community partners, and lay off employees. *Id.* at 1061–62, 1066. The court there held that "[i]n short, the Agency Memo threatens the organizational Plaintiffs' mission, services, and goodwill, and therefore causes them irreparable harm," warranting a preliminary injunction. *Id.* at 1082–83; *accord Doe II*, 284 F. Supp. 3d at 1185.

Named plaintiff CASA is an immigrant-rights organization whose mission is to improve the quality of life in low-income immigrant communities, including by offering a wide variety of social, health, job-training, employment, and legal services to immigrant communities, and advocating for immigrant rights and social justice.[38] CASA's Chief of Programs and Services submitted a declaration that CASA has devoted significant resources over the life of the CAM Program to help members apply for the Program, to engage in a major education and outreach campaign to inform members about the Program, and to seek out partnerships with refugee-resettlement nonprofits who could submit Program applications on behalf of its members.[39] A significant number of CASA staff worked on the CAM Program (two managers, three paralegals,

---

[38] Escobar Decl. – ECF No. 24-2 at 2 (¶¶ 3–5).

[39] *Id.* at 3–4 (¶¶ 8–13).

four organizers, and 25 volunteers) and invested approximately 6,000 staff hours (equivalent to approximately $125,000 in salaries paid), a significant investment of CASA's time and resources.[40] In the wake of DHS's mass-rescinding conditional approvals of parole for Program beneficiaries, CASA had to divert more resources to assist its members affected by the mass-rescission in finding alternative legal options for their family members and was forced to redirect resources, including altering staff and volunteer work plans and reassigning employees who had assisted with the CAM Program and had built considerable expertise with the Program.[41] CASA also suffered damage to its reputation as a trusted provider to a vulnerable community, because applicant families are frustrated because the CAM Program's long application process in many cases proved unfruitful, and many believe that CASA has placed them at risk of being targeted by the government's anti-immigrant policies as a result of their submitting significant private information (including DNA, addresses, and other confidential details) to the government as part of the Program's application process.[42] This impairment of CASA's organizational mission, loss of reputation and goodwill, and financial impairment constitutes irreparable harm. *Cf. East Bay II*, __ F. Supp. 3d __, 2018 WL 6660080, at *13; *Doe I*, 288 F. Supp. 3d at 1082–83; *Doe II*, 284 F. Supp. 3d at 1185.

### 2.2.2.2    Causal connection

The court finds a sufficient causal connection between the irreparable harm that CASA claims that it suffers (impairment of its organizational mission, loss of reputation and goodwill, and financial impairment) and the activity to be enjoined (the government's mass-rescission of conditional parole), for the same reasons that apply to the CAM Parole Program participants.

The defendants argue that CASA is not suffering irreparable harm that can be remedied by injunctive relief because "[t]he harm [to CASA] has already occurred, is unlikely to recur, and is

---

[40] *Id.* at 3 (¶ 9).

[41] *Id.* at 5–6 (¶¶ 17–18).

[42] *Id.* at 5–6 (¶ 18).

unlikely to be remedied by a temporary stay."[43] The harms to CASA, however, are ongoing: for example, CASA is devoting resources on an ongoing basis to assist members affected by the mass-rescission in finding alternative legal options for their family members. *Cf. East Bay II*, __ F. Supp. 3d __, 2018 WL 6660080, at *13 (issuing preliminary injunction based on showing of ongoing harms to organizational missions, including ongoing diversion of resources to find alternatives to asylum).

*     *     *

The plaintiffs have satisfied the second preliminary-injunction factor.

## 3. Balance of Harms and Public Interest

### 3.1 Governing Law

Where the government is the party opposing the preliminary injunction, the third and fourth preliminary-injunction factors — assessing the harm to the opposing party and weighing the public interest — merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

### 3.2 Application

The plaintiffs have submitted evidence that they will suffer irreparable harm in the absence of injunctive relief. Additionally, the plaintiffs have shown a likelihood of success on the merits of their APA claims, and "[t]he public interest is served by compliance with the APA: '[t]he APA creates a statutory scheme for informal or notice-and-comment rulemaking reflecting a judgment by Congress that the public interest is served by a careful and open review of proposed administrative rules and regulations.'" *Azar*, 911 F.3d at 581 (quoting *Alcaraz v. Block*, 746 F.2d 593, 610 (9th Cir. 1984)).[44]

---

[43] Defs. Suppl. Opp'n – ECF No. 61 at 3; *accord* Defs. Further Suppl. Br. – ECF No. 70 at 5–6.

[44] The focus is not solely on the result, i.e., whether DHS, had it complied with the APA, nonetheless could have achieved the same result (mass-rescinding conditional approvals of parole) that the plaintiffs challenge here. "[T]he public interest is served from proper process itself." *Azar*, 911 F.3d at 581–82 (citing *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 976 (9th Cir. 2003)).

In opposition, the defendants argue that "[a]ny order that enjoins a governmental agency from enforcing statutes and executive orders promulgated by the duly-elected representatives of the people constitutes an irreparable injury that weighs heavily against the entry of injunctive relief" and that the balance of harms and public interest thus weigh in their favor.[45] This argument reaches too far. The APA is a statute promulgated by duly elected representatives too, and courts may enjoin an agency when it violates the APA. *Regents II*, 908 F.3d at 512 (preliminary-injunctive relief "is commonplace in APA cases"); *see also Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1088 (N.D. Cal. 2018) ("The risk of interference with governmental actions inheres in any public injunction, but that does not categorically bar such injunctions. While courts must exercise particular caution in issuing injunctions on matters that concern immigration given Congress and the President's extensive authority in this arena, it is beyond peradventure that governmental decision[s], even those that concern [] immigration, are not immune from judicial review.") (citing *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001); *Osorio-Martinez v. Att'y Gen. U.S.A.*, 893 F.3d 153, 175 (3d Cir. 2018)). The defendants argue that the plaintiffs "seek[] to use the courts to undermine the policy consequences of an election."[46] But while a new administration may change the policies of its predecessor — "[e]lections have policy consequences," *S.A.*, __ F. Supp. 3d __, 2018 WL 6470253, at *31 (quoting *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015) (en banc)) — it may not violate the APA when it does so. *Organized Vill. of Kake*, 795 F.3d at 968 ("even when reversing a policy after an election," an agency must comply with the APA).

The defendants have not put forth evidence of how a preliminary injunction might cause them specific injury or harm in this case. The defendants do not point to any national-security threat posed by the CAM Parole Program participants here. They have not established that DHS would be unduly burdened if the court vacates its mass-rescission of conditional approvals of parole.[47]

---

[45] Defs. Opp'n – ECF No. 32 at 28.

[46] *Id.*

[47] The defendants submitted a declaration from USCIS's Chief of the International Operations Division that discusses the work USCIS and USCIS's third-party contractor, the International

The defendants' vague claims about burden generally are insufficient to establish that the balance of harms or the public interest favor their position. *Cf. Doe I*, 288 F. Supp. 3d at 1083 (issuing preliminary injunction where "Defendants have not put forth evidence of how a preliminary injunction might cause specific injury or harm [to Defendants] in this instance").

The plaintiffs have satisfied the third and fourth preliminary-injunction factors here.

### 4. Scope of the Injunction

#### 4.1 Governing Law

"'District courts have broad latitude in fashioning equitable relief when necessary to remedy an established wrong.'" *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (quoting *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010)). "The 'purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits.'" *Id.* (quoting *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir.

---

Organization for Migration ("IOM"), did to process beneficiaries that DHS had conditionally approved for parole. Rosenberg Decl. – ECF No. 61-1 at 2–3 (¶¶ 5–7). USCIS's contract and budget with IOM provided for two people in Honduras, one person in Guatemala, and two people in El Salvador (plus a third person spending 50% of his time) working on CAM Program processing. *Id.* at 3 (¶ 7). This included both post-approval processing for beneficiaries who were conditionally approved for parole and pre-approval processing for beneficiaries who were applying for parole (and refugee) status. Hr'g Tr. – ECF No. 75 at 6. Counsel for the defendants was not able to say how much time these spent solely on post-approval (and not pre-approval) processing for beneficiaries conditionally approved for parole (and not for refugee status), *id.* at 7, but logically it must be less than 100%.

USCIS's contract with IOM for CAM Parole Program processing ended in 2017. Rosenberg Decl. – ECF No. 61-1 at 4 (¶ 8). The defendants do not claim that USCIS could not enter into a new contract with IOM to process beneficiaries that DHS conditionally approved for parole, or, alternatively, that USCIS could not do that work itself or outsource it to another third party. The plaintiffs argue, and the defendants do not dispute, that IOM continues to work with USCIS to process beneficiaries who were approved as refugees. *See* M.C. Decl. – ECF No. 24-5 at 12 (¶¶ 4–7) (IOM processing refugee applications in June 2018); *accord* Hr'g Tr. – ECF No. 75 at 7–8 (plaintiffs' asserting, and defendants' not denying, that IOM is continuing to process refugee applications as late as January 2019). It thus appears that USCIS can make arrangements to process beneficiaries who were conditionally approved for parole.

The court also notes that the defendants did not offer any evidence of burden in their initial opposition to the plaintiffs' preliminary-injunction motion. *See* Defs. Opp'n – ECF No. 32 at 28–29. The court called for supplemental briefing and gave the defendants an opportunity to submit evidence on the burdens that the government might have to bear if it had to restart processing conditionally approved CAM Parole Program beneficiaries. Order – ECF No. 52 at 2. The defendants did not submit any evidence on this issue other than the one USCIS declaration. Defs. Suppl. Opp'n – ECF No. 61.

2009)). "The status quo ante litem refers not simply to any situation before the filing of a lawsuit, . . . . [which c]ould lead to absurd situations, in which plaintiffs could never bring suit once [unlawful] conduct had begun," but "instead to 'the last uncontested status which proceeded the pending controversy.'" *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)); *accord Boardman*, 822 F.3d at 1024 (quoting *GoTo.com*, 202 F.3d at 1210).

"'The scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff.'" *East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1255 (9th Cir. 2018) (*East Bay I*) (internal brackets omitted) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). "An injunction may extend 'benefit or protection' to nonparties 'if such breadth is necessary to give prevailing parties the relief to which they are entitled.'" *Id.* (quoting *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987)). "Equitable relief may 'be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *Id.* (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)).

"In immigration matters, [the Ninth Circuit] ha[s] consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis." *East Bay I*, 909 F.3d at 1255 (citing *Regents II*, 908 F.3d at 511; *Trump IV*, 878 F.3d at 701; *Washington*, 847 F.3d at 1166–67). "'Such relief is commonplace in APA cases, promotes uniformity in immigration enforcement, and is necessary to provide the plaintiffs here with complete redress.'" *Id.* (quoting *Regents II*, 908 F.3d at 512). While the Ninth Circuit has "recognize[d] a growing uncertainty about the propriety of universal injunctions," it recently reaffirmed that its cases affirming nationwide injunctions in the context of immigration enforcement are an "uncontroverted line of precedent." *Id.* at 1255–56.

The Ninth Circuit recently confronted issues regarding the scope of a preliminary injunction in the context of the Deferred Action for Childhood Arrivals ("DACA") program. *Regents II*, 908 F.3d 476. There, DHS made the decision to rescind DACA and announced that all DACA requests and applications for employment authorization would be rejected. *Regents I*, 279 F. Supp. 3d at

1026. The plaintiffs brought an APA challenge to DHS's rescission decision and sought a preliminary injunction.[48] The district court enjoined DHS from rescinding DACA and ordered it "to maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the rescission . . ., including allowing DACA enrollees to renew their enrollments, with [certain] exceptions[.]" *Id.* at 1048; *accord Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 409 (E.D.N.Y. 2018) (similarly enjoining DHS from rescinding the DACA program and ordering DHS to "continue processing both initial DACA applications and DACA renewal requests under the same terms and conditions that applied before September 5, 2017, subject to [certain] limitations"). It also ordered DHS to "post reasonable public notice that it will resume receiving DACA renewal applications and prescribe a process consistent with this order." *Regents I*, 279 F. Supp. 3d at 1048. It further ordered DHS to "keep records of its actions on all DACA-related applications and provide summary reports to the Court (and counsel) on the first business day of each quarter." *Id.* On appeal, the Ninth Circuit affirmed the district court's injunction, holding that the district court had the authority to vacate DHS's decision to rescind DACA on a nationwide basis and rejecting the government's arguments that the injunction should be narrowed. *Regents II*, 908 F.3d at 511–12.

### 4.2    Application

#### 4.2.1    The court's injunction

The court holds that an injunction similar to the one that the *Regents* district court issued and the Ninth Circuit affirmed is appropriate here and is necessary to preserve the status quo ante litem pending a final determination of the case on the merits.

The court first addresses the issue of what the status quo ante litem is (an issue disputed by the parties). The plaintiffs challenge not just DHS's formal announcement in August 2017 that it was mass-rescinding conditional approvals of parole but also DHS's decision in January or February

---

[48] The plaintiffs there also brought due-process and equal-protection claims and a claim for equitable estoppel, *Regents I*, 279 F. Supp. 3d at 1027–28, but the district court relied on only the APA claims in issuing a preliminary injunction, *see id.* at 1037–46; *accord Regents II*, 908 F.3d at 511 (affirming preliminary injunction on the basis of district court's "APA merits holding").

2017 to stop processing beneficiaries conditionally approved for parole without announcing that it was doing so (which the plaintiffs characterize as a "secret shutdown").[49] Given this context, the status quo ante litem is the point before January or February 2017 when DHS was still processing conditionally approved beneficiaries.[50] *Cf. GoTo.com*, 202 F.3d at 1210 ("The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy.'") (citation omitted).

To preserve the status quo ante litem, the court orders the following.

First, the court vacates DHS's decision to mass-rescind conditional approvals for the 2,714 beneficiaries conditionally approved for parole but who had not traveled to the United States. *Cf. Regents II*, 908 F.3d at 511–12 (affirming preliminary injunction vacating agency action that likely violates the APA and noting that "[s]uch relief is commonplace in APA cases").

Second, the court orders DHS to continue the post-conditional-approval processing for these 2,714 beneficiaries under the policies and procedures that it had in place prior to January 2017 for processing such beneficiaries, including the procedures described in USCIS's publication *Central American Minors (CAM) Parole Program: Information for Conditionally Approved Applicants* (Exhibit 48 in the administrative record).[51] *Cf. Regents I*, 279 F. Supp. 3d at 1048 (enjoining DHS from rescinding the DACA program and ordering DHS to maintain the DACA program on the same terms and conditions that were in effect before its attempt to terminate DACA, including with respect to DACA renewal applications); *Batalla Vidal*, 279 F. Supp. 3d at 409 (similarly enjoining DHS from rescinding the DACA program and ordering DHS to "continue processing

---

[49] The defendants do not deny that DHS stopped processing conditionally approved beneficiaries in January or February 2017. *See* Defs. Suppl. Opp'n – ECF No. 61 at 2.

[50] The court held that DHS's public announcement in August 2017 that it was terminating the CAM Parole Program mooted the plaintiffs' APA challenge to the "secret shutdown" as it relates to DHS's terminating the CAM Parole Program going forward. *S.A.*, __ F. Supp. 3d __, 2018 WL 6470253, at *32. By contrast, the plaintiffs' challenge here relates to the mass-rescinding of conditional approvals of parole that had already been issued. The alleged "secret shutdown" is relevant in determining the status quo ante litem with respect to that issue.

[51] U.S. Citizenship & Immigration Servs., *Central American Minors (CAM) Parole Program: Information for Conditionally Approved Applicants* (Nov. 23, 2015) – ECF No. 33-48.

both initial DACA applications and DACA renewal requests under the same terms and conditions that applied before September 5, 2017, subject to [certain] limitations").[52]

The court notes that the defendants have raised the prospect that, even if DHS's decision to mass-rescind conditional approvals of parole were vacated and the beneficiaries' conditional approval were restored, DHS might refuse to process the beneficiaries in good faith and instead might place the beneficiaries on an indefinite hold.[53] The court thus explicitly orders that DHS may not adopt any policy, procedure, or practice of not processing the beneficiaries or placing their processing on hold en masse. Instead, DHS must process the beneficiaries in good faith. Nothing in this order prevents DHS from placing any beneficiary's processing on hold on an individualized basis to the extent that it could do so under the policies and procedures it had in place prior to January 2017.

Third, the court orders DHS, by March 21, 2019, to submit to the court and counsel a plan for resuming processing the 2,714 beneficiaries, with benchmarks for assessing compliance. *Cf. Regents I*, 279 F. Supp. 3d at 1048 (ordering DHS to prescribe a process consistent with the court's injunction order); *Ramos*, 336 F. Supp. 3d at 1108–09 (ordering DHS to report to the court the administrative steps taken to comply with the court's injunction order); *see generally Thomas v. County of Los Angeles*, 978 F.2d 504, 510 (9th Cir. 1993) ("The district court is authorized to direct the submission of [] reports to ensure compliance with an injunction. Provided it is not 'overly burdensome,' such oversight can be a proper exercise of the district court's discretion 'because it helps ensure compliance with the injunction.'") (citing *Gluth v. Kangas*, 951 F.2d 1504, 1511 (9th Cir. 1991)).

---

[52] The court does not order DHS or USCIS necessarily to reengage IOM to process these beneficiaries. DHS and USCIS can opt to perform processing, use IOM, or contract with another third party.

[53] *See* Defs. Suppl. Opp'n – ECF No. 61 at 2 ("If the Court were to stay the August 2017 agency decision terminating that CAM Parole Program, as Plaintiffs request, the natural result would be for the program to return to the holding pattern it was in prior to that decision, not to active processing.").

Nothing in this order compels DHS to reach any particular outcome with respect to the processing of any individual beneficiary or prevents DHS from exercising its discretion with respect to the parole of any individual beneficiary.

Nothing in this order prevents DHS from reconsidering its decision to mass-rescind conditional approvals of parole, including reassessing the serious reliance interests of participants conditionally approved for parole.

### 4.2.2    The defendants' objections

The defendants raise several objections to the entry of a preliminary injunction.

The defendants first object that the preliminary injunction "does not seek to preserve the status quo, as plaintiffs posit. Instead, plaintiffs seek to alter the status quo, asking the Court to turn back the clock . . . and reinstate the [CAM Parole] program for applicants in the pipeline at the time it was officially terminated."[54] To the extent that the court's injunction "turn[s] back the clock," it does so to preserve the status quo ante litem, which — contrary to the defendants' claims — is not measured from the moment the plaintiffs filed their complaint but "instead to the 'last uncontested status which preceded the pending controversy.'" *GoTo.com*, 202 F.3d at 1210 (citation omitted).

The defendants argue that the plaintiffs did not file their complaint until ten months after DHS announced the termination of the CAM Parole Program and that this delay counsels against entry of an injunction. "But, 'courts are loath to withhold relief solely' because of delay, which 'is not particularly probative in the context of ongoing, worsening injuries.'" *Disney*, 869 F.3d at 866 (quoting *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014)). Also, here, a number of the plaintiffs initially responded to DHS's decision to rescind their conditional approvals of parole by first filing requests for review ("RFRs") of the decisions denying them refugee status under the CAM Refugee Program.[55] Two plaintiffs, M.C. and J.C., did not have their RFRs denied until June 2018.[56] The other plaintiffs who filed RFRs received no responses when they filed this

---

[54] Defs. Opp'n – ECF No. 32 at 15 (citations and internal quotation marks and brackets omitted).

[55] B.E. Decl. – ECF No. 6-16 at 11 (¶ 22); G.E. Decl. – ECF No. 6-18 at 10 (¶ 18); A.B. Decl. – ECF No. 6-14 at 10 (¶ 20); M.C. Decl. – ECF No. 24-5 at 12 (¶ 3); S.F. Decl. – ECF No. 24-6 at 11 (¶ 17).

[56] M.C. Decl. – ECF No. 24-5 at 12 (¶¶ 4–7).

action.[57] The delay is not suggestive of the plaintiffs' "sleeping on [their] rights," as opposed to the plaintiffs' possibly "waiting to file for preliminary relief until a credible case for irreparable harm can be made." *Cf. Arc. of Cal.*, 757 F.3d at 991.

The defendants argue that the plaintiffs are requesting a mandatory injunction that alters the status quo, rather than a prohibitory injunction that maintains the status quo, and that their request thus should be subject to a heightened standard. The Ninth Circuit has held, however, that preliminary injunctions "that prohibit enforcement of a new law or policy . . . [are] prohibitory," not mandatory. *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014); *accord Regents I*, 279 F. Supp. 3d at 1025–26, 1048 n.20 (where plaintiffs did not file their complaint for three months after DHS terminated the DACA program, court nonetheless held that its injunction vacating DHS's rescission of DACA and ordering DHS to continue processing DACA renewal applications was prohibitory, not mandatory, as it simply preserved the status quo ante litem). Nor does the fact that the injunction requires DHS to process conditionally approved beneficiaries transform the injunction into a mandatory one. DHS previously processed such beneficiaries during the status quo ad litem, and the court may order DHS to continue with that approach to maintain that status quo. *Cf. Regents I*, 279 F. Supp. 3d at 1048 (requiring DHS to receive and process DACA renewal applications); *Batalla Vidal*, 279 F. Supp. 3d at 409 (same).[58]

The defendants next object that a preliminary injunction would grant the plaintiffs the same relief that they ultimately seek in their complaint. But the Ninth Circuit has held that, at least in

---

[57] B.E. Decl. – ECF No. 6-16 at 11 (¶ 22); G.E. Decl. – ECF No. 6-18 at 10 (¶ 18); A.B. Decl. – ECF No. 6-14 at 10 (¶ 20); S.F. Decl. – ECF No. 24-6 at 11 (¶ 17).

[58] The defendants cite *Singh v. Carter*, 185 F. Supp. 3d 11 (D.D.C. 2016), to argue that the injunction here is mandatory. Defs. Opp'n – ECF No. 32 at 16. That case is inapposite. It involved a Sikh army officer who sought a permanent religious accommodation to allow him to wear uncut hair, a beard, and a turban as required by his faith but barred by Army grooming regulations. *Singh*, 185 F. Supp. 3d at 14. The Army had not previously granted the plaintiff a permanent accommodation that it later rescinded. (After the plaintiff filed his complaint, the Army granted him a temporary limited accommodation, but it never granted him a permanent one. *Id.* at 15.) The preliminary injunction the plaintiff sought thus would not have preserved a preexisting status quo but would have imposed new, never-before-instituted obligations on the Army. *Id.* at 17 ("the plaintiff's requested injunction is mandatory — that is, . . . its terms would alter, rather than preserve, the status quo by commanding some positive act"). Here, by contrast, a preliminary injunction would return to a preexisting status quo.

the context of APA challenges in immigration matters, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated," and the fact that vacatur is the ordinary relief provided on a final judgment does not undermine a preliminary injunction that vacates the agency's actions on a preliminary basis. *Regents II*, 908 F.3d at 511–12 (quoting *Nat'l Mining Ass'n v. U.S. Army Corps. of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)).[59]

The defendants next object that the court cannot enjoin the Secretary of Homeland Security's exercise of discretion with respect to parole decisions. This concern is misplaced. As stated above, the court does not enjoin the Secretary's exercise of discretion and does not require DHS to reach a particular ultimate decision on parole with respect to any given beneficiary. *Cf. Regents I*, 279 F. Supp. 3d at 1048 (issuing injunction but allowing DHS to exercise fair discretion on an individualized basis and not constraining DHS's ability to remove any individual DACA enrollee that DHS determines in its judgment should be removed); *Batalla Vidal*, 279 F. Supp. 3d at 437 (issuing injunction but holding that DHS "of course, may adjudicate DACA renewal requests on a

---

[59] The defendants cite *Taiebat v. Scialabba*, No. 17-cv-0805-PJH, 2017 WL 747460 (N.D. Cal. Feb. 27, 2017), to argue that a preliminary injunction that provides the same relief that the plaintiffs ultimately seek after a full judgment is improper. That case, which was not an APA case, is inapposite. The plaintiff there was a non-citizen who sought a writ of mandamus compelling USCIS to process his application for an adjustment of his immigration status. *Id.* at *1. The plaintiff sought a preliminary injunction compelling USCIS to process his application — the same relief he requested in his petition for a writ of mandamus. *Id.* at *2–3. The court denied the plaintiff's request for a preliminary injunction on the grounds that the plaintiff was not seeking to preserve any preexisting status quo and instead "[wa]s seeking a mandatory injunction that would require the government to immediately adjudicate his petition for adjustment of status." *Id.* at *3. Here, by contrast, a preliminary injunction would return the plaintiffs to a preexisting status quo.

The defendants also cite *University of Texas v. Camenisch*, 451 U.S. 390 (1981), to argue that "[i]t is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits." Defs. Opp'n – ECF No. 32 at 16 (citing *Camenisch*, 451 U.S. at 395). This argument does not change the outcome either. *Camensich* said nothing about the form that preliminary injunctive relief could or could not take: the question of a preliminary injunction in that case was moot, and the Court declined to address it. *Id.* at 394. What the Court was saying was that findings of fact and conclusions of law made by a court in granting a preliminary injunction are just that — preliminary — and do not bind the court at a trial on the merits. *Id.* at 395. As a result, it is inappropriate to enter a final judgment (such as a summary judgment) at the preliminary-injunction stage. *See id.* at 395–96. The court is not entering a final judgment here — and nothing in *Camenisch* holds that the scope of a preliminary injunction cannot overlap with the relief requested for an eventual final judgment.

case-by-case, individualized basis"). The court requires only that DHS follow the procedures that were previously in place with respect to processing conditionally approved beneficiaries.[60]

The defendants next argue that any preliminary injunction should be limited to the named plaintiffs who were CAM Parole Program participants. In support of this argument, the defendants cite *Azar*, 911 F.3d 558, where the Ninth Circuit narrowed a preliminary injunction issued in connection with a challenge to regulations promulgated under the Affordable Care Act from applying nationwide to applying only in those states that were plaintiffs in the case. *Id.* at 582–84.[61] The defendants do not explain how an injunction limited to the named individual plaintiffs in this case would provide full relief to CASA. *Cf. East Bay I*, 909 F.3d at 1256 (declining to narrow nationwide injunction where "the Government failed to explain how the district court could have crafted a narrower remedy that would have provided complete relief to the Organizations") (internal quotation marks and brackets omitted) (citing *Regents II*, 908 F.3d at 512). *Azar* also did not involve immigration, an area where the Ninth Circuit has "consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis" to "promote[] uniformity in immigration enforcement, and . . . provide the plaintiffs . . . with complete redress." *East Bay I*, 909 F.3d at 1255 (citing *Regents II*, 908 F.3d at 511–12; *Trump IV*, 878 F.3d at 701; *Washington*, 847 F.3d at 1166–67). "Because *Azar* did not involve immigration laws, it did not cast doubt on the Ninth Circuit's 'uncontroverted line of precedent' regarding nationwide injunctions in this context, which assuredly involve issues of 'nationwide impact.'" *East Bay II*, __ F. Supp. 3d __, 2018 WL 6660080, at *17 (citing *East Bay I*, 909 F.3d at 1256; *Azar*, 911 F.3d at 584).

Finally, the defendants argue that the court should remand DHS's decision to mass-rescind conditional approvals of parole to DHS for reconsideration, rather than enjoining or vacating

---

[60] *Accord* Pls. Suppl. Reply – ECF No. 67 at 3 ("Plaintiffs do not ask the Court to mandate a particular outcome in any given CAM application, but simply to require Defendants (including Border Patrol) to follow their own procedures that were in place during the last uncontested status.").

[61] Within those states, the injunction still applied statewide and thus affected nonparties beyond the named plaintiffs in the case.

DHS's decision.[62] (On February 27, 2019, two weeks after the second hearing in this case, the Director of USCIS submitted a declaration stating that USCIS is currently undergoing a reconsideration process that is expected to take approximately 60 days.[63]) The Ninth Circuit has affirmed the propriety of preliminary injunctions in APA cases staying or vacating agency action over remanding the matter to the agency. *See Regents II*, 908 F.3d at 511–12. While "'[a] federal court 'is not required to set aside every unlawful agency action,' and the 'decision to grant or deny injunctive or declaratory relief under APA is controlled by principles of equity,'" the defendants have not persuaded the court why it should decline to issue an injunction here. *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) (quoting *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995)). While DHS can consider the issue for as long as it wants, the court issues a preliminary injunction now to preserve the status quo ante litem.[64]

## CONCLUSION

The court grants in part and denies in part the plaintiffs' motion for a preliminary injunction. The court denies the plaintiffs' motion to enjoin DHS from terminating the CAM Parole Program going forward. The court grants the motion to require DHS to continue to process the 2,714 conditionally approved beneficiaries under the procedures that it had in place for processing the beneficiaries before it terminated the Program and orders the following:

1. DHS's decision to mass-rescind conditional approvals for the 2,714 beneficiaries conditionally approved for parole but who had not traveled to the United States is vacated.

2. DHS must continue the post-conditional-approval processing for the 2,714 beneficiaries under the policies and procedures for processing beneficiaries that it had in place before

---

[62] Defs. Suppl. Opp'n – ECF No. 61 at 4–7.

[63] Cissna Decl. – ECF No. 76-1 at 2 (¶ 2).

[64] *Compare id.* (stating 79 days after the court first issued its order denying in part the defendants' motion to dismiss that USCIS plans to reconsider the issue for an additional 60 days) *with NAACP v. Trump*, 298 F. Supp. 3d 209, 249 (D.D.C. 2018) (issuing preliminary injunction vacating DHS's decision to rescind DACA and staying injunction and giving DHS 90 days to better explain its decision).

January 2017, including the procedures described in USCIS's publication *Central American Minors (CAM) Parole Program: Information for Conditionally Approved Applicants* (Exhibit 48 in the administrative record). DHS is preliminarily enjoined from adopting any policy, procedure, or practice to not process the beneficiaries or to place their processing on hold en masse. Nothing in this order prevents DHS from placing any beneficiary's processing on hold on an individualized basis to the extent that it could do so under the policies and procedures it had in place before January 2017.

3. By March 21, 2019, DHS must submit to the court and counsel its plan for processing these 2,714 beneficiaries with benchmarks for assessing compliance.

4. Nothing in this order compels DHS to reach any particular outcome with respect to the processing of any individual beneficiary or prevents DHS from exercising its discretion with respect to the parole of any individual beneficiary.

5. Nothing in this order prevents DHS from reconsidering its decision to mass-rescind conditional approvals of parole, including the serious reliance interests of participants conditionally approved for parole.

**IT IS SO ORDERED.**

Dated: March 1, 2019

LAUREL BEELER
United States Magistrate Judge